Michael J. Bowe
(*pro hac vice* application forthcoming)
mbowe@brownrudnick.com
Lauren Tabaksblat
(*pro hac vice* application forthcoming)
ltabaksblat@brownrudnick.com
BROWN RUDNICK LLP
7 Times Square
New York, NY 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801

David M. Stein (#198256)
dstein@olsonstein.com
Olson Stein LLP
240 Nice Lane, #301
Newport Beach, California 92663
Telephone: (949) 887-4600

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| K.A.,<br><br>Plaintiff,<br><br>v.<br><br>MINDGEEK S.A.R.L. a foreign entity; MG FREESITES LTD, a foreign entity; MINDGEEK USA INCORPORATED, a Delaware corporation; MG PREMIUM LTD, a foreign entity; MG GLOBAL ENTERTAINMENT INC., a Delaware corporation; 9219-1568 QUEBEC, INC., a foreign entity; BERND BERGMAIR, a foreign individual; FERAS ANTOON, a foreign individual; DAVID TASSILLO, a foreign individual; VISA INC., a Delaware corporation; REDWOOD CAPITAL MANAGEMENT, LLC, a Delaware limited liability company; REDWOOD DOE FUNDS 1-7; COLBECK CAPITAL MANAGEMENT, LLC, a Delaware limited liability company; COLBECK DOE FUNDS 1-3,<br><br>Defendants. | CASE NO. 2:24-cv-04786<br><br>**COMPLAINT**<br><br>1. VIOLATIONS OF FEDERAL SEX TRAFFICKING LAWS [18 U.S.C. §§ 1591, 1594, 1595]<br>2. RECEIPT, TRANSPORT, AND DISTRIBUTION OF CHILD PORNOGRAPHY [18 U.S.C. §§ 2252, 2252A, 2255]<br>3. PUBLIC DISCLOSURE OF PRIVATE FACTS<br>4. INTRUSION INTO PRIVATE AFFAIRS<br>5. PLACING PLAINTIFF IN "FALSE LIGHT"<br>6. COMMON LAW MISAPPROPRIATION OF LIKENESS<br>7. STATUTORY MISAPPROPRIATION OF LIKENESS [California Civil Code § 3344]<br>8. DISTRIBUTION OF PRIVATE SEXUALLY EXPLICIT MATERIALS [California Civil Code § 1708.85] |

9.  NEGLIGENCE
10. UNFAIR COMPETITION
    [California Business &
    Professions Code §§ 17200,
    17500]
11. VIOLATION OF
    CALIFORNIA'S
    TRAFFICKING VICTIMS
    PROTECTION ACT
    [California Civil Code § 52.5]
12. INTENTIONAL INFLICTION
    OF EMOTIONAL DISTRESS
13. CIVIL CONSPIRACY

**DEMAND FOR JURY TRIAL**

COMPLAINT

Plaintiff K.A. ("Plaintiff"), through undersigned counsel, for her complaint against MindGeek S.a.r.l., MG Freesites Ltd d/b/a Pornhub ("Pornhub"), MindGeek USA Incorporated ("MindGeek USA"), MG Premium Ltd, MG Global Entertainment, Inc., and 9219-1568 Quebec, Inc. (collectively "MindGeek"); Bernd Bergmair, Feras Antoon, and David Tassillo (Bergmair, together with Antoon and Tassillo, the "Individual Defendants," and together with MindGeek, the "MindGeek Defendants");[1] Visa Inc. ("Visa"); Redwood Capital Management, LLC, Redwood Doe Funds 1-7,(collectively, "Redwood"); Colbeck Capital Management, LLC, Colbeck Doe Funds 1-3 (collectively "Colbeck") (Colbeck, together with the MindGeek Defendants, Visa, and Redwood, "defendants") for sex trafficking and conspiracy to benefit from a trafficking venture in violation of 18 U.S.C. §§ 1591, 1594, and 1595, for receipt, transport, and possession of child pornography in violation of 18 U.S.C. §§ 2252, 2252A, and 2255, and state statutory and common law violations, allege as follows:

## INTRODUCTION

1.    This is a case about rape and trafficking, not pornography.   And it is a case about each of these defendants knowingly and intentionally electing to capitalize and profit from the horrendous exploitation and abuse of tens of thousands of other human beings so they could make more than the enormous sums of money they would have otherwise made anyway.

---

[1]Bergmair, Antoon, Tassillo, and the U.S. partners of MindGeek purportedly sold their interests in MindGeek to the "pop-up" Montreal private equity firm Ethical Capital Partners in 2023.   Ethical Capital Partners is not an actual private equity fund and had no private equity with which to purchase MindGeek from its four owners.   Since the "sale," MindGeek has rebranded several of its corporate entities, including Defendants MindGeek S.a.r.l. (now Aylo Holdings S.a r.l.); MG Freesites Ltd (now Aylo Freesites Ltd.); MindGeek USA Incorporated (now Aylo USA Incorporated); MG Premium Ltd (now Aylo Premium Ltd.); and MG Global Entertainment, Inc. (now Aylo Global Entertainment, Inc.).

2.     From 2013 to 2023, MindGeek became the dominant, monopolistic online pornography company in the world.   During that period, it was directly dominated and controlled by its majority owner, Bernd Bergmair, and minority owners, Feras Antoon and David Tassillo, who also served as its CEO and COO, respectively.   These individuals built the MindGeek empire by knowingly and intentionally adopting an unrestricted content business model under which they would solicit and monetize all pornographic content without restriction, including child pornography and other nonconsensual content.

3.     In doing so, they did not merely provide a platform for others to post child pornography.   They embraced the practice and proactively assisted such users in maximizing the attention their content received.   They did this by rigorously analyzing and testing the performance of child porn and other nonconsensual content with users and search engines, determining how to maximize the attention such content received, and then working with users uploading the content to do so.   In essence, MindGeek used what it learned from analyzing content performance to turn images into marketing and advertising that would most effectively attract more users to its websites.

4.     MindGeek did this by creating a format in which the user uploaded an image into a template that called for added descriptive content; MindGeek instructed the user on how to use the descriptive template to generate more attention; and MindGeek shared and suggested with the user specific descriptions it had determined were most effective, including suggested titles, tags, and categories that MindGeek's search engine optimization analysis had determined drew the most attention to that particular type of content.   It was not until the user – with MindGeek's assistance, suggestions and sometimes direct instruction or intervention – had added the descriptive content to the image content that the product was added to MindGeek's website.   MindGeek then proactively drew attention to the content by combining it in playlists, suggested searches, and category libraries with other like described

1 content offered to users with similar interests.    MindGeek would also separately
2 upload the content to other websites it controlled.

3      5.      This plainly went far beyond the neutral provision of a platform to post
4 content.    It was collaborative content development in which MindGeek identified
5 descriptive content and messaging to add to the user's particular type of image
6 content and, thereby, enhance its viewership (for both the user and MindGeek's
7 benefit).

8      6.      The Individual Defendants controlling MindGeek knowingly and
9 intentionally included child pornography and other nonconsensual content in this
10 business model because they had a singular priority of dominating online
11 pornography, it materially helped them to do so, and they expected to make hundreds
12 of millions of dollars in the process.

13      7.      Doing so, however, also required massive financing and a means of
14 monetizing the content.    Colbeck and Redwood provided and arranged for the
15 hundreds of millions of dollars the Individual Defendants needed to acquire and
16 build the MindGeek Empire.    Before doing so and during the decade of such
17 financing, they were fully aware that MindGeek would be using the financing to
18 monetize child pornography and other nonconsensual content.    They knew this from
19 the extensive due diligence they did into the online porn industry and MindGeek in
20 particular before each of the several financings they provided; from their close
21 interaction with and reporting from the Individual Defendants; and from the
22 drumbeat of public reports throughout the decade of child pornography and other
23 nonconsensual content being disseminated and monetized on MindGeek's websites.
24 Nevertheless, they provided and continued to provide MindGeek hundreds of
25 millions of dollars in financing because they too had a singular focus on profits they
26 would earn from the exorbitant interest rates and other fees they could demand
27 because others were unwilling to finance this illicit business.

28      8.      Visa provided the means of monetizing the trafficked content that was

an integral part of MindGeek's march to market dominance.   Visa permitted its payment network to process all forms of payments MindGeek received from its participation in sex trafficking ventures, particularly from advertising fees it earned on ads placed next to trafficked content or from traffic generated from such content. Visa assisted MindGeek's monetization of child pornography and other nonconsensual content despite knowing it was doing so from Visa's own extensive market intelligence, its ongoing due diligence and monitoring of MindGeek, the drumbeat of public reports for a decade of such content being on MindGeek's websites, and from direct communications from victims and anti-trafficking advocates.   Nevertheless, Visa processed and continued to process financial payments for MindGeek because of the millions of dollars it was earning doing so.

9.     Plaintiff was 17-years old when her life was destroyed by the trafficking enterprise these defendants knowingly and intentionally joined to make more than the already enormous amounts of money they were already earning and would continue to earn even if they had not decided to earn more from child pornography.

**PARTIES**

**<u>Plaintiff</u>**

10.     Plaintiff K.A. is an individual who is now at the age of majority.   As alleged herein, K.A. is a victim of child sex trafficking.   At all relevant times, K.A. was a resident of Missouri.

**<u>Defendants</u>**

11.     Defendant MindGeek S.a.r.l. is a foreign entity organized and existing under the laws of Luxembourg.   MindGeek S.a.r.l. conducts business in the United States, including in this District.   MindGeek S.a.r.l., formerly known as Manwin, directly and indirectly owns and operates over 100 pornographic websites, production companies, and brands including Pornhub, RedTube, Tube8, YouPorn, PornIQ, gaytube, Thumbzilla, Peeperz, PornMD, Xtube, Brazzers, Babes.com, Reality Kings, Digital Playground, Twistys, Men.com, Mofos, MyDirtyHobby,

4

COMPLAINT

SexTube, and Webcams.   MindGeek S.a.r.l. also manages websites including Wicked Pictures, lesbea.com, and Playboy.   MindGeek S.a.r.l. owns and/or controls the majority of the pornography on the Internet, much of which it distributes for free, to any person with a web connection, regardless of age.   Although incorporated in Luxembourg, MindGeek S.a.r.l. operates out of Montreal, Canada, and has satellite offices in, among other places, Los Angeles, San Diego, and San Francisco, California.

12.     Defendant MG Freesites Ltd ("MG Freesites") (d/b/a Pornhub) is a foreign company incorporated in the Republic of Cyprus with a principal place of business at 195-197 Old Nicosia-Limassol Road, Block 1 Dali Industrial Zone, Cyprus, 2540.   MG Freesites conducts business in the United States, including in this District.   Through various intermediary entities, MG Freesites is a wholly owned subsidiary of MindGeek S.a.r.l.   MG Freesites owns, operates, and/or manages one or several of the pornographic websites owned by MindGeek, including Pornhub, and is controlled and operated by directors, officers, and employees working in MindGeek's offices in the United States and Canada.   MG Freesites' servers containing its redundant library of pornographic content, including the vast amount of child pornography uploaded to its sites since inception, are located in Waltham, Massachusetts as well as elsewhere in the United States and the world.

13.     Defendant MindGeek USA Incorporated ("MindGeek USA") is a corporation incorporated in the state of Delaware, with its principal place of business of 21800 Oxnard Street, Suite 150, Woodland Hills, California 91367.   MindGeek USA is a wholly owned subsidiary of MindGeek S.a.r.l., either directly or through intermediary companies also under the control of MindGeek S.a.r.l. and is used to support the operations of Pornhub and MindGeek's other tubesites through support services, industry outreach and influencing, lobbying, and media relations in the State of California.

14.     Defendant MG Premium Ltd ("MG Premium") is a foreign company

1   incorporated in the Republic of Cyprus with a principal place of business at 195-197

2   Old Nicosia-Limassol Road, Block 1 Dali Industrial Zone, Cyprus, 2540.   MG

3   Premium conducts business throughout the United States, including within this

4   District.   MG Premium is a wholly owned subsidiary of MindGeek S.a.r.l. through

5   intermediary companies but under the direct control of the three Individual

6   Defendants.   MG Premium owns and operates certain MindGeek premium and pay

7   sites that are supported by MindGeek's network of free tubesites which are used as a

8   means of creating traffic to, and revenues for, these premium services.   Those

9   premium sites are one of the more frequent subjects of advertisements placed on

10  Pornhub and other MindGeek tubesites, including its CSAM and others trafficked

11  content used to attract and more deeply engage users on those sites.

12       15.    Defendant MG Global Entertainment, Inc. ("MG Global

13  Entertainment") is a corporation incorporated in the state of Delaware, with its

14  principal place of business at 21800 Oxnard Street, Suite 150, Woodland Hills,

15  California 91367.   MG Global Entertainment is a wholly owned subsidiary of

16  MindGeek S.a.r.l., either directly or through intermediary companies, but is directly

17  controlled by the three Individual Defendants.   MG Global Entertainment is used to

18  support the operations of Pornhub and other MindGeek tubesites and paysites

19  through support services such as moderation, formatting, review, and approval of

20  content, industry outreach and influencing, lobbying, and media relations in the State

21  of California and throughout the United States.

22       16.    Defendant 9219-1568 Quebec, Inc. (d/b/a MindGeek) ("MindGeek

23  Canada") is a company organized and existing under the laws of Canada with a

24  principal place of business located in Montreal, though it conducts business

25  throughout the United States, including within this District.   It is a wholly owned

26  subsidiary through various intermediary entities of MindGeek S.a.r.l. but is directly

27  controlled by the three Individual Defendants.   MindGeek Canada directly employs

28  Defendants Antoon and Tassillo as well as the other employees who actually direct

1  and manage all of MindGeek S.a.r.l.'s purported subsidiaries and MindGeek S.a.r.l.
2  itself, which is along with all the MindGeek entities simply the alter ego of each
3  other and ultimately the three Individual Defendants who directly control them.

4      17.   Defendant Bernd Bergmair (also known as Bernard Bergmair) is a
5  resident of Hong Kong, China and was the majority owner of MindGeek until 2023.
6  Bergmair, while not formally an executive or employee of any MindGeek entity,
7  was, along with Antoon and Tassillo, their alter ego, and actually exercised ultimate
8  control over all such entities and their collective business, including being aware of,
9  endorsing, and approving the illegal activities alleged herein.

10     18.   Defendant Feras Antoon is a resident of Canada and was one of the
11  minority owners of all the MindGeek entities until 2023. He was also an employee of
12  MindGeek Canada and *de facto* CEO of all the MindGeek entities.   Antoon was,
13  along with Bergmair and Tassillo, the alter ego, and exercised control over all such
14  entities and their collective businesses, including being aware of, endorsing, and
15  implementing the illegal activities alleged herein.

16     19.   Defendant David Tassillo is a resident of Canada and was one of the
17  minority owners of all the MindGeek entities until 2023.   He was also an employee
18  of MindGeek Canada and *de facto* COO of all MindGeek entities.   Tassillo was,
19  along with Bergmair and Antoon, the alter ego, and exercised control over all such
20  entities and their collective businesses, including being aware of, endorsing, and
21  implementing the illegal activities alleged herein.

22     20.   As set forth herein, MindGeek has incorporated numerous subsidiaries
23  and sister companies around the world for the purpose of avoiding liabilities and to
24  hide the identity of the entities and individuals behind its corporate actions.
25  Consistent with this objective, MindGeek S.a.r.l, and all other MindGeek entities
26  operate as a single business enterprise solely dedicated to producing, distributing,
27  and monetizing pornography on the Internet.   As alleged herein, in doing all acts
28  alleged in this complaint, and as a business generally, MindGeek S.a.r.l and all of its

1  subsidiary and sister companies were and are alter egos of one another and ultimately

2  the alter egos of the three Individual Defendants.

3       21.    More specifically, although the MindGeek business was run during the

4  period covered by the complaint through hundreds of subsidiaries, affiliates, and

5  related parties located in dozens of jurisdictions throughout the world, in reality this

6  entire structure is a sham and the alter ego of the Individual Defendants, each of

7  whom actually exercises direct control over the entire organization despite not being

8  directors or executives of the vast majority of these entities and not otherwise having

9  standing to do so in any capacity consistent with the corporate form.   This corporate

10  structure was not created and is not maintained for any legitimate business purpose

11  or need of the organizations and has no economic substance but instead to

12  (a) circumvent tax, money transfer, and pornography laws in the United States and

13  other countries in which MindGeek actually does business; (b) facilitate self-dealing;

14  (c) obscure MindGeek's ownership, business practices, and transfers of money;

15  (d) impede regulatory scrutiny and enforcement; and (e) insulate the Individual

16  Defendants from legal accountability.

17       22.    In doing so, the MindGeek Defendants operate as a single business

18  entity run by the Individual Defendants by, among other things, (a) being directly

19  dominated and controlled by the three Individual Defendants in their capacity as

20  owners; (b) commingling their funds and other assets, failing to segregate funds

21  between them, and diverting corporate funds and assets without authorization for

22  noncorporate uses; (c) treating each other's assets as their own; (d) holding

23  themselves out as being personally liable for the debts of each other; (e) failing to

24  keep *bona fide*, accurate, and complete corporate and financial records; (f) using the

25  same business locations and employing the same employees; (g) failing to adequately

26  capitalize; (h) using each other as a conduit for a single venture of themselves;

27  (i) failing to maintain arm's length relationships among themselves; and (j) diverting

28  assets without consideration from/to one another to the detriment of creditors,

1     including Plaintiff.

2         23.     Recognition of the privilege of separate existences between the

3     Individual Defendants and the MindGeek Defendants would promote injustice,

4     unfairness, and fraud.   The sham corporate structure was established and maintained

5     for illegal purposes and to insulate the Individual Defendants from liability when, in

6     fact, they were ignoring those corporate structure and distinctions in their actual

7     running of the business and directing the practices that give rise to this case.

8     Accordingly, any separateness is to be disregarded.   As such, the Individual

9     Defendants and MindGeek Defendants are jointly and severally liable in this action

10     as alter egos.

11         24.     In doing all things alleged herein, the MindGeek Defendants were

12     agents, servants, representatives, partners, joint venturers, affiliates, parents,

13     subsidiaries, and/or employees of each other in the acts and/or omissions herein

14     alleged.   The MindGeek Defendants were acting within the course and scope of their

15     authority as such agents, servants, representatives, partners, joint venturers, affiliates,

16     parents, subsidiaries, and/or employees and with the permission, authorization,

17     consent, and ratification of each other.

18         25.     Defendant Colbeck Capital Management LLC (Colbeck Capital) is a

19     Delaware limited liability company with its principal places of business at 888 7th

20     Avenue New York, New York 10106.   Colbeck Capital Management is the hedge

21     fund manager for the Colbeck hedge funds through which Colbeck Capital financed

22     the trafficking enterprise alleged below.

23         26.     Colbeck Doe Fund 1-3 ("Colbeck Funds" together with Colbeck

24     Capital, "Colbeck") are the hedge funds through which Colbeck Capital financed the

25     trafficking enterprise alleged herein.

26         27.     Redwood Capital Management ("Redwood Capital Management"), LLC

27     is a Delaware limited liability company with its principal place of business at 250 W.

28     55th Street, New York, New York 10019.   Redwood Capital Management is the

hedge fund manager for the other Redwood hedge funds through which Redwood Capital financed the trafficking venture alleged below.

28.    Redwood Does 1-7 (together with Redwood Capital Management, "Redwood") are the funds through which Redwood Capital financed the trafficking venture alleged herein.

29.    Defendant Visa Inc. ("Visa") is a corporation incorporated in the state of Delaware with a principal place of business at P.O. Box 8999, San Francisco, California 94128.   Visa recognized MindGeek as an authorized merchant and processed payment to its websites including but not limited to Pornhub, and continued processing payments for its business throughout the period covered by this Second Amended Complaint.

## JURISDICTION AND VENUE

30.    This action arises under the Trafficking Victims Protection Act ("TVPA"), 18 U.S.C. §§ 1589-1595, federal child pornography and sexual exploitation laws, 18 U.S.C. §§ 2252A, 2255, and state statutes and common laws.

31.    The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and has supplemental jurisdiction over pendent state-law claims under 28 U.S.C. § 1367.

32.    This Court has personal jurisdiction over defendants pursuant to, inter alia, 18 U.S.C. § 2255 because each defendant transacts business on a systematic and continuous basis in the United States and this District and/or has engaged in tortious misconduct here in violation of U.S. law, Rule 4(k)(2) of the Federal Rules of Civil Procedure which provides a federal forum for claims over the foreign defendants, and under the California long-arm statute, Cal. Civ. Proc. § 410.10, because each defendant, directly and through agents, transacts business within the state; committed tortious acts and omissions within the state; committed tortious injury in the state caused by an act or omission outside the state; regularly does business, engages in persistent course of conduct, and derives substantial revenue from services rendered

1  in the state; owns, uses, and possesses real property within the state; or is registered

2  to do business in and has consented to personal jurisdiction in this state.

3       33.    Among other things, defendants (i) directed their activities at United

4  States citizens and California residents, (ii) derived benefit from United States

5  citizens' and California residents' activities, (iii) created a substantial connection

6  with the United States and the state of California, (iv) engaged in significant

7  activities in the United States, including within California, (v) created continuing

8  contractual obligations between MindGeek and United States entities and citizens,

9  including California citizens, and (vi) caused foreseeable harm to plaintiffs in this

10  country, state, and district.

11       34.    Defendants have offices throughout the United States, including in this

12  State and in this District and conduct business directly related to the tubesites at issue

13  in this case both in this District and throughout the United States.   Specifically,

14  MindGeek USA and MindGeek Global Entertainment maintain their principal place

15  of business at 21800 Oxnard Street, Suite 150, Woodland Hills, California 91367.

16  Defendant Visa's principal place of business is located at P.O. Box 8999, San

17  Francisco, California.

18       35.    Moreover, the MindGeek Defendants conduct business in this country

19  and state through a network of shell entities which are registered to do business in the

20  United States and California, conduct business in this country and state, committed

21  tortious acts in this country and state, and committed tortious acts outside the country

22  and state that caused harm in the United States, California and this District.   These

23  putative shell entities, agents, and alter egos, include, but are not limited to,

24  California-based entities MG Billing U.S. Corp, MG DP Corp., MindGeek LLC, MG

25  Holdings Ltd.; U.S.-based entities MG Processing Corp., RK Holdings LLC, MG

26  Global Entertainment Inc., and MG Billings U.S.; and Defendants MindGeek S.a.r.l.,

27  MG Freesites Ltd, MindGeek USA.   Redwood and Colbeck also have principal

28  places of business in the United States, specifically in New York.

36.     The illegal materials that the MindGeek Defendants and its agents and alter egos solicit, fund, produce, modify, disseminate, advertise, and monetize are created in the United States, including in among other locations this state, uploaded in this country and State, and stored on servers in the United States.   Indeed, the MindGeek Defendants transmit millions upon millions of videos and images to and from this State and process millions of dollars through the State on an annual basis.

37.     Furthermore, MindGeek derives substantial profits from U.S-based operations, including from California-based users.   MindGeek's tubesites are some of the most trafficked websites on the internet, generating an enormous amount of revenue—over $460 million in 2018.   More recent estimates suggest that figure is low, as the online porn industry as a whole—which is dominated by MindGeek—may generate as much as $97 billion per year.   By comparison, Netflix generates approximately $11.7 billion in annual revenue.   In 2020, MindGeek's tubesites received an average of 3.17 trillion monthly web impressions, more than internet giants Amazon (2.58 trillion), Netflix (2.47 trillion), and Reddit (1.55 trillion), a significant percentage of which is comprised of U.S.-based users and generated from U.S.-based user uploads, including in California.   As of 2019, Los Angeles is the city with the fourth highest volume of Pornhub.com usage in the world.

38.     MindGeek profits from United States users, including California residents by, inter alia, (i) selling targeted advertising directed at United States-based citizens and California residents on free pornographic videos hosted on MindGeek's tubesites, (ii) selling MindGeek's Pornhub Premium service to United States residents and California residents for $9.99 per month, (iii) directly selling United States citizens and California residents a license to view MindGeek's ModelHub content, and (iv) selling customer data to United States and California residents.

39.     Additionally, MindGeek partnered and shared advertising revenue with numerous sex traffickers who reside in the United States and California, uploaded and distributed sexually explicit videos of the U.S. based plaintiff without her

knowledge or consent, and generated advertising revenue and other financial benefits from those uploads.

40.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in this District.   Further, MindGeek maintains an office in this judicial district and conducts substantial business within the district.

FACTUAL BACKGROUND

## I.    MindGeek's Basic Business Model.

41.    MindGeek owns dozens of websites commercializing pornography that fall into two general categories.   It operates free "tubesites" that contain free, purportedly user populated content, and premium "paysites" where it sells content, services, and merchandise.   MindGeek attracts users to its tubesites by providing valuable services, including the ability to access, download, upload, and exchange free content; assistance in finding content they wish to view and uploading content in a manner that will maximize its exposure; and messaging, file-share, crypto, VPN, and Tor services to allow them to communicate and exchange free content with other users privately and anonymously.   Users can also become so-called "verified" users or members of MindGeek's "ModelHub" program and earn a share of MindGeek revenues earned from their content.

42.    These offerings have value to users for many reasons beyond the mere access to free pornography and revenue sharing.   For many, the ability to share and widely disseminate content that they prefer on the largest online pornographic platform, develop an online presence and network with others with similar preferences, and receive, exchange, and view the content from others with similar tastes has great value, including being able to do so privately and anonymously in a manner that would be difficult for authorities to trace.   This is particularly so for predators who traffic in child pornography and other nonconsensual content because the wide dissemination of that content is part of the perverse gratification they

1    experience from their exploitation, and it allows them to connect and share with

2    others who possess similar preferences and content.

3         43.    In addition to being the largest internet pornography platform, users

4    who value being able to widely disseminate videos receive value from the robust

5    content development support MindGeek provides.   Specifically, MindGeek does not

6    simply provide a neutral platform or means to post content online; it proactively

7    helps the user associate substantive messaging to the image to enhance its ability to

8    garner attention.   This includes instructions on "how to" maximize attention with

9    suggested titles, descriptions, and categories that MindGeek's SEO analysis has

10   determined most effectively draw attention to that particular type of content,

11   including child pornography.   In addition, MindGeek's own formatters review and

12   modify this presentation as they deem appropriate for the same purpose, including

13   the actual titles, tags and categories, as well as the videos themselves.   And

14   MindGeek then proactively draws attention to the content by combining it with other,

15   similarly described content and suggesting it to others who MindGeek identifies as

16   likely to be interested in the form of proposed searches or playlists.

17        44.    This was a collaborative development of content that was materially

18   more than the image itself and which was also tailored to the nature of the image,

19   including in the case of child pornography and other nonconsensual content.   While

20   merely providing a platform to post an image that others could view might be

21   neutral, preparing specific messaging and associated descriptions that are tailored to

22   the image's content is not.

23        45.    For predators seeking to further their exploitation by widely publicizing

24   abusive content, this assistance is of enormous value.   Moreover, providing a

25   platform is a *de minimis* part of this value compared to MindGeek's substantive

26   addition to, and amplification of, the image's distinct characteristics of interest.

27        46.    MindGeek provides additional value by itself uploading the content to

28   websites other than the particular website the user chose to upload to – thus itself

1  becoming the content provider for that website.   It does this as a matter of course

2  with respect to some websites, and asks the user about others as part of their explicit

3  online agreement permitting MindGeek to use the content in exchange for the user's

4  ability to upload it.

5      47.   MindGeek offers these valuable services because it too receives great

6  value.   That is, the users provide the most valuable "coins of the realm" to

7  MindGeek's business model: traffic and content.   MindGeek uses this traffic and

8  content to (a) advertise and drive traffic to MindGeek and third-party "premium"

9  pornographic sites or services; (b) sell advertising for non-pornographic third-party

10 products and services; and (c) harvest data to identify user interests and optimize

11 their website content to attract even more traffic and content.   It also sells the data to

12 third-parties.

13     48.   The Gold Standard for generating traffic and obtaining content is to be

14 the top result for queries on search engines like Google.    To do this, MindGeek's

15 almost singular focus is Search Engine Optimization or SEO.    Indeed, publicly,

16 MindGeek did not even mention on its corporate website that it is involved in

17 pornography.   Rather, it described itself exclusively as a technology company

18 skilled in SEO and related services.    SEO is the science of optimizing a website's

19 ability to garner top search rankings and depends on many factors, but most

20 prominently, content volume, how well that content is described in detail, the

21 website's ability to capture and analyze user interactions and preferences, and traffic.

22     49.   In establishing the valuable mutual relationship between MindGeek and

23 its users, they enter into an explicit online agreement whereby the users agree, among

24 other things, that MindGeek can use the content in exchange for the services

25 MindGeek will provide.    Moreover, although the users also putatively agree to

26 follow the website's "Terms of Service" ("TOS"), there is a tacit understanding

27 between MindGeek and those trafficking in nonconsensual content that the TOS are

28 not enforced or real, which MindGeek communicates with the ubiquitous presence

1   and proactive promotion of such content on the websites themselves.

2       50.    For example, according to those TOS, content depicting racism, hate,

3   incest, and children (even by adults) were all banned but nevertheless omnipresent on

4   the platform.   Indeed, numerous versions of "underage," "teen," and "incest" were

5   consistently among the most searched search terms and popular results in

6   MindGeek's algorithmic video and search term suggestions.   Likewise, numerous

7   versions of "drunk," "drugged," "passed out," and others indicating incapacitation

8   were also among search terms sought most often by users and suggested by

9   MindGeek.   Irrespective of the TOS, the very loud messaging of MindGeek's

10   website was such content and users who sought to upload or view were welcome.

11   **II.   MindGeek's Trafficking Venture**

12       **A.   <u>The Pre-Online Porn Industry</u>**

13       51.    Prior to the explosion of online pornography, there was a relatively

14   effective federal and state statutory framework policing child pornography, other

15   non-consensual content, and copyright piracy in the porn industry.

16       52.    First, federal law mandates that "producers" of pornographic material

17   verify the age and consent of all performers via government-issued identification;

18   maintain specified signed records of such verification for inspection; and mark all

19   pornographic materials with disclosures certifying this verification had been

20   completed and where the records can be inspected.   It is a federal felony to violate

21   these requirements.   The statute also makes it a federal crime "for any person" to

22   "sell or transfer or offer for sale or transfer" any pornographic material that did not

23   contain the required age verification disclosures.   This imposed a compliance

24   obligation on those through whom porn producers sell or transfer content or offer to

25   do so.

26       53.    Second, federal and state laws throughout the United States criminalize

27   child pornography and impose near strict criminal liability for possessing or

28   distributing such content.   Federal law also required those who came into possession

1  of child pornography to report it to the National Center for Missing and Exploited
2  Children ("NCMEC").

3      54.    Third, federal and state laws also criminalized, among other things, sex
4  trafficking as well as benefiting from a sex trafficking venture, such as the
5  commercialization of pornography produced with trafficked individuals.   These anti-
6  trafficking laws provided substantial criminal and civil sanctions for producing or
7  monetizing non-consensual pornography, including child pornography.

8      55.    Fourth, copyright laws likewise imposed substantial criminal and civil
9  sanctions for willful copyright piracy.

10     56.    Collectively, these various legal regimes effectively policed child
11  pornography, nonconsensual content, and copyright infringement in the pre-online
12  industry.

13     **B.    MindGeek's "Unrestricted Content" Business Model.**

14     57.    The explosion of online porn overwhelmed the established porn industry
15  and existing legal regime governing it.   NCMEC published a study in 2020 reporting
16  that from 1998 to 2019 there was an "insatiable demand" for internet CSAM/child
17  pornography, with millions of reported instances of such videos posted online,
18  including 8.4 million in 2018, with a "trend toward more egregious sexual content in
19  later years."   The same was true for other forms of nonconsensual content including
20  adult sex trafficking, rape, and revenge porn.

21     58.    MindGeek was a primary driver of this metastasizing criminality.   To
22  secure the most traffic and content and, thereby, dominate search engine results, it
23  knowingly exploited the lag in awareness, capabilities, and enforcement concerning
24  online pornography to aggressively solicit, pay for, and curate and optimize child
25  pornography and other nonconsensual content on its websites.

26     59.    MindGeek's motivation for its unrestricted use of nonconsensual
27  content was its singular priority of using SEO to be the top search engine website
28  result in any porn related search.   As one insider explained, MindGeek's

sophisticated SEO went beyond merely acquiring content and traffic, and extended to

optimizing how that content was described:

> what happen[ed] with Pornhub . . . is the fight they have on
> Google results.   And that's where Pornhub lives or dies. . .
> the fight they've had with sites like Xvideos, or XHamster,
> or XXX and XVideos . . . the fight they've had with
> rankings is just crazy.   And that's the thing, . . . it[']s about
> the long searches, it[']s about the long tail that are the few
> searches but enough to matter.   And that's where instead
> of you looking for one keyword, you're looking for longer
> strings of words.   And whoever is having more content
> and more diverse content, wins.

60.   MindGeek's plan to "win" was an "unrestricted content" SEO model

that knowingly and intentionally solicited, optimized, and commercialized content of

any kind, including child pornography and other nonconsensual content, and avoided

any policy, process, or technology that would exclude illegal content or limit or even

slow the upload of content generally to its websites.   Like a soft-drink company

selling different beverage types and flavors to capture all existing consumer tastes,

MindGeek proactively sought to service demand for all pornographic tastes,

including tastes for child pornography, rape, extreme violence, racism and hate, and

other illegal acts like bestiality.   As one whistleblower explained, "there is a lot of

f***ed up sh*t that is going on" (asterisks added) on MindGeek's tubesites, and "it is

not an accident . . . ownership and management are clearly complicit . . . 100%"

because "[i]t's just money" they care about.

61.   MindGeek's unrestricted content model relied on three knowing and

intentional practices.   First, it systematically ignored the laws in the jurisdictions in

which it did business.   Second, it knowingly and intentionally created a faux

"moderation" process that was designed not to exclude child pornography and other

1   nonconsensual content but to proactively attract, optimize, and monetize it, while

2   also masking it from authorities.   Third, it proactively used its extensive SEO

3   technology to curate child pornography and other nonconsensual content by further

4   "optimizing" its descriptions, tags, titles, and video formats and arranging

5   recommended searches to find, and curate playlists of, such content.

6        **1.   MindGeek Systemically Ignores Pornography Laws.**

7        62.   From MindGeek's inception, it used a shifting, opaque, and Byzantine

8   international corporate structure to, among other things, avoid rigorous laws

9   governing pornography, particularly child pornography.   This structure obscured

10  MindGeek's ownership and operation from authorities and manufactured the fiction

11  that it was a Luxembourg company operating out of Cyprus.   It selected these

12  jurisdictions because they were havens for tax evasion, money laundering, and had

13  weak laws and enforcement related to pornography.   As a whistleblower explained,

14  "spreading the corporate structure out in hundreds of shells located in dozens of

15  jurisdictions allowed spreading of transactions out such that they did not raise

16  suspicion in any one country, and even if they did it was very difficult for that

17  jurisdiction to investigate the suspicion when much of the information was in other

18  jurisdictions."

19       63.   MindGeek used this corporate fiction to ignore pornography laws in the

20  United States in particular, where it generated most of its revenues, even though its

21  operations were clearly covered under those laws.   The United States was

22  MindGeek's largest market, and it maintained servers, subsidiaries, and numerous

23  payment processing agents in the United States to service that market.   Those U.S.

24  servers contained virtually all of its content.   When users uploaded content onto

25  MindGeek's tubesites, it was uploaded onto its U.S. servers, automatically

26  transferred to certain of its other tubesites, transferred to still other tubesites if the

27  uploader chose to do so, and transferred to other users via downloads or viewing, all

28  of which went through U.S. servers for any users in the United States (which was the

majority).   In addition, the vast majority of MindGeek's revenues were earned in, and the payments processed, through United States financial and banking institutions.

64.     MindGeek also took all of the content from libraries it acquired like Redtube, YouPorn, Fake Taxi, etc., and transferred that in bulk to its servers, including its U.S. servers, without any initial review at all, let alone verifying the content complied with 18 U.S.C. § 2257.

65.     All of these functions involved transferring pornographic content in and around the United States through U.S. servers and made MindGeek the largest pornography company selling, transferring, or offering to sell or transfer pornographic content in the United States under 18 U.S.C. § 2257.

66.     Indeed, in 2023, Defendant MindGeek S.a.r.l., on behalf of MindGeek USA and MG Freesites (which operates its tubesites), entered into a deferred prosecution agreement ("DPA") with the United States Attorney's Office of the Eastern District of New York for unlawful monetary transactions involving proceeds from sex trafficking based on content uploaded to Pornhub, YouPorn, and Redtube. In doing so, these defendants "admit[ted], accept[ted] and acknowledge[d] that it [was] responsible under United States law for the acts of its officers, directors, employees and agents with respect to" their tubesites involved in these transactions.

67.     Nevertheless, MindGeek used the fiction that it was not operating in the United States to systematically ignore 18 U.S.C. § 2257.   It did this because complying with those laws would have utterly frustrated its unrestricted content model and made it impossible for it to acquire the enormous library of user-uploaded content that its business plan depended on.   Among other things, complying with § 2257 would have prevented virtually all of MindGeek's so-called uploaded "amateur" content for which written consents were almost never acquired and, in any event, were universally unavailable.   It would also have excluded the ubiquitous pirated professional content for which users also did not possess the required

documentation.   And even if these hurdles could be overcome, complying with the law would have limited the amount of content that could be uploaded by excluding illegal content that MindGeek knowingly and intentionally intended to use to "win" the SEO race and dominate the online porn industry.   MindGeek ignored § 2257 even though it acknowledged internally that it was subject to the statute.

68.   Similarly, MindGeek ignored the federal law requiring it to report to NCMEC all child pornography it received and possessed on its servers (which included all its uploads of such content because they were all co-located on its United States servers).   Complying with this law would have also devastated its unrestricted content model by discouraging the upload of such content and flagging for U.S. authorities the scope of the problem and MindGeek's continued possession of such illegal content in the U.S.

69.   Similarly, MindGeek ignored Canada's federal laws related to pornography by likewise having no way to verify the consent of those appearing in its content.   In February 2024, Canadian authorities published findings of their investigation into MindGeek and found that it had, and continued to, violate Canadian law by failing to meet these requirements.   In doing so, they rejected MindGeek's claim that it was not subject to Canadian jurisdiction because it was headquartered in Luxembourg and operating out of Cyprus.   Rather, they found that MindGeek was headquartered and operating, in fact, in Canada.

**2.    MindGeek's Faux Moderation Process.**

70.    In addition to ignoring the applicable laws concerning pornography, MindGeek maintained an exclusively human, and completely performative, "moderation" function that was hopelessly under-staffed, under-resourced, and not actually tasked with excluding illegal or otherwise purportedly banned content. What it was actually tasked with was formatting the descriptive part of the content, based on MindGeek's SEO analysis, to maximize its SEO value and mask blatant descriptions of criminality.   Although MindGeek has publicly admitted every upload was reviewed, it was only reviewed long enough to format the descriptive part of the content, not moderate its legality.

71.    Likewise, although MindGeek publicly claimed it used technology to screen child pornography and other illegal content, it actually was not doing so to ensure such content was not uploaded.   MindGeek instead applied that technology to actively curate and optimize child pornography and other nonconsensual content to maximize its revenues just as it did with licit content.   MindGeek's knowing and intentional policy of not excluding any, and instead proactively optimizing all, content even extended to content that violated its equally performative TOS.

72.    MindGeek's motive in doing so was explicitly explained by its own Social Media Manager who publicly stated that it would be a "disaster" to try to restrict users and uploaders to adults—despite the TOS adult-only requirement— because "then no one would upload anything," it would "cost[] us money to verify," "devastate[] traffic," and "MindGeek loses money."

73.    This MindGeek spokesperson further warned that even pretextual restrictions that could be evaded easily would be unacceptable because most minors would not be able to figure out how to circumvent them: "you would get around them, a lot of people here would too but the large majority won't know how."   Thus, even though MindGeek's TOS technically required users to be 18, it plainly did not intend to actually prevent minors from accessing its websites because that would

1    limit traffic and content from adult and minor children alike.   This failure was not

2    mere indifference or negligence, it was proactive and intentional – the intent was to

3    capture and monetize such content.

4        74.    The same was true for child pornography and other nonconsensual

5    content.   As one insider explained, "they knew they were doing illegal stuff," but

6    they refused to take any steps to restrict content or traffic because it would restrict

7    SEO and revenue:

8            No doubt.   I'm sure . . . Were we planning any efforts to

9            stop that?   Absolutely not.   Because of views.   Every

10           time you put an extra layer of control on who watches, you

11           lose content.   And it[']s the same thing, in this case, if you

12           put an extra layer of control on what content goes up, you

13           lose content.   And content in this case is more pages, and

14           more pages is more results, more results is more paid

15           views.

16       75.    MindGeek's knowledge and intentional use of nonconsensual content

17   was widely understood within the company.   An insider explained one such

18   notorious example that was common knowledge internally:

19           I remember there was one girl, it was huge, from when I

20           was there.   But she always seemed, in the videos she never

21           looked okay.   Like I remember she was always high.   I

22           mean something that, according to the minimum rules of

23           decency, you would at least have a bit of the type of

24           thinking you know, 'is it okay to have this type of content?

25           Is she really, you know in a state where she should be

26           doing these videos?

27       76.    Thus, while non-pornographic tubesites with far less content uploaded

28   on a daily basis (and far fewer users seeking illegal conduct) employed tens of

1  thousands of trained and well-paid "moderators" and sophisticated technology to

2  ensure content was legal and complied with the terms of service, MindGeek's

3  exclusively human moderation team consisted over time of a handful to never more

4  than about 30 untrained, minimum wage contractors in Cyprus because of the

5  availability of cheap labor.   It was impossible for this group to genuinely moderate

6  the content, which would have required the careful review of 700-1200 videos a day

7  per moderator according to insiders, advocates, media sources, and others, including

8  the Canadian Privacy Commission in its 2024 report finding MindGeek's moderation

9  and other business practices violated Canadian law.

10      77.    In reality, the real function of these "moderators" was SEO formatting,

11  and they internally were called "content formatters," not "content moderators."   As

12  formatters, their task was not to moderate legality but to format the videos to

13  optimize SEO and to conceal explicit mentions of criminality.   To do this

14  formatting, they would add or edit the content title, tags, categories, and descriptions

15  to conform with MindGeek's algorithmic code words so that those algorithms could

16  most effectively categorize them, add them to playlists, and retrieve them in response

17  to searches.   They would also sometimes edit the video for the same purposes.

18      78.    Further, they "scrubbed" words in the titles and tags that unequivocally

19  indicated criminality.   While the red flags of criminality were removed, the video

20  would nevertheless be uploaded with optimized titles, tags, and descriptions that

21  would still permit internet and MindGeek search engines to suggest the video to

22  users searching for that illegal content.

23      79.    As an insider familiar with the process explained:

24      They basically went really fast with the content.   It's not

25      like they are watching every Pornhub video.   *They kind of*

26      *like would scroll through it, make sure that the titles didn't*

27      *have anything awful, and that's it.   And it's mostly about*

28

1
2
3

> *the titles you know?*   Because *in the end if you can't find it*
> *through a search, then no one who works against human*
> *trafficking will.   Right?*

4

(Emphasis added.)

5
6
7

80.   When MindGeek moderators identified titles or tags that too explicitly flagged illegal content, they would notify the user to change the title or change it themselves.   But MindGeek would not disable the illegal video or suspend the user. For example, a member of the Pornhub model program, whose revenues were shared with MindGeek, had multiple videos of underage women with titles indicating they were underage.   One video of an underage and incapacitated woman carried the viewer comments, "I thought she was dead until five minutes in" and "I don't think that girl is old enough to buy lottery tickets.   If you catch my drift."   The uploader originally titled the video, "delete your history after watching this," which obviously flagged the video as child pornography.   But then he changed the title and when asked why he did so by other users, he explained, "Pornhub support told me to change all titles."

8
9
10
11
12
13
14
15
16
17

81.   Moreover, formatting supervisors clearly communicated that actually screening questionable or even obviously illegal content was not the formatters' task. The goal was uploading content and formatting it for use, including nonconsensual content, according to the code words and instructions from the SEO analysis.   Thus, one insider explained that the woman with overall responsibility for formatting and ostensible "moderation" was a "sociopath" who would regularly "tell her team to just look the other way."   According to another insider, there was a motto drilled into formatters: "Don't f**k with the f**ker."   (Asterisks added).   As one whistleblower explained, a typical response to a formatter questioning legality of content would be: "Imagine the trouble I will get in if we report this and take time and we don't meet quota and you will lose your job."

18
19
20
21
22
23
24
25
26
27
28

82.   Put simply, as a former MindGeek employee told the *New York Times* in 2020, "[t]he goal for a content moderator is to let as much content as possible go through" to maximize revenues.   Indeed, MindGeek's yearly bonus system for its faux moderators was based on the number of videos they *approved* for upload.

83.   MindGeek also did nothing to remove or even investigate patently underage and nonconsensual content that was flagged by users.   To the contrary, it would take extraordinary steps to ignore, frustrate, or minimize the impact of those trying to flag illegal content.   For example, for seven years Pornhub contained a video of a completely unconscious girl with underdeveloped breasts clearly being physically assaulted and raped.   The title of the video was "dead pig half-opened eyes after being drugged."   That this title was literally true was painfully obvious from the video.   The rapist repeatedly displayed the victim's dilated, red eyes and even touched her eyeball to prove she was truly unconscious.   No moderator could have missed the obvious rape depicted in this video.

84.   Another example involved one of MindGeek's most popular partner channels (and a constant focus of its SEO optimization), "Exploited Teens Asia."   A representative video on this channel involved a young girl in a child's room surrounded by toys and stuffed animals.   She was being aggressively penetrated by an old man and she was crying out for him to stop.   Viewer comments demonstrated the obviously non-consensual nature of the video:

> Do we really know sex trafficking when we see it!!
> EXPLOITED TEENS ASIA she can't be older than 15 or
> 16.   This is a real victim.   In some moment she looks like
> she wants to cry.   You can see that she doesn't want this,
> you can see that she wishes he'd leave her alon[e]!   I can't
> believe 9k liked the image of an old perv humping a
> helpless GIRL!   Flag the f*** out of this and hopefully

1    pornhub will remove it.   My heart breaks for her.

2         (Asterisks added).

3    Others comments likewise identified this as rape: "She is crying 'kurushi' meaning

4    painful and begging him to stop!" and "She looks underage af."

5         85.   The video had been up for 3 years and received over 4 million views,

6    certainly performance that MindGeek SEO would have closely analyzed and tried to

7    recreate, and the comments had been up as much as 7 months before advocates called

8    out the video on Twitter.   In response, MindGeek kept the title, description, and

9    tags, and swapped out the video.   This was done because the SEO indicated that the

10   explicit titles were very effective in capturing internet traffic searching for child

11   pornography and other rape.

12        86.   Similarly, at the end of 2019, a video of an undeniably intoxicated and

13   incapacitated women being sexually assaulted was uploaded to Pornhub.   The video

14   was categorized as "homemade," titled as "Misadventures of a Drunk Girl," and

15   tagged in the category of "teen," "teenager, young drunk, funny."   The woman was

16   stripped naked, unable to walk or stand, crawled when she did move, and ultimately

17   was completely unconscious with her eyes rolled into the back of her head.

18
19
20

21
22
23
24
25
26
27
28

87.    Viewer comments such as, "so hot.   Love how drunk she is!",
confirmed her obvious incapacity as did, "I would take advantage of her all nite.
dude's smart for trying get her to drink more.   Bet he dumped loads in her stupid
c*nt.   I know I would."   (Asterisks added).



88.    Users who MindGeek directed to this video were then directed by
MindGeek's suggested search and video algorithms to equally clear cases of rape.
In one video, the drug needle used to render the victim unconscious was then inserted
into the vagina of the victim and zoomed in on.   These videos were on the site for
years and accompanied by numerous comments flagging them as obvious rape.

89.    Another video on Pornhub for over four years captured the rape of an
Indian woman.   The video was not professionally produced.   There was no indicia
of consent or performance.   Neither the uploader nor woman were identified.   The
woman was clearly in distress and desperately trying to hide her face.   Two years of
user comments plainly flagged the video as rape: "this is f***ing rape!!!!!!!
bastards!!!!!!!!" (Asterisks added).   MindGeek was aware of the video, its obvious
nonconsensual content, and the users' comments.   Rather than remove the video and
page, Pornhub instead censored the word "rape" from the comments and left the
video and its other tags and descriptions because they were effective in capturing

internet traffic searching for rape.

90.    For this video, MindGeek's suggested search algorithms directed viewers to similar rape videos, including a young teen woman in obvious distress, crying, and trying to cover her face while her rape was recorded.   The video is titled and tagged "amateur teen" and "hot Indian teen."

91.    Even worse, MindGeek also had no functioning process for victims of nonconsensual content to have that content removed, and instead actively worked to retain such content for SEO optimization.   Consequently, victims who tried to get nonconsensual content removed were typically ignored, stonewalled, and stalled as much as possible to preserve the use of the content for as long as possible.   This was especially a priority when the content was performing well, and MindGeek's SEO analysts were trying to use that data to refine their algorithms to effectively solicit similar content and traffic seeking such content.   Standard MindGeek practices to thwart takedowns included demanding information victims reasonably could not possess in many instances, like the URL, even though they had provided sufficient other information for MindGeek to locate it; or telling victims only the uploader could request a video be taken down, that the videos did not exist or could not be found when they did exist and could be found or had not even been searched for, and that the video had been taken down when it had not been.

92.    For example, one victim had the video of her rape uploaded to Pornhub with her personal information where it remained for months despite her desperate pleas until she hired a lawyer:

> It was terrifying, there were people on Twitter sharing
> screenshots of them buying a train ticket saying they were
> going to come and rape me.   I thought about killing myself
> it got so bad. Hundreds of thousands of people saw that
> video, which I didn't even know I still had.   It was
> devastating.   What a horrible, humiliating thing to do to

someone.   I moved in with a friend and put my flat on the

market because I thought I was going to get raped.   I had

to change my whole life – leave my job, withdraw from

almost everybody I used to work with.   I used to stay in

my room all weekend crying because I couldn't deal with

it.   He ruined my life.   I came off social media completely

and the only version of me that existed online was this

persona that he created.

93.     Moreover, when victims or authorities succeeded in getting MindGeek

to remove an illegal video, it would only disable the video but keep the webpage

with its title, description, tags, and comments so that the video, though disabled,

would still continue to increase SEO.   When a user searching for such content

landed on the disabled video's webpage, MindGeek's search algorithms would solicit

the user with similar videos to the one disabled.

94.     As one insider explained:

If you do [a takedown request] through Pornhub, then

Pornhub eliminates the video but keeps the page.   So that

page still has the titles and can still run from Google. . .

Because what they want is ad impressions, because that's

what they charge for, for their clients.   It's ad impressions,

ad impressions, ad impressions.

95.     Remarkably, MindGeek's indifference was so callous it extended to

even public outreach from victims, such as this victim who made her report to

MindGeek's Social Media Director on social media:

I was away on an international business trip when I met a

man at a hotel bar and went back to his room to have

sex . . . .   Recently my friend sent me a Pornhub video and

said it looked like me.   I looked at it and it was me having

1      sex in the hotel room with thousands of views.   My face

2      was clearly visible in parts.   The video had an insulting

3      title calling me a slut.   The channel it was on featured a

4      dozen other videos of the same guy having sex with

5      different women in hotel rooms with the same amateur

6      quality . . . .   I tried flagging the video with no results. I

7      want the video taken down and the guy punished, but I'm

8      really not sure what to do.

9      96.    Pornhub's only response to this report was to send the victim a link to

10 their site's takedown page.



25      97.    Not only did MindGeek not remove CSAM/child pornography it

26 became aware of on its tubesites, or report it to authorities, it actively discouraged

27 victims and others from reporting it to authorities and lied to do so.   For example,

28 MindGeek tried to convince a victim of CSAM/child pornography not to report its

1  presence on MindGeek's tubesites and lied about MindGeek's practice of not

2  removing such content unless forced to do so: "You don't need to report the urls to

3  an agency, just flag them it[']s very likely if it[']s not removed it not illegal

4  content. . . .   We do have access to our entire upload library, including deleted

5  videos and can confirm this."

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21



22      98.    Even for content that MindGeek was forced to take down, it did so in

23  the most limited fashion possible so as to minimize the impact on its SEO.   For

24  example, even where MindGeek verified that content was child pornography or other

25  illegal content, they would not terminate the account that uploaded it, disable the

26  user's ability to upload more content, search the account for other versions of the

27  content or other illegal content, track whether the content had been downloaded or

28  notify the downloaders that it was illegal.

99. Moreover, MindGeek took no steps to disable the website or internet registry links to the content to prevent it from triggering search engine results. Indeed, one can still run internet searches for known CSAM/child pornography or other non-consensual content that was ordered taken down by NCMEC or otherwise and the search will bring you to Pornhub even though that video is not enabled. MindGeek's algorithm will then direct you to similar non-disabled content. This was an intentional product of MindGeek preserving the SEO links to the video and its descriptors so they will be included in internet search engine results.

100. Much worse, according to multiple insiders, MindGeek systematically and surreptitiously would reupload content that it had been forced to disable and do so in a manner in which it appeared to have been reuploaded by independent users and which circumvented MindGeek's purported moderation. One eyewitness to this process explained that caches of disabled content "would be provided to employees on disks and they would be instructed to reupload those videos from non-MindGeek computers using specific email addresses that would allow the uploads to bypass MindGeek's purported 'fingerprinting' of removed videos. . . . They say they kept the stuff on the servers to cooperate with authorities but it was really so they could reupload."

101. MindGeek has stated publicly and repeatedly that it retains on its servers all videos ever uploaded onto its tubesites. This no doubt is necessary for its reuploading practice and to maximize optimization. MindGeek, therefore, has throughout its existence illegally possessed CSAM/child pornography, and reuploaded that CSAM/child pornography innumerable times. Indeed, MindGeek, with duplicative servers in the United States and Canada (among other locations) is likely the largest non-regulatory repository of CSAM/child pornography in North America.

102. Despite admitted possession of massive amounts of child pornography, until 2020, MindGeek never voluntarily made a single legally required disclosure to

authorities in the United States or Canada about that material under either countries' CSAM/child pornography laws.   MindGeek failed to do so even when its possession had been publicly reported.   For example, in 2019, 58 videos of a 15-year who was beaten and raped were posted on Pornhub.   These videos were ultimately removed, but as per the testimony of NCMEC during Canada's parliamentary investigation, MindGeek had never reported any instances of child sexual abuse to NCMEC as required by federal law or reported to NCMEC's counterpart under Canadian law until late 2020 when its business practices were revealed in the *New York Times* and it was forced to do so.

103.   Likewise, in early 2020, two videos of child pornography – one involving a toddler in diapers being abused and another of a pre-pubescent girl being anally raped – were located on Pornhub.   After multiple reports, MindGeek notified those flagging it that the video had been disabled, fingerprinted, and reported to NCMEC.   But according to NCMEC's own testimony, it was not reported to NCMEC.   Two months later, the same two videos were discovered back up on the site, uploaded by two separate user accounts.   Investigators submitted takedown requests to Pornhub that were ignored.   It was not taken down until it was reported to the FBI, the FBI notified NCMEC, and NCMEC issued a takedown order to Pornhub.   One reupload remained up for almost two weeks after the initial takedown requests and had over 20,000 views and an unknown number of downloads.   Even after it was removed, MindGeek left the title, tags, views and url live to continue driving traffic to the site using the child rape video.

104.   In addition to actually facilitating its monetization of nonconsensual content, MindGeek's faux moderation process also provided a public veneer of legality and plausible deniability to MindGeek and the Individual Defendants.   Since its inception, MindGeek frequently trumpeted its robust moderation processes that it falsely claimed employed well-trained moderators and advanced technology and prevented child pornography, other nonconsensual content, and violations of its TOS.

It maintained such false statements on its websites and in response to the many public reports to the contrary.

105.   This phony public portrayal of MindGeek's actual business model was essential to its agreement with payment processors like Visa and Visa's agent banks to continue processing payments for advertising and paysite subscriptions. Although, as set forth below, Visa and its agent banks were fully aware of MindGeek's actual business model and the falsity of its public portrayals, maintaining these public pretexts and window dressings provided these payment processors plausible deniability.

106.   And when such reports became so widespread that the Canadian Parliament held hearings, Antoon and Tassillo repeated this false narrative in sworn testimony.   For example, Tassillo testified that he could "guarantee you that every piece of content, before it's actually made available on the website, goes through several different filters," including several "different pieces of software" followed by review by moderators.   Tassillo claimed that "the human moderators will watch each one of the videos" and that "we always instruct all of our agents to err on the cautious side.   Basically, if you have any doubt at all, just don't let it up" to the tubesites.   He also testified that MindGeek reported "all cases to NCMEC."   None of this was true.

107.   When one whistleblower familiar with the moderation process heard their testimony, he said, "it is a lie."   This accusation was corroborated by the findings of the Canadian Privacy Commissioner in its 2024 report concluding even as of that date that MindGeek (now called Aylo) never employed "reasonable efforts" to ensure all its content was consensual, employed "completely inadequate control measures" that were "wholly ineffective," and "could only result in devastating consequences."   The Privacy Commissioner also found that as of 2024, MindGeek still "did not accept responsibility," had not "take[en] necessary corrective measures," acted "wholly inconsistent with an organization taking

responsibility for giving meaningful effect" to consent requirements, and "had not taken the necessary and responsible corrective measures to redress the significant privacy harm that was uncovered . . . It has not committed to follow our recommendations, nor has MindGeek proposed any meaningful alternative measures to address the contraventions identified" other than suing the agency to prevent it from issuing its finding and recommendations.   Among other examples, it noted that MindGeek continued to allow all content to be uploaded without any moderation for significant periods of time and that 70% of this content failed to meet its purported uploading criteria.

### 3. MindGeek's SEO Technology Actively Commercialized Nonconsensual Content.

108.   MindGeek intentionally did not deploy any technology to exclude non-consensual or other banned content even though it described itself as the leading SEO technology firm in the world and instead spent tens of millions of dollars on SEO technology and effort to optimize all its content, including child pornography and other nonconsensual content, in order to maximize revenues.

109.   Utilizing its bread and butter SEO technology to not just optimize and monetize legal content, but also enhance meaningful moderation would have been easily feasible, but MindGeek's unrestricted content model knowingly and intentionally wanted to utilize all content and traffic, even illegal content.   As one insider explained: "I've seen it, you can search any word, any video, you can look for the user, anything like any other database. . . . and the titles are there . . . so, why are they not searching for this and cleaning? . . . Because they want the content on their sites."

110.   Indeed, when certain content adversely affected SEO performance, it was removed using the same SEO capabilities.   For example, through its constant analysis, MindGeek determined that male homosexual content on its more popular tubesites was interfering with its impressions and conversions because when the

suggested video and search algorithms suggests a gay video, a material percentage of users exited the website.   Accordingly, MindGeek affirmatively worked to reduce such content on the site by deleting it, transferring it to other sites, segregating, and suppressing it.   No similar steps were taken when it became aware of illegal, nonconsensual content in its SEO work.

111.   This was a knowing, deliberate, and detailed business decision made by Bergmair, Antoon and Tassillo at the ownership level.   As an insider explained, "[w]ell they know, they know everything that's going on . . . they are very involved. For sure. . . . would Feras know?   Absolutely.   Would David know? Absolutely." But, he further explained, "they don't care" and "don't' even check" because all they care about is SEO and revenues.

112.   The Individual Defendants' knowledge and intent to proactively embrace and monetize child pornography and other nonconsensual content existed from the start.   Each of Bergmair, Antoon, and Tassillo were already doing so at the respective online porn websites they were running prior to their 2013 acquisition. This issue was one each focused on in considering that transaction and its business risks and in their business planning throughout the decade they operated it.   This included talking about it with the lenders, prospective lenders and investors, payment processors, employees, and government agencies, including PayPal, which terminated its relationship with MindGeek in 2019 because of illegal content. Throughout this period, and as set forth more fully below, all three Individual Defendants discussed and decided how they would proceed, with Bergmair as the majority shareholder having the final say and Antoon and Tassillo handling the direct day-to-day implementation.

113.   Thus, in their testimony to the Canadian Parliament, Antoon and Tassillo explicitly stated that from the beginning they were aware of this risk, and considered it a priority and responsibility for them individually as the heads of the business and owners.   Although it was not truly a priority to prevent it, it was true

1    they knew about and set the policy to embrace it.   And, accordingly, when these

2    issues exploded in 2019-2023, they, along with Bergmair, were directing

3    MindGeek's response.

4          114.   As the majority shareholder actively managing the business, Bergmair

5    was also individually aware and involved from the beginning in MindGeek's

6    embrace of nonconsensual content.   And he was directly involved in the response to

7    the tsunami of criticism that MindGeek received in 2019-20 and did nothing even

8    after the fallout resulted in Visa and Mastercard suspending the business relationship.

9    Instead, he left Antoon and Tassillo in place and sanctioned their performative public

10   announcements of improvements that were designed to actually minimize any impact

11   of increased moderation.   He took no steps because none of this was news to him or

12   contrary to the plan he and Antoon and Tassillo had always agreed upon.

13         115.   Thus, MindGeek incorporated all illegal content into its SEO process

14   just like it did all other legal content.   Nonconsensual content that was performing

15   well was analyzed, refined, and tested to amplify that performance, and the lessons

16   learned were used to optimize similar content and proactively provide uploaders and

17   users preferred titles, tags, and category descriptions as well as suggested searches

18   and playlists to watch.   Thus, when a user sought to upload content, they would be

19   directed and assisted in adding to the content detailed titles, descriptions, tags, and

20   categories, and MindGeek would provide suggestions and preexisting terms to use

21   based on its SEO analysis.

22         116.   For example, in its explanation of "How to Succeed" on Pornhub's

23   website, the MindGeek Defendants directed users to use up to 16 tags that describe

24   the video and performers; select up to 8 relevant categories; when applicable, use

25   niche specific categories to ensure content is visible to the "right" fans; write a

26   creative title that described the scene; and add a stage name to the title of the video.

27   The MindGeek Defendants' categories demonstrate how they are specifically

28   targeting viewers who are interested in child pornography, with categories like

"teen," "school," "babysitter" and "old/young."   On the page explaining video categories, MindGeek informed that "Teen" is one of its most popular categories.

117.   But MindGeek did not leave the development of uploaded content exclusively to user decisions based on its assistance and input.   Its formatters would also add and edit the content for maximum effect when they reviewed it, including not just the descriptive part of the content, but also scenes and length. Indeed, in public remarks, the owner of MindGeek's predecessor, Fabian Thylmann, explained that MindGeek was a creator of content and that customizing content for identified user preferences was the only way to make "really good money" in the online porn industry.

118.   Thus, for example, MindGeek formatters create a graph or timeline underneath videos to demonstrate the level of intensity of activity within a particular section of the video.   This helps the viewer identify and quickly advance to various levels of sexual activity within the video.   MindGeek harvests this data to optimize its advertising services by determining which words generate traffic, and refines its suggestions to users for content to watch and descriptions to use on uploads.

119.   Along similar lines, MindGeek formatters create buttons for some videos that describe certain types of sexual activity occurring within the video, thereby allowing viewers to jump ahead to desired sections of the video depicting the activity identified in the button.   These efforts are yet another way to optimize profit sharing, ad placement, and otherwise capitalize on the data of user preferences.

120.   Similarly, MindGeek formatters create thumbnails for the videos on MindGeek's tubesites and store these thumbnails on a separate server.   The server includes thumbnails created from CSAM videos.   As MindGeek explains to its users and content partners, thumbnails are a key component to attracting viewers to a video: "A well-chosen thumbnail will greatly impact the number of views by making videos more appealing for users to click on."

121.   All of this content creation is directed at maximizing revenues.   With

respect to advertising placement and content, MindGeek, through its advertising business, sells banner and sidebar advertisements, as well as advertisements that appear before and after videos.   MindGeek placed these advertisements on all pages viewed by users, including those featuring CSAM.

122.   MindGeek edits advertisements placed on its websites to frequently highlight terms such as "girls," "boys," "broken teens," and "twink," which are terms that are known and encouraged for use by MindGeek.   These terms promote the creation, use, and viewing of CSAM.

123.   Indeed, MindGeek's advertising platforms allow advertisers to build campaigns around keywords that clearly reflect illegal activity, including "13yearoldteen"; "not18"; "14yrold"; and "15yrold."   For example, if an advertiser selects the keyword "teens," the advertising platform shows that term alongside related terms including "teenager"; "pigtail"; "clubseventeen"; "coed"; "braces"; "teenplayground" and "teenylovers."   MindGeek tracks the amount of traffic generated by each word, showing advertisers the volume of traffic being driven by such keywords and the expected traffic to be generated by each potential word choice.   In doing so, it allows people to target ads to people searching for words such as "rape" and "child rape" in languages other than English.   All this traffic data is then used to direct uploaders to upload the categories of content most watched and use the best descriptions to capture that interest.   Throughout the period in the complaint, child pornography and nonconsensual content was one of the most in demand categories.

124.   What was not a focus at all of any of this effort was excluding child pornography or other nonconsensual content because the business model intended to do the opposite.

125.   The result of this was just what MindGeek intended.   Simple Google searches even suggesting nonconsensual content would invariably return Pornhub as the top search result.   Pornhub's suggested video and search algorithms would then

1  direct users to similar content.   With each click the search was refined further and

2  further.   In just a few clicks, in just a few minutes, users (and investigators and

3  journalists) could find seemingly unlimited pages and videos depicting violent rapes,

4  date and drugged rapes, child sexual assault or exploitation, coerced or trafficked

5  subjects, secret and stolen recordings, or any other form of nonconsensual conduct.

6       126.   For example, when a user searched for "teen sex," MindGeek would

7  present the most popular video results associated with that term, suggest playlists,

8  and suggest searches with a host of other more detailed terms used by others for

9  similar content, like "barely legal teen sex," "young teen sex," "middle school teen

10  sex," etc.   Titles, descriptions, tags and comments with these videos and suggested

11  by MindGeek were blunt, including: "CP" (i.e., child porn), "teen," "young teen,"

12  "barely legal," "super-young teen," "old/young," "young," "exploited teen," "crying

13  teen," "little," "xxxtra small," "drunk girl," "drugged girl," and "passed out."

14  MindGeek knew from its SEO that many of these were among the most popular

15  searches and included substantial content that was patently nonconsensual with little

16  of the rest discernibly consensual.

17       127.   By way of example only, in just minutes of basic searches, users, and

18  certainly those working fulltime optimizing MindGeek's SEO, would easily be

19  directed to troves of:

20           a.    homemade videos of adult males having sex with apparently or

21                 obviously underage girls with titles such as, "Young Teen Gets

22                 Pounded," "Old Man with young teen," "Young girl tricked,"

23                 "Petite Thai Teen," "A Club Where You Can Play With Little

24                 Girls And It's So Fun," "Bratty Little Girl," "Giant guys f***ing

25                 with no mercy this little whore while she's crying" (asterisks

26                 added);

27           b.    homemade movies of young boys being raped with titles and tags

28                 such as "Barely legal step-son well used after school in uniform,"

"Young hairless twink gets slapped," "Daddy f***s young teen boy virgin first time" (asterisks added), "Daddy came home frustrated and abused boy to crying";

c.   drunk, drugged or otherwise incapacitated women, often clearly underage, being assaulted with titles and tags such as "Drunk," "Passed out teen," "Passed out sex," "Drunk and Passed Out Porn," "Passed out teen f***ed" (asterisks added), "Teen Totally Drunk Passed Out Sex Video Free," "Passed Out Naked Teens," "Tinder Girl Passed out at my House so I stuck it in her ass," "Mexican Teen She's to Drunk After Party Real Home Made!," "Drunk girl let's me dominate her," "Cute Amateur Teen Drunk And Stoned In Ecstasy With Her First BBC On Drugs," "F***ed sister hard in the ass while she was drunk and sleeping" (asterisks added), "Drunk girl gets handcuffed and abused," "Teen gets drunk and gangbanged";

d.   non-professional secret recordings, often of obviously underage women, such as Asian high school students in a bathroom with a hidden camera with the title, "Stolen Teen's secret peeing scenes";

e.   stolen underage pornographic videos with titles and tags such as, "Amateur sextape stolen from teen girl[']s computer";

f.   videos with extreme hate and racist themes such as "Black slave girl brutalized" with comments including "yes f*** that n*****" (asterisks added) and "love seeing this little petite black whore tied up like she belongs taking it in her black ass," "Busty African Slave Gets Pounded," "African Busty sluts get tortured by white master," "You should get your own black slave," " Black slave girl pleasures white master and call herself 'N***** whore"

(asterisks added) and "Black slave Girls Made to Eat White Girl Asshole" or anti-Semitic Nazi themed content.

128.  Likewise, searches for "Pnp," "meth," "homeless," "crack whores," "meth whores," and other similar terms turned up countless videos of women who were plainly incapacitated or having a debilitating drug addiction being exploited by pimps and johns.

129.  Further, MindGeek's algorithmic suggestions and playlists would direct users searching "Asian" to a cache of sadistic abuse videos.   Among these caches were a category in which apparently underage Asian women were being suffocated in plastic bags attached to a vacuum packing machine.   The women were thrashing and screaming.   They were not performing.   The videos were amateur, poor quality, and had zero indicia of consent.

130.  In one such video, an apparently underage Asian women was dragged onto a dirty balcony and submerged in a plastic tub of ice water.   Her assailants were violently grabbing her hair and used their boots to force her head under the water. They restrained her and sprayed her face from a hose when she tried to breathe. There was no indication of consent, only assault: the young woman shook, shivered, wept, gasped, and pleaded.   She was not performing.   When the men finally removed her from the tub, they continued to dose the collapsed, shivering woman with the hose before all urinating on her shaking body.

131.  Abuse videos were also common in MindGeek's partner channels in which it shared revenues with the uploader.   For example, one of MindGeek's official ModelHub partner accounts called PornForce, from which MindGeek received a cut of all revenue, had videos of obvious victims being exploited.   One of those videos, titled "Thai street teen" with the description "f***ed and facialized for $5" (asterisks added), showed a homeless and disabled Thai teen being penetrated and filmed "for $5."   In the comments a viewer asked, "is she deaf," and PornForce responded, "yes."

132.   Another ModelHub account was comprised of a man exploiting homeless teens in New Jersey in commercial sex acts.   The victims of this exploitation were anally assaulted while crying and pleading for the abuse to stop. MindGeek's suggested video and search algorithm would direct viewers of these videos to similar videos and suggested search terms such as "abused teen," "crying teen," "exploited black teens," "homeless teen," and the like.

133.   The same abuse occurred on Pornhub Gay.   A simple search for "daddy and son" produced oceans of unprofessionally produced videos of patently underage or young looking boys with the titles saying "REAL Father Son" and other videos of distressed young hairless boys being penetrated by older men.   Other cases of child pornography involved underage boys videotaping themselves in sex acts, with video titles like "13 yr old boy" and "14yr old."

134.   Like many videos on Pornhub, these abuse videos all were typically introduced with Pornhub or other advertisements before playing and always were surrounded by other ads for which Pornhub was paid for its own products and websites.   Some of these videos had millions of views alone.   The "categories" collectively had many millions more, evidencing the significant contribution unrestricted access to nonconsensual content was to MindGeek's business model.

135.   MindGeek's SEO was so sophisticated, that it could tell advertisers what kind of content categories were most likely to engage with their ads.

136.   In addition, in order to further amplify their SEO, MindGeek allowed users to download such content so they could reupload curated playlists of such nonconsensual content on MindGeek's websites and other third-party websites with links MindGeek provided back to its sites.   In this way, MindGeek effectively deputized users as optimizers and advertisers, and each such transfer violated 18 U.S.C. § 2257.

137.   All this optimization involved more than merely allowing content to be uploaded.   Rather, it involved the curating, editing, and formulating of how the

1    content was substantively described, presented and optimized for searching and

2    viewing.   The fact that MindGeek proactively avoided using its technology to

3    exclude such content and instead used it to optimize it demonstrates its knowing

4    intent.

5              **4.      MindGeek Produced Nonconsensual Content.**

6              138.   In its earlier years when MindGeek was attempting to rapidly reach

7    content scale, it manufactured fictional purported "user" content for its tubesites that

8    was actually produced by human traffickers that MindGeek itself commissioned or

9    from whom it otherwise agreed to purchase.   It did this to increase its content and

10   SEO exponentially faster than it could have through genuine user uploaded content

11   alone.   It also allowed it to secure tailored content that its SEO analysis identified as

12   high performers.   MindGeek used different variations to secure such content.   These

13   high level efforts were directed and discussed by and among Bergmair, Antoon, and

14   Tassillo.

15             139.   First, monies necessary to pay for the production, middlemen, and

16   uploading of the content were transferred from different foreign subsidiaries to

17   agents/middlemen without any paper trail as to what the payments were for.   Those

18   agents/middlemen would handle all interactions with producers in Eastern Europe

19   and Asia who offered the best quality for the cheapest prices.   This was dramatically

20   cheaper than what such productions would cost in the United States, and MindGeek

21   understood it was because the content was the product of trafficking.   The finished

22   content would then be transferred to the agent, who then transferred it to shell

23   companies or MindGeek partner channels who would do the formatting in exchange

24   for favorable terms or monies disguised as partner channel payouts.   The MindGeek

25   Defendants were fastidious about avoiding any contact in the process with certain

26   jurisdictions like the United States, Germany, or the United Kingdom, which were

27   viewed as the most rigorous in enforcing laws against trafficking.

28             140.   Insiders familiar with this elaborate scheme left no doubt that MindGeek

1  understood this was trafficked content: "100% they knowingly paid real pimps.

2  They would discuss how this cheap content was coming from old school pimps.

3  They found it exciting.   They would explain, 'we don't need to pay studios in the

4  US, low paid pimps come to us.'"

5       141.   Once formatted, the content would be uploaded by these entities and/or

6  a network of agents who were paid to create user identities and upload content.

7  Sometimes such content would be uploaded by MindGeek directly, either in Canada

8  or Cyprus.   Once uploaded, the content would be analyzed for its SEO effectiveness,

9  ad impressions, and conversions, and the content as well as the formatting refined to

10 maximize SEO.   Then additional orders would be placed using the conclusions from

11 that analysis.

12      142.   One insider described the process this way:

13          MindGeek owns studios and works with studios.   These

14          studios produce high quality porn at high cost.   MindGeek

15          determined that high quality porn doesn't convert well on

16          tubesites.   Most people want to see the girl next door and

17          videos that seem more realistic.   To get this content they

18          run networks of advisors who run agencies that acquire

19          porn and cam videos from high trafficking areas like Czech

20          Republic and sell in bulk to MindGeek entities all over the

21          world or license companies that all actively feed the videos

22          into the tube sites as user uploads.   Actively feeding

23          content on the sites to make sure it does not touch North

24          America, Germany, or the United Kingdom.   It is clear to

25          anyone in this industry that stuff out of eastern Europe is

26          from trafficking.   People within the company knew there

27          were real pimps running these agencies and MindGeek

28          knew it.   It was actively communicated among

management especially in Cyprus who were the ones
working to get stuff through it.   'We don't care,' was their
attitude. . . .   MG affiliates will contract with a local agent.
Local agent interfaces with the production companies.
Agent gets it and sell it to MindGeek in bulk to their
affiliates.   No employee can talk of these studios.   Then
they create identities and upload it through Cyprus and
Canada.   They avoided UK and Germany.   The content
couldn't touch the UK or Germany offices because
enforcement and investigation risk was too much.   There
were other means of bulk uploading.   If huge partners have
big studio that is part of MindGeek group.   You could give
it to them and they upload it and they get better treatment
and terms and share the revenue.   MindGeek pays for it
but steer business through agents and pay huge amounts to
launder the money and uploading.   So you can't see it
went to MindGeek or that it uploaded it.

143.   In addition to the general awareness that content from these regions was
the product of extensive trafficking operations, MindGeek was aware the content was
trafficked because it met with the producers and visited some of their production
sites.   In one such visit, MindGeek executives witnessed a football-field size
warehouse in which women were crammed into adjoining studio stalls "like
livestock" to perform on camera.   Many of the women appeared young and were
engaged in scenes depicting underage girls.

144.   When asked by the producer where the women came from and lived, the
producer unapologetically explained that his company had agents that scoured
Eastern Europe for women who they recruited with promises of lucrative modelling
jobs that would allow them to go to college and otherwise have a better life.   When

1  those women agreed, they were transported to dormitory style housing or apartments
2  and matched with a "boyfriend" who would groom them for porn.

3      145.   Women who were victimized by this trafficking network reported that
4  when they tried to leave, they were informed that their cam sessions had been
5  recorded and if they did not continue performing, the trafficker would send copies to
6  their families and otherwise release them publicly and destroy their reputation and
7  future.

8      146.   Similarly, MindGeek allowed its platform to be used for prostitution.
9  Like now defunct online marketplace BackPage (which was indicted along with its
10  founders and seized by federal authorities), and Craigslist's now defunct "personal"
11  pages, MindGeek knowingly permitted its platform to be used to facilitate trafficked
12  prostitution.   The website is awash in third-party advertisements for "Craigslist,"
13  "Backpage," and other previously known sites where prostitution could be solicited
14  from trafficked women.

15      147.   MindGeek repeatedly deflected concerns raised internally by finance
16  people who were alerted when they realized MindGeek was paying numerous
17  ostensibly independent cam models through a single account.   This was a trafficking
18  red flag, but MindGeek executives informed finance to ignore the red flags and
19  continue payments because "they knew the people behind the account and it was ok."

20      148.   In addition, MindGeek allowed its private premium accounts on
21  Pornhub to be used as a secret marketplace to distribute illicit content, particularly
22  CSAM/child pornography, for a fee, sometimes directly on the platform, sometimes
23  through links to an external CSAM cache exchanged privately through the accounts.
24  This trafficking included minors posting child pornography of themselves at the
25  direction of predators and pimps.   The content, while private to other unsubscribed
26  users, was visible to MindGeek, part of its SEO analysis, and included in Google and
27  other search engine search result calculations and thus embraced and allowed to
28  remain.

149.   This pervasive incorporation of multiple streams of illegal content and revenue was not accidental, but a knowing and intentional business decision. MindGeek embraced illegal content precisely because that content would significantly enhance its SEO, traffic, ad impressions, and customer conversions.   Its legality or consequences were irrelevant, as an insider explained:

> They focus on how much money I can make today.   Right?
> So they take risk because today it's going to give you a
> dollar.   If you have to change your practices next month,
> well we'll get there.   But right now this is making more
> money.   Right, that's the type of mentality that makes you
> take those decisions.   What's going to help me make more
> money. . . .   100% they are all about the money, not safety
> . . . .   they just see numbers, let's be honest.

**C.** **The Individual Defendants, Financiers, and Visa Knowingly and Intentionally Participated in the Trafficking Venture.**

**1.** **The Individual Defendants.**

150.   The evidence that the Individual Defendants knowingly and intentionally were aware of MindGeek's unrestricted content model and directed it is overwhelming.

**(i)** **The Individual Defendants' Direct Knowledge**

151.   As set forth in section II.D, the Individual Defendants were the alter ego of MindGeek, personally controlled, set, and implemented its policies and practices in their capacity as the three owners, and were fully aware of and directed its unrestricted use of CSAM and other nonconsensual content.   They made the decision to employ a sham corporate structure to evade pornography laws in the jurisdictions in which they operated and earned the bulk of their revenues.   They made the decision to avoid any *bona fide* technological and human moderation and to instead devote all of MindGeek's technological and human resources to monetizing

child pornography and nonconsensual content just like all other content.    They implemented and maintained these practices and policies through their putative sales of their interests in 2023, fully aware of the enormous illegal content that resulted on MindGeek's sites and its monetization of same.    And they worked aggressively to misrepresent and conceal the truth from the public and authorities for years.

152.    In fact, the Individual Defendants were aware of these facts even before they became owners.    Bergmair previously owned and individually ran Pornhub competitor Redtube for years, used the same unrestricted content model and ubiquitous presence of nonconsensual content at Redtube, and understood MindGeek did too.    As part of the MindGeek acquisition, he became the majority owner of the entire business, and as the majority owner, dictated and approved all major strategic and operational decisions.    As part of the acquisition, he agreed and directed that the Individual Defendants would continue the same model that they used previously in their competing business, and continued to agree with and direct them to continue using it to the maximum extent possible until they putatively sold their interests in 2023.

153.    Similarly, before Antoon and Tassillo became MindGeek owners in 2013, they had been running MindGeek predecessor Manwin for years with the same unrestricted content model and intentional monetization of child pornography and other nonconsensual content.    They too agreed to continue this model in the new combined company and did so as the CEO and COO through the purported sale of their interests in 2023.

154.    Even if the Individual Defendants had not been running the same unrestricted content model in their respective roles at Redtube and Manwin prior to assuming MindGeek ownership, as experienced industry executives and owners they knew the notoriously understood fact among anyone familiar with the industry that an unrestricted content model would necessarily result in the ubiquitous presence of nonconsensual content.    Indeed, this was understood even in the pre-internet

pornography industry and was the reason for the strict federal laws policing the industry.   And it was this universal understanding that led to the dearth of capital market debt or equity financing for the online porn industry.

155.   They also understood this throughout the period they owned and controlled the company because it was staring them in the face from the SEO being done, the guidance they were giving users in terms of preparing their content, the editing of that content they conducted, the data analysis they were providing advertisers, and from the most basic exploration of their websites.

156.   This included knowledge from the performance and SEO of such content they received throughout their term as CEO and COO from regular reports and meetings, including quarterly and annual week-long sessions with the entire management team where such issues were discussed and which Bergmair also attended.   And they were aware of it from their internal discussions and strategy sessions in which they discussed concerns from employees, and complaints from victims, advocates, and law enforcement.

157.   This included regular complaints, concerns, and questions about how to treat illegal content from insiders and the continued optimization of such content to drive market share.   Consequently, throughout the period they controlled the company as CEO and COO and owners, they were aware from hundreds of reports from law enforcement, advocacy groups, victims, government agencies, the press, website users, and their own employees that illegal and nonconsensual content was ubiquitous on MindGeek's websites, and they knew the reason for this was the policy of monetizing it that they and Bergmair agreed to maintain.   Nevertheless, these owners knowingly and intentionally decided to continue capturing illegal content, optimizing it, and using as part of their product offering.

158.   For example, in May 2020, MindGeek personnel sent third-party complaints concerning the child pornography to Antoon, along with the URL and screenshots.   Although it was obviously child pornography, Antoon and his team

did not remove it, wondering instead whether, "[f]rom our end, does it help or hurt us to remove the video?" without regard to considering their legal and moral obligations to do so.   In the end they did not remove it, and the video remained on MindGeek's website until December 2020 when MindGeek learned that the *New York Times* was working on a story that exposed victimization by MindGeek.

159.   As set forth below, throughout this period, in addition to Bergmair's attendance at the quarterly and annual management meetings, Antoon spoke virtually every day with Bergmair about the business and discussed and took direction from him as the majority owner and ultimate decision maker on all material matters, including their practices with respect to child pornography and other nonconsensual content.

### (ii)   The Individual Defendants' Indirect Knowledge

160.   In addition to this overwhelming direct knowledge, the Individual Defendants were also aware that MindGeek's websites were awash in nonconsensual content from the decade of numerous public reports of such.   These Individual Defendants closely monitored such reports as part of their robust marketing and brand awareness activities, their management of their investment and ownership interests, their relationship management with lenders and payment processors, and their concern that their false claims about a robust moderating function and their actual unrestricted content model would be revealed.

161.   For example, in the mid-2010s, multiple UK news outlets repeatedly reported on the problem of children accessing and uploading videos of themselves to Pornhub, often at the direction of an abuser.   In March 2015, the *Daily Mail* claimed that according to research from the National Society for the Prevention of Cruelty to Children (NSPCC), ten percent of children had "made or been part of sexually explicit videos."

162.   In 2012, it was widely reported that Taiwanese playboy Justin Lee was arrested for date raping dozens of women, some minors, and posting videos of those

rapes to Pornhub.    Although Lee's arrest, conviction, and criminal conduct, including his uploading of the rape videos to Pornhub, were highly publicized worldwide, MindGeek kept those rape videos on its site and optimized them for years thereafter.    While the videos were subsequently disabled, MindGeek continued to use them to ensure search engines would still direct searches concerning Lee to Pornhub, including search engines directing the users to similar content categories like "celebrity sex tapes."

163.    In 2013, it was widely reported that a German model was raped, and the video of her assault was uploaded to Pornhub.    The video remained on Pornhub and was optimized until June 10, 2016, at which point it had been viewed over 1 million times.

164.    In October 2014, a Slate essay quoted a MindGeek employee who explained, that "[i]f you're interested in the 'Content Formatter' job, just be aware you're basically a glorified child porn screener, and you will be watching disgusting videos all day."

165.    On October 16, 2014, Detroit Free Press reported that a Florida man began cyberstalking a 13-year-old girl in Michigan, coerced her into sending him naked photographs, and posted those on Pornhub where the photos remained and were optimized for over 5 years with thousands of user comments, many users noting that the subject was obviously underage.

166.    In 2014, a Reddit user posted that she had been raped and a video of the rape had been uploaded to Pornhub.

167.    On August 20, 2015, the Columbus Dispatch reported that a local man had been arrested after creating child pornography of several minors and uploading it to Pornhub.

168.    In October 2015, multiple news outlets reported that rapper Eric D. Chavis was arrested and charged with rape and creating child pornography for regularly raping and videotaping minor girls and posting the videos to Pornhub and

that MindGeek paid him $10,000 and 60% of the revenue earned on his child rape collection as part of its revenue-sharing content partner program.

169.   In October 2015, Pornhub publicized a purported process to make it easier to take down revenge porn, but multiple news outlets noted that the process did not work, which MindGeek knew because the process was merely part of its ongoing effort to conceal its unrestricted content model.   Publication the Verge called this out, quoting law professor Mary Ann Franks, who said that "[i]f Pornhub or any other site or platform featuring adult content really wants to launch a 'preemptive strike' ... against nonconsensual pornography, they should be focusing on truly preemptive measures, not after-the-fact procedures."

170.   Likewise, in October 2015, Splinter News reported on the ineffectiveness of Pornhub's recent purported crackdown on revenge porn, "if you search terms like "ex-girlfriend porn" or "revenge porn" on Pornhub, plenty of results still come up" and that it was impossible to determine whether they were consensual or not.

171.   On December 26, 2015, The Sunday Guardian reported that the government of India had filed a lawsuit against Pornhub seeking to ban it in India because of its use of child pornography.

172.   On January 26, 2016, a UK advocate published an essay reporting that there were "endless videos" tagged "domestic violence" and "sexual abuse" on Pornhub that appeared to be, in fact, nonconsensual.   Media reports that month and the next, further reported on the popularity of the Pornhub categories "teen," "humiliation," "abuse," and "rape."

173.   Also in January 2016, the International Business Times published an article titled "Pornhub: If you have ever watched teen porn you could be breaking the law" noting according to Pornhub's own 2015 published statistics, "teen" was their most popular search term and that it was impossible to discern if the individuals appearing in many of these videos were adults.

174.   On March 15, 2016, California media outlets reported on the arrest of a California man for recording sexual acts he had with a minor girl and posting them to Pornhub.

175.   Throughout 2016, there were numerous media reports concerning arrests, civil judgments, and victim accounts concerning revenge porn or nonsonsensul content being posted to Pornhub.

176.   In 2016 and 2017, there was widespread reporting on multiple nations banning Pornhub because of the widespread presence of child pornography.

177.   In 2016, Pornhub's most popular Content Partners, GirlsDoPorn and its founders were sued by twenty-two women and minors for trafficking since 2009, and the founders were indicted on federal trafficking charges in 2019.   GirlsDoPorn and its website were shut down in 2020 shortly after the indictment and the flight of one of its founders to New Zealand.   Ruben Andre Garcia, one of the traffickers involved in the GirlsDoPorn trafficking operation, was sentenced to twenty years in prison on June 15, 2021.   This human trafficking ring was one of Pornhub's most popular partner channels, with nearly 800,000 subscribers and over six hundred million views, and was heavily promoted by MindGeek.

178.   The channel was so lucrative, and MindGeek so indifferent to monetizing nonconsensual content, that MindGeek kept the channel on its site and collected revenue from it even after learning of the initial civil lawsuit and did nothing to investigate the allegations.   Pornhub continued to host and monetize this trafficked content until the company and its founders were indicted and the website shutdown.   Nevertheless, even after the formal channel was disabled, trafficked GirlsDoPorn content was ubiquitous on MindGeek's tubesites and its internal search engine would regularly direct users to those videos.   As of October 2020, a simple search of "GDP" would result in over 300 videos and images of those victims.

179.   In December 2016, multiple news sources reported that porn actress Nikki Benz had gone on Twitter to publicly accuse Tony T, a director for

MindGeek's Brazzers premium brand, of forcing her to participate in a rape scene. Other women porn performers affirmed that they had experienced similarly coercive and abusive behavior from Brazzers directors.    Buzzfeed's reporting specifically noted that Brazzers is a MindGeek subsidiary.

180.   In February 2017, the Jamaican press reported on the presence of child pornography in the thousands of videos on Pornhub's "Jamaican School Girls" channel and the plans of Jamaican prosecutors to bring prosecutions under its child pornography laws.

181.   In March 2017, Mashable.com reported that nude photographs of female marines and other women were uploaded to Pornhub without the women's consent and the women were doxed as well, and the Louisiana media also reported on the arrest of a man for posting revenge porn on Pornhub.

182.   In April 2017, Pennsylvania media outlets reported on the arrest of an individual on child pornography charges who created a Pornhub account for the purpose of acquiring and distributing such content.

183.   In May 2017, Florida media reported that a Pensacola man raped a female minor and posted photographs to Pornhub.

184.   In October 2017, Wisconsin media reported on the nonconsensual video recording of women in changing room that were posted to Pornhub.

185.   In late 2017, there was public reporting documenting "[t]he hatred of women" and misogynistic violence on Pornhub.    One video was described as follows: "This is a homemade video taken on a mobile. The female does not appear to be enjoying this and is protesting verbally and with her body language. The male pulls the string from the stool that supports her weight and then dives and holds her body up to prevent anything life threatening. He does this a few times. This is real footage of a woman being hanged for the male's sexual arousal and uploaded onto Pornhub for other men's misogynistic and sexual gratification."

186.   In December 2017, the Coalition Against Trafficking in Women, the

National Organization for Women, and Gloria Steinem held a press conference concerning Pornhub and its active promotion of "racism, incest, sexual violence, and rape," the fact "Pornhub sells the idea of sexual abuse of children," "sexual violence against woman," and the "degradation" of women, and included statements from victims reporting on pimps and traffickers recording rapes and posting them to the website.

187.   Follow-up publications from the Coalition Against Trafficking in Women (CATW) further accused Pornhub of "normalizing violence against women and sexual abuse of children" with, among other things, categories of "barely legal" content allowing "Pornhub visitors [to] watch middle-aged men penetrating 'actresses' resembling barely pubescent girls in pigtails and school uniforms," content described as "'Picking up a Schoolgirl for a Quick Drive Home,' . . . 'Hot Innocent Teen Gives Grandpa a Blowjob,'" and sex trafficking.

188.   In 2018, MindGeek porn performer Asa Akira its exclusive "Brand Ambassador" promoted sex with 13 year-olds and disdain for the laws protecting minors and for "snitches" who dare object to such abuse:

> This 13-year-old? . . . if I were single and we were sitting in the jacuzzi and he was like, "Hey, you know, like, I've never f***ed a girl. (Asterisks added) Do you want to?" I think I'd say yes.   No, that definitely... no one, no one would consider that rape . . . except maybe his mom. . . . And that's only if she's, like, a total bitch. . . . Yeah . . . and the law. Whatever. . . . Who's gonna tell? No snitching. Snitches get stitches.... . . . I think there are 13- year-old girls out there that might be ready to be f***ing, but not that many. (Asterisks added). Like, 15, yeah. There's- . . . quite a few that are ready. . . .I would not finger this 13-year-old's asshole

189.    These were not the only such comments Akira publicly made before MindGeek made her its exclusive brand ambassador.   By way of example only, before she was hired as MindGeek's Brand Ambassador Akira had made the following widely publicized comments celebrating rape, pedophilia, incest, and anti-Semitism: (a) "Is GHB the rape drug.   Asking for a friend" (9/8/2011); (b) "it's not really rape unless its anal rape, right? . . . "what the f*** is marital rape you can't rape the willing . . . Shoutout to my pedophiles" (9/27/2011) (asterisks added); (c) "If loving Japanese rape porn is wrong, then I don't want to be right" (1/29/2011); (d) "Also, I'm pretty proud of myself for making it this far in life without having to register as a sex offender" (2/29/12); (e) "It only hurts if you resist" (1/23/13); (f) "Gay incest should be legal" (12/9/14); (g) "adulthood is knowing the difference between good rape and bad rape" (10/31/13); (h) "Why not f*** a jew for Hitler's birthday" (4/20/15) (asterisks added); and (i) "not one but TWO sightings of Hassidis Jews today" (11/28/09).

190.    In February 2018, a Pornhub user repeatedly flagged child pornography being uploaded repeatedly to Pornhub's gay content categories.   One of those users told MindGeek, "[p]lease remove all pictures in the gay category starting with [XXXX] in the title.   They contain underage children.   Some of whom look 7 or 8 years old.   Its disgusting that this has slipped through, two nights in a row.   Does this material get screened.   I'll be checking to see if the content has been removed." Again, MindGeek permitted this illegal content to be repeatedly uploaded and transferred to its other tubesites despite its obviously illegal nature and despite being explicitly being flagged by users.

191.    In March 2018, news outlets reported on an American in Taiwan who "has been secretly filming one-night-stands with Taiwanese women and posting them on a porn website for profit…On the adult video website Pornhub, Schulte has an account titled TravelPorn with over 3,000 subscribers and 800,000 views, which contains videos of at least 36 Asian women performing sexual acts with him."

192.   In October 2018, the media reported on the arrest of a Palo Alto woman who posted videos on Pornhub showing her having sex with an underage 14-year old female relative.

193.   In the fall of 2019, the Internet Watch Foundation, the United Kingdom's private internet watchdog for child pornography, reported to the Sunday Times that it had been notified of 118 instances of child pornography on Pornhub by the public over the prior 2.5 years, increasing each year.    Half of that child pornography was Category A, the worst kind of abuse involving penetration and/or sadism.    MindGeek permitted the upload of this child pornography and transferred it to its other tubesites and never reported it the authorities as it was required to do in the United States and other jurisdictions where its servers are located.    That child pornography remains on MindGeek's servers to this day.

194.   The Sunday Times published an investigation in 2019 confirming that Pornhub was "flooded" with illegal content that it failed to remove even after the paper had notified it of that illegal content:

> the world's most popular porn website [Pornhub] is flooded
> with illegal content . . . . Pornhub is awash with secretly
> filmed "creepshots" of schoolgirls and clips of men
> performing sex acts in front of teenagers on buses.    It has
> also hosted indecent images of children as young as three. .
> . . The website says it bans content showing under-18s and
> removes it swiftly. But some of the videos identified by this
> newspaper's investigation had 350,000 views and had been
> on the platform for more than three years. Three of the
> worst clips that were flagged to Pornhub still remained on
> the site 24 hours later. . . . The Sunday Times found dozens
> of examples of illegal material on the website within
> minutes. It followed research by the campaign group

#NotYourPorn, which identified revenge porn videos and
clips filmed by secret cameras. . . . One account, called
"Candid teen asses," is devoted to posting covertly filmed
"creepshots" showing UK girls in school uniform. Another
features clips of a man performing sex acts among young
concertgoers, rubbing up against them in a crowded music
venue. . . . While Pornhub has blocked users from
searching terms such as "underage" and "child porn,"
synonyms including "jailbait," "very young girl" and
"lolita" can still be used to find content. . . .

195.   Also, in 2019, PayPal terminated its relationship with MindGeek
because of the presence of illegal content on MindGeek's websites.

196.   These individual examples of the frequent public reporting of individual
nonconsensual content on MindGeek's websites were merely indications of the
knowing and intended consequences of it its unrestricted content model.   Among
those consequences included hundreds of videos of child pornography uploaded and
present on its websites from 2013-20, including from video chat service Stickam,
which was a notorious child pornography exchange that was shut down in 2014 as
part of one of the largest internet child pornography prosecutions in history,
involving the sextortion of over 350 minors via the video chat service.   Despite the
highly publicized investigation and conviction, for years, those child pornographic
videos and compilations of those videos were ubiquitously uploaded by MindGeek
users and optimized and transferred by MindGeek to its other tubesites and to users
downloading the videos.

197.   Similarly, from 2013-2017, New York resident Nicole Addimando's
husband physically abused and raped her, and subjected her to sodomy with objects,
vaginal torture with heated spoons, and being left for extended periods of time and in
degrading and painful positions.   These assaults were videotaped and posted to

Pornhub.   Pornhub not only permitted those uploads, it optimized and transferred those videos to its other tubesites.   Even after Addimando's abuse and Pornhub uploads became highly publicized, videos of the assaults remained on MindGeek's tubesites and were uploaded, downloaded, optimized, and transferred by MindGeek numerous times.   Those videos remained on MindGeek's tubesites as late as 2019 and remain on its servers even after having been disabled for optimization purposes. To this day, a search engine inquiry of "Nicole Addimando Sex Tape" will result in the top two search results being to Pornhub with the result stating: "Nicole Addimando" and "Watch Nicole Addimando porn videos for free, here on Pornhub.com.   No other sex tube is more popular and features more Nicole Addimando scenes than Pornhub!"

198.   Likewise, from 2014-2015, 49-year-old Dawn Giannini sexually abused a 14-year-old relative, recorded the abuse, and posted those recordings on Pornhub. MindGeek not only permitted the obviously underage assault and child pornography to be uploaded to Pornhub, it transferred those videos to its other tubesites.   The videos were viewed by the victim's friends at school, one of whom ultimately alerted the authorities leading to Giannini's arrest in 2018.   Those videos were still present on MindGeek sites as late as 2019 and remain on its servers for optimization purposes.   To this date, a search of "Giannini sex tape" on Yahoo produces a Pornhub search result listed third, for "Dawn Giannini Porn Videos" and the message "Watch Dawn Giannini porn videos for free, here on Pornhub.com. . . . No other sex tube is more popular and features more Dawn Giannini scenes than Pornhub!.

199.   Each of the Individual Defendants were aware in real time of these reports.   Antoon and Tassillo and MindGeek's substantial media and social media optimization ("SMO") teams closely tracked all new about the business.   Many of these reports were accompanied by media, law enforcement, or other third-party inquiries.   And the three Individual Defendants discussed many of them as well as well as responses thereto.

1          (iii)    **The Individual Defendants' Active Concealment**

2          200.   The Individual Defendants' knowledge and intent is also demonstrated

3    by the aggressive and sustained disinformation campaign they directed and sustained

4    when mounting public reports revealed MindGeek's lack of any genuine moderation

5    and active monetization of child pornography and other nonconsensual content.    It

6    is undisputed that the Individual Defendants knew about the facts being reported,

7    undeniable that they knew those facts were true, and their decision to nevertheless

8    deny the truth, take no remedial steps, and instead attempt to misrepresent their

9    existing business model and practices demonstrates they were knowing and

10   intentional.

11         201.   For example, in response to The Sunday Times' 2019 reporting that

12   Pornhub was "flooded" with illegal content that it failed to remove even after the

13   paper had notified it of that illegal content, MindGeek disseminated blatantly false

14   denials from a fictious spokesman who does not exist, but who was, in fact,

15   MindGeek VP Corey Urman.    As the Sunday Times reported,

16              Pornhub said it had a 'robust internal policy' for removing

17              offending material, including 'expertly-trained human

18              reviewers' and 'scanning content to determine whether it is

19              consensual.'    Blake White, its vice president, said child

20              sexual abuse made up a tiny proportion of content and the

21              aim was to eradicate it.   'It is important to note that

22              oftentimes videos described as 'hidden camera footage' or

23              'young teen' are in fact legal, consensual videos that are

24              produced to cater to various user fantasies,' he said.

25              'They are in fact protected by various freedom of speech

26              laws. Certain words are banned from being used in titles

27              and tags, and we will be doing a thorough audit of our

28              websites to update and expand this list.

202.   Urman's statement was a lie.   MindGeek had no real moderation function and did not scan videos before they were uploaded.   Instead, despite being fully aware of all these and many more other reports of CSAM and other nonconsensual content on its websites, MindGeek did nothing to alter its unrestricted content model but instead continued to intentionally monetize such content while publicly misrepresenting its practices in response to reports otherwise.   As with all other major undertakings, MindGeek's response to this report was directed by its CEO and COO Antoon and Tassillo in consultation with the controlling shareholder, Bergmair.

203.   Indeed, even months after this reporting, on or about March 10, 2020, four videos of child pornography were uploaded to Pornhub depicting men abusing a toddler in diapers and a pre-pubescent child bound and being raped anally while crying for the abuser to stop.   At the time, Pornhub publicly admitted that these videos had been uploaded on its site, but misrepresented that they had been removed, "fingerprinted" so they could not be reuploaded, and reported to NCMEC.   As with all important undertakings, MindGeek's response to this incident was directed by its CEO and COO Antoon and Tassillo in consultation with its controlling shareholder, Bergmair.

204.   Because MindGeek's response was not true, two months later two of the videos were reuploaded to Pornhub by two separate Pornhub accounts, received thousands of views, and were the subject of takedown requests to Pornhub. Pornhub, however, refused to remove the videos for over ten days, during which time they were viewed tens of thousands of times, and only did so when the FBI became involved, reported it to NCMEC, and NCMEC instructed Pornhub to disable the video.   Although Pornhub disabled the video, it left the video page, title, tags, and user on its site, did not cancel and remove the uploading accounts or review those accounts for the offending videos or other offending videos.   Indeed, to this day, if one googles the title or user, Pornhub remains the number one search result.

Although the video is not available, Pornhub directs you to similar content identified by its algorithm.   As with all important undertakings, MindGeek's response to this incident was directed by its CEO and COO Antoon and Tassillo in consultation with its controlling shareholder, Bergmair.

205.   Similarly, in late 2019, it was widely reported that a "verified" member of Pornhub's model program was actually a trafficked 15-year-old girl who had been missing for approximately a year.   MindGeek allowed the uploading of fifty-eight videos of this child being raped to its "verified" model channel and transferred those videos to its other tubesites.   MindGeek never reported this child pornography to NCMEC or Canada's CP3 as it was legally required to do.

206.   Once again, MindGeek's response to these reports was to disavow any responsibility or knowledge, here claiming that the child had been "verified" as an adult with "valid ID": " @luxliv3s Hey Lux, she is a verified model with valid ID."



207.   This, however, also was a lie.   MindGeek knew that it had never verified the age of the 15-year old missing girl (which was impossible), but elected to permit the upload anyway to use the videos as advertising for traffic and to profit from advertising impressions from these videos and other videos viewed by those who it drew to the website.   As with all important undertakings, MindGeek's response to this incident was directed by its CEO and COO Antoon and Tassillo in consultation with its controlling shareholder, Bergmair.

208.   MindGeek's entrenched commitment to using illegal content to fuel its business is perhaps best captured by its response to the viral internet campaign in

2019-20 exposing its practices and the late 2020 bombshell *New York Times* expose confirming those claims.   MindGeek's response to the viral campaign was not to change its practices, but to continue lying about those practices while attacking victims and advocates in an aggressive PR campaign to defame and discredit them.

209.   This major undertaking of existential strategic importance was discussed and directed by Bergmair, Antoon, and Tassillo and led by MindGeek vice-president Corey Urman and New York public relations and social media firm 5wPR.   Urman and 5wPR regularly speak on behalf of MindGeek using false identities misrepresented as MindGeek spokespeople because they know their statements are lies.   These identities include Ian Andrews, Mike Williams, Chris Jackson, Brett Hall, Dusty Gitalto, and Corey Price.

210.   On February 9, 2020, advocate Laila Mickelwait published an op-ed in the Washington Times about Pornhub to make the public aware that the site was infested with easily located child pornography and other nonconsensual content because it had no meaningful moderation process and was intentionally monetizing such illegal content.   Thereafter, Mickelwait launched a Change.org campaign to shut down what the campaign branded as "Trafficking Hub" and titled "Shut Down Pornhub and Hold Its Executives Accountable for Aiding Trafficking." Mickelwait's "Traffickinghub" Campaign went viral.

211.   After years of acting with impunity, Pornhub's initial response was muted.   Indeed, it did not even deny the Op-Ed's claims, instead only stressing that MindGeek was a technology company registered in Luxembourg for tax purposes. The Washington Times Op-Ed editor noted the response "speaks volumes" about the accuracy of the petition's claims.

212.   However, as the Traffickinghub Campaign continued its viral momentum, MindGeek unleashed an aggressive gaslighting campaign to preserve its unrestricted content model by smearing, discrediting, and intimidating advocates and victims who dared to speak out.

213.   This campaign began with Antoon and Tassillo misrepresenting to employees that the public claims were "lies" spread by people seeking to destroy the porn industry for "religious reasons."

214.   MindGeek and 5wPR also engaged an extensive network of social media agents, influencers, and amplifiers to spread the same disinformation.   On or about February 25, 2020, Corey Urman, falsely posing under the alias Blake White, misrepresented that MindGeek had "a steadfast commitment to eradicating and fighting any and all illegal content on the internet, including non-consensual content and child sexual abuse material," was and continued to be committed to ensuring nonconsensual content, that nonconsensual content was not part of its product and that claims otherwise were "factually wrong" and "intentionally misleading" lies:

> Pornhub has a steadfast commitment to eradicating and
> fighting any and all illegal content on the internet,
> including non-consensual content and child sexual abuse
> material.   Any suggestion otherwise is categorically and
> factually inaccurate. . . . Pornhub is actively working to put
> in place state-of-the-art, comprehensive safeguards on its
> platform to combat this material.   These actions include a
> robust system for flagging, reviewing and removing all
> illegal material, employing an extensive team of human
> moderators dedicated to manually reviewing all uploads to
> the site, and using a variety of digital fingerprinting
> solutions.   We use automated detection technologies such
> as YouTube's CSAI Match and Microsoft's PhotoDNA as
> added layers of protection to keep unauthorized content off
> the site.   We also use Vobile, a state-of-the-art
> fingerprinting software that scans any new uploads for
> potential matches to unauthorized materials to protect

1   against banned video being re-uploading.   We are actively
2   working on expanding our safety measures and adding new
3   features and products to the platform to this end, as they
4   become available.   Furthermore, Pornhub will continue to
5   work with law enforcement efforts and child protection
6   non-profits in the goal of eliminating any and all illegal
7   content across the internet.   The petition is not only
8   factually wrong and intentionally misleading, it was created
9   and is promoted by a radical rightwing fundamentalist
10   group in the United States – a group who's founders have
11   long vilified and attacked LGBTQ communities and
12   women's rights groups, aligned themselves with hate
13   groups, and espoused extremist and despicable language.
14   https://www.dailydot.com/irl/petition-pornhub-shut-down-sex-trafficking/

15   215.   These claims were gross misrepresentations.   There was no such
16   commitment to avoiding non-consensual content; it was embraced.   MindGeek had
17   no effective way to moderate content either by technology or human moderation.   It
18   had never made any real effort to develop such capabilities, and its CEO admitted
19   internally to another employee by email that MindGeek's policies "do not appear to
20   match our practices."   It did not work with law enforcement or report suspected
21   CSAM as required under federal law, and Antoon knew it had repeatedly ignored
22   takedown requests from authorities.   And Laila Mickelwait was not a bigot, anti-
23   LGBTQ or women's rights, or misleading, let alone, intentionally misleading.

24   216.   Over the course of the next year, MindGeek's press relations and social
25   media organization would continue to aggressively disseminate this gross
26   disinformation.   As with any important initiative, this effort was discussed and
27   directed by Bergmair, Antoon, and Tassillo.   This effort included surreptitiously
28   "vandaliz[ing]" the Wikipedia page for advocates by loading them with this

disinformation.    Their efforts were so blatant and extensive, Wikipedia put a disclaimer on the target's page.

217.   A centerpiece of this disinformation campaign included "ghost bloggers" and other undisclosed operatives publishing scripts provided by MindGeek and 5wPR as "independent" work.    That placed content by MindGeek would then be amplified by its social media network, captive reporters, and 5wPR.

218.   One such operative using the social media moniker "EyeDeco" began attacking and doxing advocates and victims.    EyeDeco's real identity is a female living in Montreal known to Plaintiff with the initials GS.

219.   On March 1, 2020, she began disseminating MindGeek's gaslighting narrative misrepresenting that it only operated legally and with consensual content and that those publicly claiming otherwise were lying to enrich themselves.    She indicated that her audience would discover this if they "#FollowtheMoney," which was a message and meme she would continue promoting for months.

220.   She also began publicly doxing and releasing personal information about those who dared speak up against MindGeek and their extended families. This personal information was researched and provided to GS by Urman and 5wPR. As part of this intimidation campaign, in June 2020, GS doxed Mickelwait and her extended family by releasing information on the properties that they owned, one of which GS falsely indicated was a brothel.

221.   Shortly thereafter, Mickelwait's extended family members discovered that their bank accounts, messaging apps, and iClouds had been hacked.    Those who committed this illegal intrusion then sent an intimate stolen picture of the spouse of one family member to threaten and intimidate Mickelwait.    Other critics of MindGeek received similar treatment.    For example, senior executives at vocal critic National Center for Sexual Exploitation as well as their siblings had computers, cloud storage, emails, and social media accounts hacked.

222.   GS also directly targeted CSAM victims.    One victim, going by Sofia,

shared on a blog her story of being trafficked from the age of 9-15 and having videos of her abuse posted on Pornhub.[2]   In response, GS called her part of a group of "#grifters" who "have hijacked a legitimate issue in order to further their own agenda" of enriching themselves.   GS also used very particular information only MindGeek would have known to falsely claim that the video had been uploaded by "sofia herself" showing she was a "scammer" working for #LailaMickelwait." More particularly, she published, "I see you created your twitter account rather quickly – as in today. Your 'friend' #LailaMickelwait must have coached you on how to open a new account. What timely timing.   As to why you would #lie about this – no doubt Laila knows she does a lot of it re: #Pornhub."

223.   When the sixteen-year-old Sofia defended herself, GS again accused her of lying, actually being "Laila aka Sofia," and accused her again of uploading the video herself as part of a scam:   "Before uploading stories, suggest vetting sources first see above regarding #edit button ONLY being available to #Uploaders Which in this case as per screenshot in your #Article #Story is Sofia herself. #LailaMickelwait #scammers."

224.   GS only stopped her assault after a distraught Sofia explained she had the uploaded image "because my assaulter sent me the screenshot himself.   He used it to make me know he could profit of my body I am just a 16 year old why would I lie about this," and then shared the actual text message that accompanied the image, which said, in Spanish, "See told you I could do whatever I wanted with you" "cheap whore" "they don't even have to wear a condom I am gonna tell Desire I found more clients for you."

---

[2] https://medium.com/@A.Sofia/not-alone-945c743b6e42



225.   Urman and 5wPR made the same knowing misrepresentation about Sophia to the *New York Times* in an effort to persuade it not to publish in 2020.

226.   Urman and 5wPR also had GS attack Serena Fleites, who was featured in the 2020 *New York Times* expose.   MindGeek fed GS opposition research on Fleites derived from a "scrap" of the young woman's social media accounts to likewise attack Serena as a "#grifter": "Serena seems like she knows and has known for quite some time exactly what she is doing aka #grifting."

227.   When the *New York Times* asked MindGeek about GS's targeting of Serena and Sofia, and the coincidence of both MindGeek and GS accusing Sofia of uploading the video herself, MindGeek lied that it had nothing to do with it and GS began taking down her social media and locked her account.

228.   After GS was compromised, Urman and 5wPR shifted the responsibility of online attacks to Sarah Valmont, a porn writer who had attended graduate school in Montreal, and who freelanced for MindGeek under the false identity, Justine Halley.   Valmont would subsequently get a job with MindGeek.

229.   Valmont began publishing MindGeek messaging to discredit the viral campaign claiming it was "really an effort to exploit[] the pain of real victims in [support of the advocate's] million dollar trafficking hub campaign . . . . Churning out increasingly sensationalist messages and outright falsehood to make it appear as though Pornhub is intentionally acting in bad faith, and is encouraging people to abuse their own platform terms of service by uploading illegal content. . . . Pornhub dos not allow illegal content period.   Pornhub has a robust system in place to

moderate content using both cutting edge technology and human moderators."

230.   Valmont went on to claim falsely that Mickelwait was "doctoring screenshots" that she was presenting publicly to prove her claims: "I have evidence that Laila Mickelwait is doctoring screenshots she shares of Pornhub content and is deliberately lying and misrepresenting the platform.   In some legal circles that kind of things is called, 'libel'.   More to come" ((8/29/20), and "I hope Laila gives whoever doctors her screenshots of PH a nice raise, along with plenty of Kleenex." (9/1/20).

231.   MindGeek's more overt network operatives also aggressively prosecuted its gaslighting disinformation campaign with the same false narrative. One of the most aggressive was its exclusive Brand Ambassador Asa Akira.   For example, on July 2, 2020, Akira publicly misrepresented that claims by victims and advocates were false:   "Their claim that Pornhub is profiting off of child porn is FALSE.   Illegal content is (and always has been) strictly prohibited on Pornhub; that included any porn involving anyone underage and any porn involving anyone who is there without consent."   On October 17, 2020, she called such claims "straight-up lies and misinformation."

232.   Likewise, throughout 2020, Pornhub's social media director "Pornhub Aria" also misrepresented that MindGeek strictly prohibited illegal content, screened for it, had technology to detect it, `and removed it immediately.   For example, on April 10, 2020, Pornhub's Aria wrote on social media about "misinformation circulating" on social media by advocates and victims who "misrepresent [MindGeek's] policies and procedures":

>First and foremost, illegal content is strictly prohibited on
>Pornhub.   This has always been the case and will always
>be the case and the safety of our users and models is our
>number one priority.   Upon upload, every video and photo
>uploaded to Pornhub is reviewed manually by a large and

1    extensive team of moderators looking for illegal content.

2    This sets us apart from other platforms like Twitter or You

3    Tube as well as other adult sites and allows us to act swiftly

4    and promptly for users who violate the terms of service.

5    In addition we use automatic detection technologies on

6    uploads such as YouTube's CSAI Match and Microsoft

7    Photo DNA as added layers of protection.    Finally, we

8    also review flags or content removal reports for illegal

9    content.    We have a dedicated community that works

10   actively to ensure that content adheres to our TOS and

11   rapidly flags any they find questionable for

12   review/removal.    Any content removal request we receive

13   on our content are priorities and expedited faster than any

14   other type of support request and acted upon within hours,

15   not days.    If we come across CSAM, the videos are

16   fingerprinted so they cannot be reuploaded, and the user is

17   banned.    We report the user and the uploads to the

18   National Center for Missing and Exploited Children

19   (NCMEC) who will work with global authorities. . . . All

20   illegal content, in addition to content that breaches our

21   terms of service, is immediately removed as it is detected.

22        233.   Every sentence of this MindGeek statement was a lie.

23        234.   Proof of the lie appeared in the December 2020 *New York Times* expose

24   reporting that the search "Young Asian" tuned up 26,000 videos in addition to

25   thousands more from related suggested searches like "young tiny teen," extra petite

26   teen," "extra small petite teen," "tiny Asian teen," "young girl," and "exploited teen

27   Asia"; there were "many videos on Pornhub that were recordings of assault on

28   unconscious women and girls"; "its business model profits from sex videos starring

young people"; users with names like "13yoboyteen" were posting videos; searches such as "Girl with braces" turned up almost 2000 videos while "13yo" generated 155,000 videos; videos titles such as "Junior High School Girl After Class" depicting an underage teenager"; and videos of prepubescent girls and other minor girls were easily found that the *New York Times* reported it could not "see how good-faith moderators could approve of these videos."

235.   MindGeek's response to this reporting was to refuse to provide an executive for an interview and instead to issue its standard blatantly false mantra: "Pornhub is unequivocally committed to combating child sexual abuse material, and has instituted a comprehensive, industry-leading trust and safety policy to identify and eradicate illegal material from our community" and that claiming otherwise "is irresponsible and flagrantly untrue."

236.   However, this time, MindGeek's gaslighting was not sufficient. When Visa and Mastercard responded by quickly confirming the accuracy of the *New York Times* reporting based on their own investigation and suspending their relationship with MindGeek, the Individual Defendants scrambled to save the business by promising better moderation.   They made numerous public statements about adding substantial technology, better human moderation, and partnerships with authorities and anti-trafficking NGOs.   But instead of actually delivering on those promises, they continued to proactively work to frustrate the effect of such steps so they could continue to monetize as much unrestricted content as possible.

237.   Among other things, as reflected in one text exchange between employees, in the scramble to address the fallout while continuing to cover up the extent of the problem, senior MindGeek executives instructed subordinates not to forward to them reports on the amount of CSAM present on the websites because they did not "wnat [sic] to know how much cp we have ignored for the past 5 years?"

238.   MindGeek's continued effort to frustrate its own moderation practices included limiting the deployment of such technology to its paysites so that it could

tell Visa and Mastercard it had deployed such technology on the sites where they processed payments, while secretly not using that technology on the tubesites that it used to attract traffic to its paysites and where there was the greatest risk of nonconsensual content.   This effort was directed by Antoon in consultation with Bergmair.

239.   In addition, although MindGeek touted its new policy of reviewing flagged content, it concealed that it was only reviewing content that had been flagged over 15 times.   Its chief product officer instructed in an email with Antoon and other senior executives, "I wouldn't mention the threshold of when we manually review a flagged videos being 15+," while another executive responded that the chief product officer's alternative just made 'it[] obvious we are just trying to hide that it's a minimum number of flags" before content was reviewed.   Antoon himself responded that using a percentage indicated that "we want to on purpose profit from popular high viewed video[s]" that were flagged, which, of course, they did and always had.

240.   When employees purportedly tasked with implementing MindGeek's publicly announced policies confronted its chief product officer and chief legal officer to tell them the actual policies were grossly inadequate, and then pressed the issue, the chief legal officer told him to "F*ck off.   It's all good.   Stop" (asterisk added).

241.   MindGeek's disingenuous public claims of a new business model are further belied by the scathing February 2024 report from the Canadian Privacy Committee, which reported that MindGeek had refused to cooperate with its investigation, refused to provide requested information or even an affidavit attesting to the accuracy of the information it had provided, contradicted its own interviewed employees, ignored the agency's recommendations, and instead sued the agency unsuccessfully to prevent it from publicly issuing its findings and recommendations.

242.   Although that lawsuit managed to delay the findings for over a year,

when they were issued in February 2024, the findings included that (a) MindGeek's much touted increased human and technological moderation practices remained "inadequate" and had "many deficiencies" that "are wholly inconsistent with an organization taking responsibility" for ensuring all content is consensual; (b) MindGeek still "in the majority of cases [] had no knowledge of evidence as to whether all individuals depicted in the content in question consented" and knew a large portion did not; and (c) MindGeek refused to "take[] the necessary and responsible corrective measures," "commit[] to follow our recommendations," or []propose any meaningful alternative measures to address the contraventions we identified."

243.   Instead, it reported that MindGeek "continues to rely on the uploaders for [] consent," allows content to go live without the uploaders satisfying the new, purportedly more robust documentation requirements, and refuses to apply its increased moderation standards and processes to previously uploaded content.   And it found that MindGeek continued to do so despite "overwhelming evidence that this results in the posting of vast amounts of intimate content without consent."

244.   It was only after MindGeek lost its lawsuit to prevent these findings from becoming public that it announced it would finally require proof of consent from all persons appearing in uploads although it has still refused to reveal whether this is actually an enforced requirement and whether it applies to its paysites and tubesites.   MindGeek continues to refuse to apply the same moderation standards to previously uploaded content.

245.   All of this evidence demonstrates that MindGeek's commercialization of child pornography and other nonconsensual content was not an innocent deficiency but the product of deliberate and knowing choice that it is trying to maintain to this day.

## 2.   **The Colbeck and Redwood Syndicates.**

246.   Colbeck and Redwood are hedge funds specializing in financing

distressed and "special situations" businesses that have no other sources of capital. Colbeck was the initial lead lender that advised and assembled a syndicate of similar hedge funds to finance MindGeek's growth (the "Colbeck Syndicate"), and Redwood would become one of the largest financiers.

247.   For the same reasons as the Individual Defendants, in providing the necessary financing for MindGeek's growth, monitoring that investment, and advising MindGeek, Colbeck and Redwood fully understood that MindGeek was intentionally embracing child pornography and other nonconsensual content and these hedge funds nevertheless knowingly and intentionally entered into three separate illicit agreements to finance and directly profit from that monetization.   As a result, for much of the period at issue, they received virtually all of the profits from that monetization.   They did this even though they could have refused to finance this trafficking venture, stopped the conduct, or pulled their financing at any time.   Yet, they did not take this action because they, like MindGeek, knowingly and intentionally sought to benefit from the same trafficking conduct.

248.   MindGeek's patent criminality was known before either Colbeck or Redwood decided to first finance MindGeek and became more widely known before, during, and after the terms of each successive financing they did.   For example, in 2009, the United States Secret Service seized $6.4 million from the company's bank accounts in an investigation into, among other things, money laundering by MindGeek, then called Mansef, and its owners Ouissam Youseef and Stephane Manos.

249.   In the wake of that investigation, in 2010, Thylmann "bought" Youseef's and Manos' ownership interests in a seller-financed debt transaction by which they would be paid over time from company earnings.   The transaction distanced the business from its founders while masking their continued economic interest in it.

250.   As part of that effort, Thylmann renamed Mansef, Manwin.   In 2011,

he borrowed over $360 million to fund a massive expansion by acquiring online porn sites and content libraries.   In doing so, however, standard sources for affordable capital were not available because of the well-known illegality ubiquitous in the unregulated online porn industry, and at Manwin in particular.

251.   Instead, Thylmann turned to Colbeck and its former Goldman Sachs banker founders, Jason Colodne and Jason Beckman, to arrange financing in 2011 and they arranged for Redwood and other to participate in that financing.

252.   The loan was fully secured by all of Manwin's assets, including its intellectual property, and provided the Colbeck Syndicate with substantial control over the company's management, operations, and economics through extensive covenants and other onerous terms.   Despite the loan being fully secured, the effective interest rate was in excess of 20%, reflecting the unavailability of any other capital due to the well-known illicit nature of the business. The high interest rate and exorbitant other debt costs would consume all of the business' earnings for years. As a practical matter, the Colbeck Syndicate owned Manwin and during the term of the financing had the ability to control virtually all aspects of the business and receive the vast majority of its earnings.

253.   Thylmann kept Mansef originals Antoon and Tassillo, and the three used the financing to vastly expand the business and establish the Pornhub brand as mainstream.   To do so, they used a Byzantine, multi-national corporate structure consisting of countless subsidiaries in various international jurisdictions that were frequently dissolved and reformed in a dizzying shell game.   This Byzantine structure had no economic substance and served no legitimate or commercial business purpose and was, in fact, highly inefficient from a business management perspective.

254.   However, it masked the true ownership and relationships of these businesses as well as the flow of monies between and out of them.   It also obscured the magnitude of the monies being funneled through any one entity.   Moreover, the

sheer number of companies and jurisdictions made it difficult for regulators, law enforcement, and potential creditors to effectively investigate or take legal action against the business.

255.   Most important, the ruse that the company's business was headquartered in Luxembourg and operated out of Cyprus, where laws and enforcement concerning pornography were minimal, was used to circumvent the much stricter criminal and civil laws and enforcement regimes concerning pornography and CSAM in the United States, Germany, and Canada where MindGeek actually operated and generated virtually all of its revenues.

256.   Two years after purchasing the company, Thylmann was arrested and extradited from Belgium to Germany on charges he had used this Byzantine corporate scheme to evade Germany taxes while also being under investigation for violating child pornography laws.   As a result, he and the Colbeck Syndicate sought to again whitewash the business from scandal by having Antoon and Tassillo buy out Thylmann.

257.   Ultimately, Thylmann was "bought out" by a refinancing and increase in the debt and the investment of Bergmair.

258.   In exchange for this investment, these parties agreed that Bergmair would putatively own 59% of the new business, Antoon and Tassillo 31%, and several preexisting American partners 10%.   In fact, however, Bergmair, Antoon, and Tassillo were only the nominal owners because the Colbeck Syndicate effectively owned the company more than ever because the increased debt it held on the business exceeded its assets, the debt was fully secured by the entire business, and the financing agreement's draconian terms gave the Colbeck Syndicate effective control over the business, the ability to foreclose on it at any time, and the right to receive virtually all of its earnings for the foreseeable future.

259.   All of these MindGeek financiers were intimately familiar with the unrestricted content model MindGeek had been using and would continue to use to

1   drive revenues used to repay the syndicate.   This thorough understanding of

2   MindGeek's practices was initially secured through the extensive due diligence and

3   investment analysis the Colbeck Syndicate and each of its members, including

4   Redwood, conducted before providing financing to Manwin, and later Mindgeek.

5       260.   These repeated rounds of due diligence included in-depth investigations

6   and financial modeling of, among other things, tubesite businesses generally and the

7   online pornography industry in particular, as well as MindGeek's specific business

8   model and legal risks, its competitors, and its websites.   They also included

9   interviews with the Individual Defendants, MindGeek personnel, and industry and

10  legal experts.

11      261.   The due diligence materials included reports from security and

12  consulting firms that highlighted the risks associated with "minors" and "the

13  distribution of illegal material" and euphemistically explained that the company tried

14  to "maintain such risks at acceptable levels for all stakeholders while, at the same

15  time, maintaining the attractiveness if its products and services."   Before providing

16  financing, Colbeck and Redwood fully understood and endorsed what those

17  "acceptable levels" of "minor" and "illegal material" were under MindGeek's

18  unrestricted content model (*i.e.*, as much as possible).

19      262.   Based on this extensive due diligence, Colbeck and Redwood elected to

20  proceed on the investment thesis that MindGeek's unrestricted content model would

21  drive search engine dominance and all investment and effort would be dedicated to

22  unlimited content acquisition and not genuine moderation.

23      263.   When they did so, they knew from their due diligence that more

24  mainstream websites and social media companies like Facebook and YouTube

25  deployed substantial investment and effort into moderating child pornography and

26  other illegal content given the ubiquitousness of such content in an unrestricted

27  online environment.   The due diligence also revealed that no comparable moderation

28  investment or effort was applied in the online pornography industry, which

universally operated without regard to, and by commercializing, illicit content in a wild, wild west market environment.   Indeed, the rampant illegality in the industry was the reason why virtually no other investment capital was available.   And the due diligence revealed that MindGeek too had been and would be continuing to operate with the very same unrestricted content model that affirmatively embraced the use of child pornography and all other forms of nonconsensual content.

264.   This due diligence also involved a detailed understanding of MindGeek's purported international corporate structure as well as its actual business structure and operations, including the fact that it was actually headquartered in Canada and had duplicate servers containing all its content as well as subsidiaries acting as critically essential agents in the United States.   From this due diligence, Colbeck, Redwood, and their syndicates understood the actual applicability of U.S. tax and pornography laws to MindGeek's business, and the devastating impact on that business if MindGeek complied with those laws.

265.   In short, from before providing any financing through the term of all financing, Colbeck, Redwood, and their syndicates intimately understood MindGeek's industry, competitive environment, legal obligations and risks, business practices, financial models and plans, and the consequences and risks associated with them.   They understood that absent substantial investment and effort in meaningful moderation and compliance, the business would be infested with child porn and other nonconsensual content.   They understood MindGeek was intentionally operating without any such meaningful moderation and compliance and intentionally planned to continue to do so.   They understood that instead MindGeek's unrestricted content model knowingly and intentionally planned to incorporate such content into its business and monetize it by proactively optimizing and promoting it.   And they understood it planned to do so, in part, by evading U.S. laws based on a fictitious corporate structure and misrepresented claims about its practices.

266.   And, critically, they understood that directing all investment into

monetizing illicit as well as licit content and none to moderation was essential to MindGeek's ability to successfully execute its business plan and pay back the exorbitant debt.   Indeed, among other things, that financing was intended to fuel projected growth by the mass acquisition of existing businesses and content that also used unrestricted content models and were already infested with illegal content.   The growth was not based on building a better safer alternative to illegal online porn, but in grabbing market share in an illicit industry with a company that was likewise illicitly operating.   In short, the financing was an investment in child pornography and other trafficked content in exchange for oversized returns.

267.   It was the knowing and intentional willingness to finance this illicit business, which the rest of the investment community was not willing to finance, that permitted Colbeck and Redwood to secure exorbitant effective interest rates as high as 20% on secured loans with onerous control terms.

268.   Colbeck and Redwood were also aware MindGeek was commercializing child pornography and other nonconsensual content from their direct involvement with the company over the terms of their financing.   In addition to its exorbitant economics, the financing terms also included draconian covenants and remedies that provided Colbeck, Redwood, and their syndicates substantial transparency into the business, regular reporting of financing and material business and legal matters, and the ability to effectively control the company through various means including through broad default and foreclosure rights.

269.   Under these terms, the syndicate regularly received detailed reports on MindGeek's business and financial performance, business plans, and legal issues and risks, including when issues concerning child pornography and other nonconsensual content were raised by government bodies and law enforcement, business counter-parties, victims, and the press.   These included detailed disclosures of communications concerning illegality that were received from advocates, business counter-parties, political officials, and journalists, including the responses provided.

1  Colbeck, Redwood, and the syndicates knew these reports were true and MindGeek's

2  denials false but permitted them anyway.

3      270.  Beyond the complete access to information about MindGeek's

4  operations, the Colbeck and Redwood syndicates' substantial rights amounted to

5  effective ownership and control.  The syndicates consumed virtually all of the

6  business' earnings for most of the years, and Colbeck and Redwood could at any

7  time have declared a default for any number of reasons, including MindGeek's

8  failure to comply with U.S. law or otherwise exclude illegal content, and thus had the

9  ability to either take direct ownership and control or replace the Individual

10  Defendants running the company.  Therefore, at any time, they could have directed

11  MindGeek to comply with U.S. law and exclude child pornography or other illegal

12  content, but they knowingly and intentionally did not do so because they understood

13  the business and the syndicate's investment depended on that unrestricted content

14  and the full utilization of the financing and operational earnings in acquiring, not

15  limiting, it.

16      271.  Beyond all these sources for Colbeck's and Redwood's direct

17  knowledge of MindGeek's systematic use of child porn and other nonconsensual

18  content, they also closely monitored MindGeek's websites and news and other public

19  information about the business and the industry as part of their ongoing management

20  of this massive high-risk investment and communicated regularly with Antoon

21  regarding same.  Thus, Colbeck and Redwood were aware of all the public reports

22  of CSAM and other non-consensual content on MindGeek's websites throughout this

23  period.  At no time, however, did either Colbeck or Redwood take any steps to stop

24  what they knew was the systemic and intentional use of child pornography and other

25  nonconsensual content because they had always been aware of this fact and agreed to

26  finance and profit from it.  And their failure to do so even in the wake to the

27  damning public reporting from 2019-2021 demonstrates this reporting was neither a

28  surprise nor a problem for them.

### 3.   <u>Visa</u>

272.   Also aware of and uniquely situated to prevent MindGeek's trafficking venture were the financial institutions processing the transactions upon which that venture monetized the content.   At the top of that list were major American credit card companies Visa and Mastercard.   The impact these financial institutions could have had in preventing the victimization of women and men as well as children worldwide was made apparent in December 2020 when, in response to public outrage from a bombshell *New York Times* report exposing MindGeek's trafficking, they cut ties with Pornhub and consequently forced MindGeek to take down over 10 million unverified videos from its tubesites in response.

273.   But that expose was not a bombshell to Visa and Mastercard.   For over a decade they had been well aware of the facts the *New York Times* exposed and instead of insisting that MindGeek commercialize only legal consensual content, and comply with United States laws concerning the same, they elected instead to facilitate and profit from the MindGeek trafficking venture.   Even today, Visa continues to process payments for MindGeek paysites that are themselves rife with trafficking and are promoted, marketed, and sustained by the MindGeek trafficking venture.

274.   At all times relevant to this complaint, major credit card companies and their member banks providing merchant services to MindGeek were aware of its trafficking venture and knowingly profited from it.   They did so despite numerous high profile publicly reported instances of obvious and indisputable trafficking, the termination of relationships with MindGeek by competitors and other business partners, facts in plain sight and known to them, and detailed reports presented to them from numerous anti-trafficking advocacy groups.

275.   These credit card companies and their member banks providing merchant services to MindGeek were aware of the trafficking risk because it was common knowledge in the pornographic industry since no later than the 1980 and the

1    subject of numerous public reports from government and advocacy agencies ever

2    since, particularly since the emergence of online pornography industry.   They were

3    likewise fully familiar with 18 U.S.C. § 2257 provisions designed to prevent

4    CSAM/child pornography.

5        276.   More particularly, these financial institutions and their member banks

6    were aware of actual instances of trafficking and CSAM/child pornography and red

7    flags of such content from their own due diligence and compliance functions. Indeed,

8    since its inception, all one needed to do was visit MindGeek's tubesites to observe

9    tens of thousands of videos (with the help of MindGeek's suggested search and video

10   algorithm) depicting subjects who were obviously underage, under duress,

11   incapacitated, being raped, or secretly exploited.   One would also easily observe tens

12   of thousands more videos depicting the very same content where there was no way to

13   determine whether the content was nonconsensual.

14       277.   In addition, it was apparent from the most such superficial inquiry that

15   MindGeek was taking no steps to police the presence of obviously nonconsensual

16   content or determine if ambiguous content was consensual.   To the contrary, that

17   simple investigation would have revealed that the titles, descriptions, and tags and

18   MindGeek's algorithmic suggested video and search functions did not merely

19   tolerate non-consensual content but encouraged its upload and viewing.

20       278.   Furthermore, the most basic inquiry would have revealed that

21   MindGeek made no effort to effectively employ technology to police illegal content,

22   employed virtually no human moderation, employed no human moderation remotely

23   approximating that of other websites with far less content, and had an incoherent

24   random selection of superficial policies to prevent such content that were plainly not

25   intended to do any such thing but were, as one insider said, "100% BS."

26       279.   Moreover, it was apparent to anyone, including the credit card

27   companies and their merchant banking members, that MindGeek systemically

28   ignored the requirements of 18 U.S.C. § 2257, which was enacted decades earlier

because it was a known fact that absent basic age verification CSAM/child pornography would infest the pornography business.

280.   The most basic observation also would have revealed that while major websites with video libraries and upload volumes as big as or smaller than MindGeek reported millions of CSAM/child pornography depictions to authorities, MindGeek reported virtually none.   This fact alone would have alerted anyone who cared that MindGeek was intentionally concealing and commercializing such content.

281.   Certainly, taken together, all of this would have informed even the densest inquisitor that MindGeek was intentionally engaged in commercializing non-consensual trafficked content.   The credit card companies and their members providing merchant banking to MindGeek were not uniquely incapable of understanding all of this.   To the contrary, they were uniquely capable and in the best position to understand this.   And they did understand this.   They simply chose to do business with MindGeek and benefit from its trafficking venture nevertheless.

282.   Most important, these companies and member banks were well aware that it is was impossible to segregate MindGeek's trafficking venture from its legitimate porn business.   These companies were intimately familiar with MindGeek's business model and that all its content, including its trafficked content and CSAM/child pornography, was inextricably intertwined in MindGeek's SEO, promotion, solicitation, and funneling of website traffic to its paid porn services. Indeed, as the campaign exposing Pornhub went viral in 2020, these credit card companies began pressuring MindGeek to clean up explicit references to trafficked content and CSAM/child pornography on its sites by removing titles, descriptions, and tags that explicitly flagged such content.   However, Visa did not insist that the content itself be removed or that MindGeek put in place systems to reasonably ensure it was not commercializing such content and/or using it to benefit its business through SEO and the funneling of traffic to its websites.

283.   Not all financial institutions chose to continue benefiting from

MindGeek's trafficking venture.   For example, in November 2019, Visa's competitor PayPal terminated its relationship with MindGeek because it could no longer ignore the overwhelming evidence of MindGeek's trafficking venture.   At the time, PayPal publicly explained that "[PayPal] explicitly prohibits the use of [its] services for the sale of materials that depict criminal behavior, or the sale of sexually oriented content to minors."[3]   Despite this public disclosure, Visa continued to partner with MindGeek.   They continued to do business with MindGeek because Visa and its merchant banks servicing MindGeek were long aware of the same information and intentionally elected to not terminate their relationships with MindGeek.

284.   Likewise, Visa continued to process payments for MindGeek partner channels even after one of its most popular partner channels, GirlsDoPorn, was indicted and then convicted for being a human trafficking venture.   When it did this, Visa was aware that it had made millions of dollars in profits from GirlsDoPorn and similar MindGeek partner channels and elected to continue to do so without any investigation or diligence.   It did so because it was already aware that MindGeek's business was infested with trafficked content like GirlsDoPorn, was aware that MindGeek systemically violated 18 U.S.C. § 2257 in neither requiring its partner channels to secure and certify age verification and consent and by transferring millions of videos a year in and through MindGeek's network of websites that did not comply with § 2257.

285.   Even worse, Visa continued to do business with MindGeek even after it was confronted directly with evidence of its complicity in MindGeek's trafficking venture.   For example, in 2020, Visa was included for the first time on the annual Dirty Dozen List issued by anti-trafficking advocates to highlight mainstream

_____

[3]   https://www.thetimes.co.uk/article/paypal-cuts-off-porn-site-that-ran-child-abuse-videos-98j2bdnjt.

business that facilitate, participate in, and profit from sexual abuse and exploitation. In response, Visa issued a public statement misrepresenting that:

> Visa only permits transactions on the Visa network for the purchase or sale of lawful products and services.   We categorically prohibit transactions involving child pornography and human trafficking. As a founding member of the Financial Coalition Against Child Sexual Exploitation, Visa works together with our coalition partners to identify potentially illegal merchants or illegal activities and bar them from the Visa network.

286.   In fact, Visa was aware that it and its merchant banks servicing MindGeek permitted and profited from tens of thousands of transactions annually that benefited from MindGeek's trafficking venture.   Specifically, in addition to transactions processed to pay for trafficked content and child pornography specifically, Visa and these banks, together with MindGeek, used their trafficking venture to promote, solicit, and facilitate the purchase of consensual porn.   And they did so despite its flagrant violation of § 2257.   Visa and its network banks were intimately familiar with MindGeek's business model and how it used illicit content to attract and funnel business, advertising, and paid memberships, all of which Visa elected to process and profit from nevertheless.

287.   Further evidencing Visa's commitment to doing business and benefiting from MindGeek's trafficking venture, in April 2020, during a conference call with Elizabeth Scofield, the Director of Global Brand Protection for Visa, anti-sex trafficking advocates detailed the ways in which MindGeek was enabling and profiting from the rape and trafficking of women and children.   At the conclusion of the call, Scofield requested written information that she could present to others at Visa, which was provided to her on April 30, 2020 in the form of a lengthy, detailed presentation detailing the ways in which Visa was participating in the exploitation of

victims of sex trafficking through its partnership with MindGeek.   Visa never

responded further, and elected instead to continue doing business with and benefiting

from MindGeek's trafficking venture.

288.   Thereafter, Visa's participation and facilitation of MindGeek's illegal

conspiracy was reiterated by a letter sent by another non-profit organization

dedicated to ending human trafficking and modern slavery on May 1, 2020.   The

letter, which was addressed to Visa's president, Alfred Kelly, detailed MindGeek's

documented complicity in the trafficking of women and children and concluded with

a plea to Visa to terminate its partnership with MindGeek.

289.   MindGeek's illegal and criminal activities were further detailed in a

second letter sent to Visa five days later on May 5, 2020.   Among other important

disclosures, the May 5, 2020 letter explained that it is impossible to "judge or verify

consent in any videos on [Pornhub] let along live webcam videos" which inherently

make it "a target for sex traffickers, child abusers, and other sharing predatory

nonconsensual videos."[4]   This was not a novel alert.   The presence of trafficking in

the webcam industry was notorious and well known to Visa.

290.   Nevertheless, Visa and its member banks processing payments from

MindGeek elected to continue processing such transaction even when they carried

with them obvious red flags such as involving accounts from known trafficking

regions and where payments from large numbers of purportedly independent cam

models were being deposited into single accounts of obvious traffickers.

291.   When Visa failed to take any action in response to the detailed

presentation of facts and follow up correspondence, anti-trafficking public advocates

launched an email campaign, targeting the executives of Visa.   Within two days of

the May 8, 2020 campaign launch, hundreds of emails had been sent.   On May 15,

2020, a second campaign was started.   By May 22, 2020, thousands of emails had

---

[4]   https://www.bbc.com/news/world-52543508

been sent to Visa executives calling for Visa to terminate its relationship with Pornhub.

292.   Yet Visa did not respond.   However, over two months later when the campaign against MindGeek again picked up steam due to a viral video released by advocates, Visa did conduct a CYA scramble to avoid being accused of ignoring the issue entirely.   On July 15, 2020, it sent a response letter.

293.   That response was stunning.   Instead, of seriously considering the evidence of illegality it was already well aware of, it offered mealy-mouthed platitudes about its vital role in commerce, its need to remain neutral, and the need for others to do something about a pure evil it was uniquely situated to immediately address:   "We believe that any truly effective solution must come from thoughtful changes to laws and regulations by those elected to establish the laws of our country . . . Maintaining a neutral stance under the law is vital for the free flow of commerce." That is to say, translated into English:   *we do not want to get involved in policing illegal conduct when we are making money on the illegal conduct even if we admit it is evil and we could easily stop it*" (emphasis added).

294.   The ease with which anyone, and certainly sophisticated financial institutions with rigorous due diligence obligations, would have become aware of MindGeek's trafficking venture was made obvious by the December 4, 2020 *New York Times* bombshell report by Pulitzer Prize winner Nicholas Kristoff, "The Children of Porn Hub."   Acknowledging that MindGeek's business involves much legitimate, legal pornography, Kristoff also reported how his relatively modest investigative efforts easily revealed that its business also was flooded with non-consensual content and seems designed so be so:

> Yet there's another side of the company:   Its site is
> infested with rape videos. It monetizes child rapes, revenge
> pornography, spy cam videos of women showering, racist
> and misogynist content, and footage of women being

asphyxiated in plastic bags. A search for "girls under18"
(no space) or "14yo" leads in each case to more than
100,000 videos. Most aren't of children being assaulted,
but too many are.

*************************************

A great majority of the 6.8 million new videos posted on
the site each year probably involve consenting adults, but
many depict child abuse and nonconsensual violence.
Because it's impossible to be sure whether a youth in a
video is 14 or 18, neither Pornhub nor anyone else has a
clear idea of how much content is illegal.

*************************************

I came across many videos on Pornhub that were
recordings of assaults on unconscious women and girls.
The rapists would open the eyelids of the victims and touch
their eyeballs to show that they were nonresponsive.

Pornhub profited this fall from a video of a naked woman
being tortured by a gang of men in China. It is monetizing
video compilations with titles like "Screaming Teen,"
"Degraded Teen" and "Extreme Choking." Look at a
choking video and it may suggest also searching for "She
Can't Breathe."

*************************************

Facebook removed 12.4 million images related to child
exploitation in a three-month period this year. Twitter

closed 264,000 accounts in six months last year for engaging in sexual exploitation of children. By contrast, Pornhub notes that the Internet Watch Foundation, an England-based nonprofit that combats child sexual abuse imagery, reported only 118 instances of child sexual abuse imagery on its site over almost three years, seemingly a negligible figure.

The Internet Watch Foundation couldn't explain why its figure for Pornhub is so low. Perhaps it's because people on Pornhub are inured to the material and unlikely to report it. But if you know what to look for, it's possible to find hundreds of apparent child sexual abuse videos on Pornhub in 30 minutes. Pornhub has recently offered playlists with names including "less than 18," "the best collection of young boys" and "under- - age."

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

So while it is now no longer possible to search on Pornhub in English using terms like "underage" or "rape," the company hasn't tried hard to eliminate such videos. A member called "13yoboyteen" is allowed to post videos. A search for "r\*pe," turns up 1,901 videos. "Girl with braces" turns up 1,913 videos and suggests also trying "exxxtra small teens." A search for "13yo" generates 155,000 videos. To be clear, most aren't of 13-year-olds, but the fact that they're promoted with that language seems to reflect an effort to attract pedophiles.

Moreover, some videos seem at odds with the list of banned content. "Runaway Girl Gets Ultimatum, Anal or the Streets" is the title of one Pornhub video. Another user posts videos documenting sex with teenage girls as they weep, protest and cry out in pain.

While Pornhub is becoming more careful about videos of potentially litigious Americans, it remains cavalier about overseas victims. One Indonesian video is titled "Junior High School Girl After Class" and shows what appears to be a young teenager having sex. A Chinese sex video, just taken down, was labeled: "Beautiful High School Girl Is Tricked by Classmates and Taken to the Top of a Building Where She Is Insulted and Raped."

In the last few days as I was completing this article, two new videos of prepubescent girls being assaulted were posted, along with a sex video of a 15-year-old girl who was suicidal after it went online. I don't see how good-faith moderators could approve any of these videos.

295.   Almost immediately after this report was published, both Visa and Mastercard terminated substantial connections with MindGeek, claiming that after just a few days of "investigation" they had "discovered" that MindGeek's websites were permeated with illegal content.   In fact, these companies and their member banks providing merchant banking services to MindGeek were aware of these facts for over a decade but elected to continue doing business with them and make millions of dollars in profit from MindGeek's trafficking venture.

296.   On December 10, 2020, Visa posted on Twitter: "[g]iven the allegations

of illegal activity, Visa is suspending Pornhub's acceptance privileges pending the completion of our ongoing investigation. We are instructing the financial institutions who serve MindGeek to suspend processing of payments through the Visa network."

297.  Unlike Visa's response which merely acknowledged "allegations of illegal activity," the CEO of Visa's biggest competitor, Mastercard, acknowledged publicly that after just a few days of "investigation" it had determine MindGeek was trafficking in illegal content:

> We went back and we looked, and we found actually
> instances where clearly the legal standard of what should
> be allowed on Pornhub had been crossed. So, we went back
> to Pornhub and said, 'Sorry, you've crossed the legal
> standard.'   Porn's not illegal. It is certain kinds of porn
> that are illegal. So child porn is, and that's what we saw.
> That's why we pulled out.

298.  Visa's investigation revealed the same thing, and more, yet it refused to also publicly acknowledge this fact because it wanted to continue doing business with, and profiting from, MindGeek's trafficking venture.

299.  And that is what it did.   Visa's ban on MindGeek's websites was short-lived.   Although Visa continues its ban on MindGeek's websites that host user-generated content, like Pornhub, in short order Visa reembraced MindGeek and began processing payments again for MindGeek's paysites despite knowing that these revenue streams are likewise permeated with trafficking like GirlsDoPorn, and that MindGeek used its trafficking venture overall to attract, advertise, and funnel visitors revenues to these paid sites.   As of the filing of this lawsuit, Visa continues to process payments for such content.[5]

---

[5]  https://endsexualexploitation.org/wp-content/uploads/2021-Dirty-Dozen-List_Notification-Letter_Visa_Final.pdf.

### D.   MindGeek's Alter Ego Corporate Structure and Operation

300.   The Individual Defendants and the Mindgeek Organizations were the alter egos of each other because the complicated corporate structure (a) lacked economic substance; (b) was a sham created to evade pornography, tax, and monetary transaction laws; lacked any *bona fide* corporate purpose or reality, and instead consisted of a phantom "headquarters" and phantom "operating companies" in Luxemburg and Cyprus, respectively, when, in fact, the *de facto* headquarters and operating company was located at a purported Canadian subsidiary; and (c) was systematically ignored in so far as, among other things, all the organizations were run as one, comingled monies, failed to segregate funds, paid each others' fees, expenses and distributions, treated each other's assets as their own, held themselves out as being personally liable for the debts of each other, used the same business locations employing the same employees, failed to adequately capitalize, used each other as a conduit for a single venture, failed to maintain arm's length relationships among themselves, diverted assets without consideration from/to one another to the detriment of creditors (including Plaintiff), failed to keep *bona fide*, accurate, and complete corporate and financial records, and were dominated and directly controlled by the Individual Defendants personally who used that domination and control to engage in substantial self-dealing and diverting of corporate funds and assets without authorization for noncorporate uses.

301.   For example, during the period covered by the complaint, the Luxembourg headquarters was empty, described by journalists who visited it as "reception deserted, there are a few cardboard boxes lying around, cables hanging out of the walls and price tags are stuck on the desks."   One neighbor reported there was never anyone in the offices.   Likewise, the offices of the purported Cyprus operating companies were staffed merely by a handful of very junior employees engaged in low-level formatting that they described as "edit[ing] content for some websites" and loading content onto those sites.   When anyone tried to contact these

companies about the business, they would be informed that the offices have nothing to do with the actual websites purportedly being operated out of those offices. Those who actually operated, acted on behalf of, and communicated for these purported businesses were located primarily in Canada at the actual company headquarters and their communications would be routed through Cyprus servers to misrepresent that they were there.

302.   Indeed, contrary to the corporate form Mindgeek created and maintained publicly to be true, the Individual Defendants directly dominated and ran the company as owners.   Antoon and Tassillo publicly testified and otherwise publicly affirmed that they ran the entire company as CEO and COO even though they held no such roles and had no such authority under the formal corporate form.   Antoon and Tassillo ran the entire company directly as its owners along with the person they identified as the majority owner, Bernrd Bergmair.   Bergmair was consulted and approved all major decisions, was regularly briefed on all material matters, and frequently travelled to the Canadian offices where he had an executive office.

303.   In addition, the Individual Defendants used their direct and personal domination and control over the company to engage in substantial self-dealing.   For example, for years Antoon and Tassillo used MindGeek Canada and no less than a dozen of its executives and personnel to manage their personal and investment affairs and those of their family members.   Among others, Antoon and Tassillo used the general counsel and MindGeek's legal staff to handle personal and investment contracts and insurance matters, to prepare legal letters to tenants in their numerous real estate rental properties, and to assist in legal proceedings concerning those properties.

304.   They used the CFO's office and, in particular, the Senior Director of Corporate Finance, to manage their personal and investment finances and bank accounts using MindGeek's systems.   This included keeping the books on their personal and investment finances, issuing monthly reports, tracking receipts of rental

and other payments and expenses, including property, auto and other insurance, federal state and local taxes, mortgage fees, condominium fees, and furniture and appliances purchases.   These personnel had access to and control over Antoon and Tassillo's personal and investment bank accounts and credit cards, managed those accounts, and prepared regular financial reports.

305.   In addition, the head of MindGeek facilities and members of her department worked, including several full time, on managing Antoon and Tassillo's real estate investment properties, including the following tasks: investigating and recommending potential investment properties; managing the purchase or sales processes; conducting regular site visits; advertising rentals; interviewing and screening potential tenants; negotiating rental and sales deals; having lease and renewal contracts prepared and executed; coordinating tenant moves; handling rental unit repairs and cleaning; arranging for and managing annual inspections; handling rent collection and deposits; responding to tenant complaints or requests; shopping for and negotiating insurance, vendors services, furniture and appliances; attending condominium board meetings and liaising with condominium management on behalf of tenants or Antoon and Tassillo; paying condominium fees and property taxes; arranging and paying for utilities, cable and communications, and refuse services; and coordinating all such activities and payments with MindGeek's finance, legal, IT, and administrative functions.

306.   With assistance from MindGeek's general counsel and his staff, these facilities personnel also handled government rental board matters, evictions, and legal proceedings to collect delinquent rent.

307.   These personnel provided similar services for Antoon's and Tassillo's personal residences by providing or arranging for maintenance, repairs, improvements, technical services, vendor selection and management, furnishing and appliance purchases, utilities, and financial management.

308.   In addition to using MindGeek personnel, Antoon and Tassillo and

those personnel commingled MindGeek credit cards and vendor accounts to fund such activities, frequently running the costs of them through the expense system or company charge cards.   Furniture, appliances, and other items were similarly purchased for their personal or investment properties through MindGeek accounts and were often delivered and stored at MindGeek.

309.   Moreover, the legal entities in which such properties were held used MindGeek's address, the personnel acting on Antoon's and Tassillo's behalf communicated with their counterparties through MindGeek emails and telephone accounts, they wrote correspondence addressed from MindGeek, and their signature blocks identified them as MindGeek employees.

310.   Also involved in such activities were Antoon's and Tassillo's family members.   For example, Tassillo's sister was employed by MindGeek and actively assisted in the management of his real estate investments and personal residences and other assets as part of her responsibilities; and MindGeek personnel also provided similar services for Antoon's family members, including his brother Mark, his mother and father, and his cousins.   Antoon also had MindGeek pay his family for running a cafeteria at MindGeek Canada.

## III.   Plaintiff Was Exploited by MindGeek's Trafficking Venture

311.   At age seventeen, K.A.'s adult boyfriend coerced her into oral sex and recorded the encounter.   From 2018-2019, the CSAM video of seventeen-year-old K.A. was disseminated and monetized on Pornhub under the title "Ginger GF sucks c*** and gags" (asterisks added).

312.   At no time prior to posting the video did MindGeek, Pornhub, or any other website owned or operated by MindGeek attempt to verify K.A.'s identity or age.   Neither K.A. nor her parents consented to having a video of her uploaded, commercialized, and monetized on Pornhub, and neither K.A. nor her parents could lawfully consent to the possession and dissemination of child pornography had they been asked.

313.   To the contrary, MindGeek personnel reviewed the video of K.A. prior to upload, as they repeatedly have claimed do for every video uploaded to Pornhub, and the title, and were aware that this video constituted CSAM.   Nevertheless, consistent with its overall business model and practices, MindGeek posted the video to its Pornhub site.   It also categorized, tagged, optimized for user preferences, and disseminated the images, tags and video depicting 17-year old K.A.   And it uploaded the optimized, tagged, categorized video to its other tubesites itself and incorporated it into its algorithmic playlists and suggested videos.   The video appeared alongside advertisements that MindGeek had placed and on which it earned revenues with every page visit, impression, engagement, and conversion.

314.   K.A.'s ex-boyfriend intended to monetize the exploited video of K.A. at the time it was recorded and he and those to whom he sold the videos and images regularly uploaded such videos to MindGeek's tubesites.

315.   In November 2019, K.A. through a friend, reached out to her ex-boyfriend and demanded that the video be removed from Pornhub.   K.A. also contacted the police who conducted a full investigation.   During that investigation, K.A.'s boyfriend conceded that he uploaded a video of the two engaged in a sex act to Pornhub and that K.A. was underage in the video.

316.   Although Pornhub eventually removed the video from its site, the two-year long dissemination of CSAM images online has caused K.A. severe anxiety and distress which has only been mitigated by ongoing treatment from a mental health professional.

317.   Moreover, to mitigate the continued dissemination of her CSAM video, K.A. was forced to retain an investigatory firm to investigate whether any of her videos were still accessible on Pornhub or other pornographic sites and to facilitate takedown requests.

318.   K.A. was victimized on multiple occasions.   First, when she was first coerced and exploited.   Second, when the CSAM video of her was uploaded to

MindGeek's platform.   Third, when MindGeek, as a matter of course, transferred that video to its other tubesites, to users downloading them, and to its platform again when it periodically reuploaded disabled content or non-disabled content that it had further optimized.   Fourth, when defendants did nothing to police and report such content to the authorities.

## CAUSES OF ACTION

## COUNT I

## (VIOLATION OF 18 U.S.C. §§ 1591(A)(1), 1591 (A)(2), 1595)

## (AGAINST THE MINDGEEK DEFENDANTS)

319.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

320.   As set forth herein, MindGeek, through its Byzantine network of sham shell entities, owners, alter egos, agents, executives, and investors, is a sex trafficking venture within the meaning of 18 U.S.C. §§ 1591 and 1595.

321.   The MindGeek Defendants knowingly used the instrumentalities and channels of foreign commerce to facilitate violations of 18 U.S.C. §§ 1591 and 1595.

322.   The MindGeek Defendants' conduct was in, or affected, interstate and/or foreign commerce.

323.   The MindGeek Defendants recruit, entice, harbor, transport, provide, obtain, advertise, maintain, patronize, or solicit videos and images depicting CSAM on their websites.

324.   Moreover, the MindGeek Defendants participated in a venture engaged in sex trafficking that targeted Plaintiff by *inter alia*:

(a)   recruiting, commissioning, producing, buying, and aggressively soliciting illegal content, including content depicting CSAM, rape, assault, and other nonconsensual activities;

(b)     systemically uploading paid for trafficked, CSAM, and other illegal content through a network of agents and MindGeek employees in Canada or Cyprus;

(c)     partnering with content channels to produce CSAM and other illegal content for its tubesites;

(d)     entering into explicit online agreements with traffickers at the time of upload to use the illegal content and commercialize it on other MindGeek owned tubesites;

(e)     curating, formatting and modifying uploaded content to optimize search engine optimization and visualization and mask blatant descriptions of criminality, including editing scenes, video length, and content to appear as if it was user-made;

(f)     creating thumbnails to attract viewers to videos, including CSAM videos;

(g)     directing viewers interested in child pornography and other illegal content to CSAM on its site through playlists, titles, tags, buttons that direct viewers to various types of content and levels of intensity;

(h)     featuring categories on their websites that target users interested in child pornography and other sexual abuse, trafficking, and nonconsensual materials;

(i)     directing and assisting users to describe their videos through content titles and tags using categories like "teen" to drive traffic to CSAM materials and suggesting preexisting terms based on its SEO analysis;

(j)     maintaining the webpage and thumbnails for disabled videos so that the MindGeek Defendants can continue to generate traffic

and revenue from that illegal content and direct users to similar content;

(k) maintaining a search and tagging system that directs users to find and view videos of child and adult sex abuse, sex trafficking, and other nonconsensual content;

(l) providing guidance to its global network of sex traffickers on how to upload videos of sex trafficking and evade criminal liability while complying with MindGeek's purposefully loose restrictions, including by maintaining public list of "banned words"—i.e., words to avoid in the title of videos;

(m) providing its global network of sex traffickers VPN services to allow them to cover up their unlawful conduct by obscuring the sex traffickers' locations and identities;

(n) enabling videos to be uploaded to its tubesites without proper verification and moderation that the video complies with 18 USC 2252 or other applicable laws;

(o) enabling the downloading of videos which facilitated the reupload by different users with different titles, including numerous instances where the CSAM videos of Plaintiff were reuploaded to Pornhub and other MindGeek owned tubesites;

(p) pushing and reuploading all effective content on any of its tubesites, including CSAM videos of Plaintiff, regardless of its initial sourcing, to its other tubesites which it falsely portrayed as posted by a user other than MindGeek;

(q) monetizing CSAM and other illegal content through subscriptions and advertising, including through MindGeek affiliate TrafficJunky, and by placing advertisements alongside CSAM videos, including CSAM videos of Plaintiff;

(r)  enabling advertisers to build campaigns around keywords that clearly reflect illegal activity, including "13yearoldteen"; "not18"; "14yrold"; and "15yrold";

(s)  editing advertisement placed on its tubesites to highlight terms that promote the creation, use, and viewing of CSAM.

(t)  systematically and surreptitiously reuploading content that it had been forced to disable, and doing so in a manner in which it appeared to have been reuploaded by independent users;

(u)  maintaining a database of all CSAM, illegal, abuse, and other nonconsensual content ever uploaded to any of its tubesites, including deleted videos, for future commercialization and monetization.

325.  As set forth herein, defendants entered into explicit online agreements with sex traffickers to use and broadly disseminate uploaded content, maintained affiliations with those sex traffickers by enabling the posting of child pornography on their websites, and strengthened those affiliations by connecting traffickers with those who want to view child pornography by, among other things, creating playlists that target those interested in child pornography, feature categories on their website that target those interested in child pornography, instruct users to describe their videos with terms like "teen"; and declined to take down CSAM images, and when they do leave the disabled link up so that it can direct viewers to similar content.

326.  The MindGeek Defendants knowingly benefit from a sex trafficking venture by benefitting financially from the dissemination and monetization of child sexual abuse materials, including hundreds of millions of dollars in annual profits from subscriptions and almost three billion ad impressions each day, much of which is attributable to CSAM and other illegal content.

327.  The MindGeek Defendants knew or should have known that their tubesites were rife with CSAM, abuse, rape, trafficked and other nonconsensual

content. Among other things, between 2011 and the present, the MindGeek
Defendants have been repeatedly informed of child pornography and other trafficked,
nonconsensual, and illegal content on their websites by victim complaints, user
comments, third party reporting, advocacy groups, and governmental investigations.
Moreover, by way of further example, as set forth herein:

    (a)    MindGeek had a reasonable opportunity to observe the victims
featured on its website;

    (b)    MindGeek purported to have moderators review every video prior
to uploading it to its website, and the CSAM nature of the video
was obvious from the age of Plaintiff, the title, and tags;

    (c)    MindGeek regularly reuploaded materials that had been removed
from its site in response to a directive from authorities or a
victim's lawyer to remove child pornography or other illegal
materials;

    (d)    comments on posts, titles, and tags, including the title and public
comments associated with the videos of Plaintiff that was
uploaded to Pornhub, informed MindGeek that the content
depicted underage victims and victims of assault and sex
trafficking;

    (e)    MindGeek intentionally and aggressively pursued a no restricted
content business model, and in furtherance of this objective failed
to adopt verification and modification techniques, including for
the videos depicting Plaintiff that were uploaded and reuploaded
to its tubesites.

328.    Plaintiff's CSAM videos that were disseminated on MindGeek's
tubesites constitute commercial sex acts because all of the videos and images
generate revenue for defendants and/or traffickers.

329.    As a direct and proximate result of the MindGeek Defendants'

violations of 18 U.S.C. §§ 1591 and 1595, Plaintiff has suffered substantial damages, including but not limited to, physical, psychological, financial, and reputational harm, investigation expenses, and other costs associated with the prolific dissemination of her CSAM.

330.   Further, by profiting from these videos and images, the MindGeek Defendants have become unjustly enriched at the expense of Plaintiff in an amount to be determined at trial.

331.   Moreover, by reason of the MindGeek Defendants' violation of 18 U.S.C. §§ 1591 and 1595, Plaintiff is entitled to recover attorney's fees, costs, and punitive damages.

**COUNT II**

**(VIOLATION OF 18 U.S.C. §§ 1591, 1595)**

**(AGAINST VISA)**

332.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

333.   As set forth herein, MindGeek, through its Byzantine network of sham shell entities, owners, alter egos, agents, executives, and investors, is a sex trafficking venture within the meaning of 18 U.S.C. §§ 1591 and 1595.

334.   Visa participated in the MindGeek sex trafficking venture by processing premium subscriptions for MindGeek partner channels and ad payments for MindGeek's pay and tubesites.   As set forth herein, Visa processed payments that allowed viewers to access or download videos of Plaintiff, among countless other trafficking victims.   Additionally, Visa participated in the MindGeek sex trafficking venture by making at least two public statements falsely suggesting that all of the content on MindGeek's tubesites was lawful and legitimate under current laws, despite Visa's knowledge to the contrary.   Reflecting Visa's central participation and role in the MindGeek sex trafficking venture, when Visa terminated its payment processing service in December 2020 following the *New York Times* expose,

MindGeek immediately took down nearly 10 million unverified videos from its tubesites.

335.   Visa knowingly used the instrumentalities and channels of foreign commerce to facilitate violations of 18 U.S.C. §§ 1591 and 1595, occurring within the territorial jurisdiction of the United States.

336.   Visa's conduct was in, or affected, interstate and/or foreign commerce.

337.   Visa knowingly benefits financially and/or receives something of value from participation in the MindGeek sex trafficking venture including, but not limited to, millions of dollars in profits from credit card transaction fees for premium subscriptions and ad revenues.

338.   Visa knew, recklessly disregarded, or should have known that it benefitted from participation in a sex trafficking venture that trafficked Plaintiff, among countless other victims, and engaged in acts that constitute violations of section of 18 U.S.C. § 1591(a)(1).   As set forth herein, MindGeek's business model of recruiting, enticing, harboring, transporting, providing, obtaining, advertising, maintaining, patronizing, and/or soliciting CSAM and other sexual abuse and trafficking content was known to, recklessly disregarded by, or reasonably should have been known to Visa because, among other reasons:

(a)   known risks associated with the pornography industry dating back to the 1980s;

(b)   media reporting concerning CSAM on MindGeek's and its predecessor company sites dating back to 2011,

(c)   video titles, comments and tags, including the titles and comments on Plaintiff's CSAM videos that were uploaded to Pornhub, informed Visa that the content depicted underage victims and victims of assault and sex trafficking;

(d)   direct correspondence from advocacy groups and e-mail writing campaigns re same;

(e)     governmental investigations, including by the Canadian House of Commons; and

(f)     the most basic due diligence searches on MindGeek's sites which revealed thousands of videos depicting subjects who were obviously underage, under duress, incapacitated, being raped or secretly exploited.

339.   As set forth herein, on November 14, 2019, Visa's competitor, PayPal, terminated its payment service to MindGeek upon learning of the existence of trafficked, underage images and other illegal content.   PayPal publicly explained the basis for its decision to terminate the relationship: "[PayPal] explicitly prohibits the use of [its] services for the sale of materials that depict criminal behaviour, or the sale of sexually oriented content to minors."

340.   Moreover, in May 2020 anti-trafficking advocacy groups sent Visa a series of letters detailing the prevalence of unlawful sex trafficking content on MindGeek's tubesites and demanding that Visa stop processing payments and immediately terminate its relationship with MindGeek.   Further, thousands of members of these organizations emailed Visa echoing the letter and the requested action.

341.   Yet Visa intentionally ignored, or at a minimum recklessly disregarded, this information and continued to participate in and financially benefit from MindGeek's sex trafficking venture.   Indeed, despite this information and Visa's knowledge of it, Visa made at least two public statements falsely suggesting that all of the content on MindGeek's tubesites was lawful and legitimate under current laws. It was only thirteen months after PayPal publicly disclosed MindGeek's illegal activities that Visa finally called for an investigation into MindGeek's practices and purported to "suspend[] Pornhub's acceptance privileges pending the completion of [Visa's] ongoing investigation."   Visa also purported to "instruct[] the financial institutions who serve MindGeek to suspend processing of payments through the

Visa network."   And while Visa has continued its ban on MindGeek's websites that distribute user-generated content, Visa has re-initiated its relationship with MindGeek and began processing payments again for professionally produced content.

342.   As a result of Visa's violations of 18 U.S.C. §§ 1591 and 1595, Plaintiff has suffered substantial damages, including but not limited to, physical, psychological, financial, and reputational harm as well as other damages.

343.   Further, by profiting from these videos and images, Visa has become unjustly enriched at the expense of Plaintiff in an amount to be determined at trial.

344.   Moreover, by reason of Visa's violation of 18 U.S.C. §§ 1591 and 1595, Plaintiff is entitled to recover attorney's fees, costs, and punitive damages.

## COUNT III

## (VIOLATION OF 18 U.S.C. §§ 1591, 1595)

## (AGAINST REDWOOD CAPITAL AND COLBECK CAPITAL)

345.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

346.   As set forth herein, MindGeek, through its Byzantine network of sham shell entities, owners, alter egos, agents, executives, and investors, is a sex trafficking venture within the meaning of 18 U.S.C. §§ 1591 and 1595.

347.   Defendants Redwood and Colbeck participated in the MindGeek sex trafficking venture by participating in the financing syndicates that funded MindGeek's operations and growth and included draconian control rights over the company's management, operations, and economics such that these lenders effectively owned the business.   In that role, Colbeck and Redwood worked closely with the MindGeek Defendants and advised and assisted on the plan to dominate the online pornography industry via the unrestricted content model.

348.   Redwood and Colbeck knowingly used the instrumentalities and channels of foreign commerce to facilitate violations of 18 U.S.C. §§ 1591 and 1595,

occurring within the territorial jurisdiction of the United States.

349. Redwood's and Colbeck's conduct were in, or affected, interstate and/or foreign commerce.

350. Redwood and Colbeck knowingly benefitted financially from their participation in the MindGeek sex trafficking venture by exploiting the illegal nature of the business to siphon millions in windfall profits from exorbitant interest rates and other onerous economic terms on a fully secured loan.

351. Redwood and Colbeck knew or recklessly disregarded their participation in a sex trafficking venture that trafficked Plaintiff, among countless other victims, and engaged in acts that constitute violations of section of 18 U.S.C. § 1591(a)(1) through the extensive due diligence each conducted on the business before extending debt, their close monitoring of the business throughout the loan period in which each was earning millions in high double digit interest rates and other onerous debt terms, its regular and close interaction with the Company and its executives, extensive public reporting on the ubiquitousness of illegal content on MindGeek's websites dating back to 2011, and governmental investigations. Indeed, Redwood and Colbeck were only able to earn such high interest on the debt because the illegality associated with MindGeek's business was so well understood in the capital markets generally, and specifically among any prospective lenders who conducted the most basic pre-loan due diligence, that there was no alternative financing available. Thus, while the rest of the capital markets avoided this criminal venture, Colbeck and Redwood consciously embraced it because of the potential to earn windfall profits charging massive interests on a fully secured loan.

352. As a result of Redwood's and Colbeck's violations of 18 U.S.C. §§ 1591 and 1595, Plaintiff has suffered substantial damages, including but not limited to, physical, psychological, financial, and reputational harm as well as other damages.

353. Further, by profiting from these videos and images, Redwood and

Colbeck have become unjustly enriched at the expense of Plaintiff in an amount to be determined at trial.

354.   Moreover, by reason of Redwood's and Colbeck's violation of 18 U.S.C. §§ 1591 and 1595, Plaintiff is entitled to recover attorney's fees, costs, and punitive damages.

## COUNT IV
## (VIOLATION OF 18 U.S.C. §§ 1594(c), 1595)
## (AGAINST ALL DEFENDANTS)

355.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

356.   Defendants conspired by agreement or understanding, to commit unlawful acts.   Each of the defendants shared the same conspiratorial objective, which was to financially benefit from the monetization, recruitment, solicitation, funding, maintenance, advertisement, streaming, and distribution of CSAM and other nonconsensual and illegal content.

357.   As set forth above and in Count I-III, all of which are incorporated by reference as though fully set forth herein, defendants committed overt acts in furtherance of the agreement or understanding by knowingly recruiting, producing, funding, maintaining, streaming, and distributing CSAM and other nonconsensual content, directing and implementing the no restricted content business model, and financing its operations and its growth and/or benefiting financially from such distribution.

358.   Defendants' participation in the furtherance of the sex trafficking venture and/or purpose was intentional and/or willful and, therefore, defendants intentionally and/or willfully caused Plaintiff's commission of the sex acts.

359.   Defendants Redwood, Colbeck, and Visa funded, supported and facilitated MindGeek's commercialization and monetization of CSAM and other nonconsensual content, including the content depicting Plaintiff.   Moreover, Visa

1  also knew at the time it made the public statements referenced in this Complaint that,

2  contrary to the false suggestion that those statements clearly created, MindGeek's

3  tubesites were awash with unlawful and nonconsensual content, including CSAM.

4      360.   Defendants conspired with each other through affirmative acts that

5  provided financial support to MindGeek to enable its exploitation of Plaintiff.

6      361.   At all relevant times, defendants' conduct was willful and done with

7  legal malice and knowledge that it was wrongful.

8      362.   Plaintiff has suffered substantial damages, including but not limited to,

9  physical, psychological, financial, and reputational harm as well as other damages.

10      363.   Moreover, by reason of the defendants' violation of 18 U.S.C. §§ 1594

11  and 1595, Plaintiff is entitled to recover attorney's fees, costs, and punitive damages.

12  **COUNT V**

13  **(VIOLATION OF 18 U.S.C. §§ 2252, 2255)**

14  **(AGAINST THE MINDGEEK DEFENDANTS)**

15      364.   Plaintiff incorporates by reference and realleges each and every

16  allegation contained above, as though fully set forth herein.

17      365.   Plaintiff is a victim of violations of 18 U.S.C. §§ 2252 and suffered

18  personal injuries as a result of these violations.   Accordingly, Plaintiff is entitled to

19  bring a civil action under 18 U.S.C. § 2255.

20      366.   MindGeek knowingly transported visual depictions of minors engaging

21  in sexually explicit conduct, as defined under 18 U.S.C. § 2256(2)(A), including, but

22  not limited to, photographs and videos of Plaintiff, who was a minor at the time the

23  photographs and videos were taken, via its websites which affected interstate or

24  foreign commerce in violation of 18 U.S.C. § 2252(a)(1).

25      367.   MindGeek knowingly received and distributed visual depictions of

26  minors engaging in sexually explicit conduct, as defined under 18 U.S.C. §

27  2256(2)(A), including, but not limited to, photographs and videos of Plaintiff, who

28  was a minor at the time the photographs and videos were taken, via their websites

1 which affected interstate or foreign commerce.

2     368.  MindGeek knowingly sold or possessed with intent to sell visual

3 depictions of minors engaging in sexually explicit conduct, as defined under 18

4 U.S.C. § 2256(2)(A), including, but not limited to, photographs and videos of

5 Plaintiff, who was a minor at the time the photographs and videos were taken, via its

6 websites which affected interstate or foreign commerce in violation of 18 U.S.C. §

7 2252(a)(3).

8     369.  MindGeek knowingly possessed visual depictions of minors engaging in

9 sexually explicit conduct, as defined under 18 U.S.C. § 2256(2)(A), including, but

10 not limited to, photographs and videos of Plaintiff, who was a minor at the time the

11 photographs and videos were taken, via its websites which affected interstate or

12 foreign commerce in violation of 18 U.S.C. § 2252(a)(4).   Moreover, even when

13 MindGeek was forced to take down illegal content in response to legal requests,

14 rather than delete the materials it was not legally allowed to possess or redistribute, it

15 claimed to have stored all the data on its servers and periodically would reupload that

16 content or push it to affiliate sites so that it could continue to generate traffic and

17 corresponding revenue.

18     370.  In addition, the MindGeek Defendants duplicated and distributed new

19 child pornography depicting Plaintiff by creating and hosting new "thumbnail"

20 images from existing videos of Plaintiff.

21     371.  MindGeek's knowledge of the CSAM nature of the videos depicting

22 Plaintiff can readily be inferred from the visual depiction of Plaintiff, the title of the

23 video, the tags, and comments.

24     372.  Plaintiff has suffered substantial physical, psychological, financial, and

25 reputational harm as well as other damages as the result of MindGeek's violation of

26 18 U.S.C. § 2252.

27     373.  The MindGeek Defendants' conduct was malicious, oppressive, or in

28 reckless disregard of Plaintiff's rights, and Plaintiff is entitled to injunctive relief,

compensatory, and punitive damages, and the costs of maintaining this action. 18 U.S.C. § 2252A(f).

## COUNT VI
## (VIOLATION OF 18 U.S.C. §§ 2252A, 2255)
## (AGAINST THE MINDGEEK DEFENDANTS)

374.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

375.    Plaintiff is a victim of violations of 18 U.S.C. § 2252A and suffered personal injuries as a result of these violations.    Accordingly, Plaintiff is entitled to bring a civil action under 18 U.S.C. § 2255.

376.    MindGeek knowingly transported child pornography, as defined under 18 U.S.C. § 2256(8), including, but not limited to, photographs and videos of Plaintiff, who was a minor at the time the photographs and videos were taken, via their websites which affected interstate or foreign commerce in violation of 18 U.S.C. § 2252A(a)(1).

377.    MindGeek knowingly received or distributed child pornography, as defined under 18 U.S.C. § 2256(8), including, but not limited to, photographs and videos of Plaintiff, who was a minor at the time the photographs and videos were taken, via their websites which affected interstate or foreign commerce in violation of 18 U.S.C. § 2252A(a)(2).

378.    MindGeek knowingly reproduced child pornography, as defined under 18 U.S.C. § 2256(8), including, but not limited to, photographs and videos of Plaintiff, who was a minor at the time the photographs and videos were taken, via their websites which affected interstate or foreign commerce in violation of 18 U.S.C. § 2252A(a)(3)(A).

379.    MindGeek knowingly advertised, promoted, presented, distributed, or solicited visual depictions of actual minors engaging in sexually explicit conduct, as defined under 18 U.S.C. § 2256(2)(A), including, but not limited to, photographs and

videos of Plaintiff, who was a minor at the time the photographs and videos were taken, via their websites which affected interstate or foreign commerce in violation of 18 U.S.C. § 2252A(a)(3)(B).

380.   MindGeek knowingly sold or possessed with intent to sell child pornography, as defined under 18 U.S.C. § 2256(8), including, but not limited to, photographs and videos of Plaintiff, who was a minor at the time the photographs and videos were taken, via their websites which affected interstate or foreign commerce in violation of 18 U.S.C. § 2252A(a)(4).

381.   MindGeek knowingly possessed child pornography, as defined under 18 U.S.C. § 2256(8), including, but not limited to, photographs and videos of Plaintiff, who was a minor at the time the photographs and videos were taken, via their websites which affected interstate or foreign commerce in violation of 18 U.S.C. § 2252A(a)(5).   Moreover, even when MindGeek was forced to take down illegal content in response to legal requests, rather than delete the materials it was not legally allowed to possess or redistribute, it claimed to have stored all the data on its servers and periodically would reupload that content or push it to affiliate sites so that it could continue to generate traffic and corresponding revenue.

382.   In addition, the MindGeek Defendants duplicated and distributed new child pornography depicting Plaintiff by creating and hosting new "thumbnail" images from existing videos of Plaintiff.

383.   MindGeek's knowledge of the CSAM nature of the videos depicting Plaintiff can readily be inferred from the visual depiction of Plaintiff, the title, tags, and comments associated with that video indicating that Plaintiff was clearly a minor.

384.   Plaintiff has suffered substantial physical, psychological, financial, and reputational harm as well as other damages as a result of MindGeek's violations of 18 U.S.C. §§ 2252A.

385.   MindGeek's conduct was malicious, oppressive, or in reckless disregard

of Plaintiff's rights, and Plaintiff is entitled to injunctive relief, compensatory and punitive damages, and the costs of maintaining this action. 18 U.S.C. § 2252A(f).

## COUNT VII
### (PUBLIC DISCLOSURE OF PRIVATE FACTS)
### (AGAINST THE MINDGEEK DEFENDANTS)

386.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

387.   By maintaining, streaming, distributing, reuploading, and monetizing videos and images of sexually explicit conduct, including nonconsensual sexual acts and child pornography, of Plaintiff on its websites, including but not limited to Pornhub, MindGeek publicly disclosed private facts about Plaintiff.

388.   Before this disclosure, the videos and images of nonconsensual sexual acts and child pornography of Plaintiff were private and not known to the public.

389.   The videos and images of sexually explicit conduct, including nonconsensual sexual acts and child pornography, of Plaintiff made known to the public are highly offensive and objectionable to a reasonable person.

390.   MindGeek disclosed the videos and images of sexually explicit conduct, including nonconsensual sexual acts and child pornography, of Plaintiff with knowledge that they are highly offensive or with reckless disregard of whether they are highly offensive.

391.   The videos and images of sexually explicit conduct, including nonconsensual sexual acts and child pornography, of Plaintiff are not of legitimate public concern.

392.   Plaintiff has suffered substantial physical, psychological, financial, and reputational harm, as well as other damages, as the result of MindGeek's public disclosure of the videos and images of sexually explicit conduct, including nonconsensual sexual acts and child pornography, of Plaintiff.

393.   MindGeek's conduct was malicious and/or the MindGeek Defendants

1   acted with the intent to vex, injure, or annoy, or with a conscious disregard of the
2   Plaintiff's rights, and Plaintiff is entitled to injunctive relief, and compensatory and
3   punitive damages.

4                              **COUNT VIII**
5                    **(INTRUSION INTO PRIVATE AFFAIRS)**
6                 **(AGAINST THE MINDGEEK DEFENDANTS)**

7          394.   Plaintiff incorporates by reference and realleges each and every
8   allegation contained above, as though fully set forth herein.

9          395.   By maintaining, streaming, distributing, reuploading, and monetizing
10  videos and images of nonconsensual sexual acts and child pornography of Plaintiff
11  on its websites, including but not limited to Pornhub, MindGeek intentionally
12  intruded upon the solitude or seclusion, private affairs or concerns of Plaintiff.

13         396.   The intrusion was substantial, and of a kind that would be highly
14  offensive to an ordinarily reasonable person.

15         397.   Plaintiff has suffered substantial physical, psychological, financial, and
16  reputational harm, as well as other damages, as the result of MindGeek's intrusion
17  into Plaintiff's private affairs.

18         398.   Because MindGeek has engaged in conduct of an oppressive,
19  fraudulent, and malicious nature, Plaintiff is entitled to punitive damages.

20                              **COUNT IX**
21                 **(PLACING PLAINTIFF IN FALSE LIGHT)**
22                 **(AGAINST THE MINDGEEK DEFENDANTS)**

23         399.   Plaintiff incorporates by reference and realleges each and every
24  allegation contained above, as though fully set forth herein.

25         400.   By maintaining, streaming, distributing, reuploading, and monetizing
26  videos and images of nonconsensual sexual acts and child pornography of Plaintiff
27  on its websites, including Pornhub, MindGeek made a public disclosure of a fact
28  about Plaintiff.

401.   The fact disclosed was false and portrayed Plaintiff in a false light. Namely, Plaintiff was placed before the public in a false light because viewers and at least some users of the websites, including but not limited to Pornhub, may have, and likely did, believe that Plaintiff voluntarily appeared in the videos and images, willingly engaged in pornography, and made money as "actors" off of the posting of the videos and images.

402.   The false light in which Plaintiff was placed would be highly offensive to a reasonable person.

403.   MindGeek had knowledge of or acted in reckless disregard of the falsity of the publicized fact and the false light in which Plaintiff would be placed.

404.   As a result of MindGeek's wrongdoing, Plaintiff has suffered substantial physical, psychological, financial, and reputational harm, as well as other damages.

405.   Because MindGeek has engaged in conduct of an oppressive, fraudulent, and malicious nature, Plaintiff is entitled to punitive damages.

**COUNT X**

**(COMMON LAW MISAPPROPRIATION OF NAME AND LIKENESS)**
**(AGAINST THE MINDGEEK DEFENDANTS)**

406.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

407.   By maintaining, streaming, distributing, reuploading, and monetizing videos and images of nonconsensual sexual acts and child pornography of Plaintiff on their websites, including but not limited to Pornhub, MindGeek appropriated Plaintiff's identity, image, likeness, and pictures.

408.   The appropriation of Plaintiff's identity, image, likeness, and pictures was for MindGeek's own purposes or benefit, commercially or otherwise. MindGeek financially benefitted from these videos and images.

409.   Plaintiff did not consent to this appropriation.

410.   Plaintiff has suffered substantial physical, psychological, financial, and

reputational harm, as well as other damages, as the result of MindGeek's appropriation of Plaintiff's identity, image, likeness, and pictures.

411.   Plaintiff is entitled to, among other remedies, compensatory and punitive damages, restitution of all amounts to which the MindGeek Defendants have been unjustly enriched as a result of the misappropriation, disgorgement of the MindGeek Defendants' profits from the misappropriation, and injunctive relief.

**COUNT XI**

**(MISAPPROPRIATION OF NAME AND LIKENESS IN VIOLATION OF CAL. CIVIL CODE 3344)**

**(AGAINST THE MINDGEEK DEFENDANTS)**

412.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

413.   By maintaining, streaming, distributing, reuploading, and monetizing videos and images of nonconsensual sexual acts and child pornography of Plaintiff on its websites, including by not limited to Pornhub, MindGeek knowingly appropriated Plaintiff's identity, image, likeness, and pictures.

414.   The appropriation of Plaintiff's identity, image, likeness, and pictures was for MindGeek's own purposes or benefit, commercially or otherwise. MindGeek financially benefitted from these videos.

415.   Plaintiff did not consent to this appropriation.

416.   Plaintiff has suffered substantial physical, psychological, financial, and reputational harm, as well as other damages, as the result of MindGeek's appropriation of the Plaintiff's identity, image, likeness, and pictures.

417.   Plaintiff is entitled to, among other remedies, compensatory and punitive damages, restitution of all amounts to which the MindGeek Defendants have been unjustly enriched as a result of the misappropriation, disgorgement of the MindGeek Defendants' profits from the misappropriation, and injunctive relief.

# COUNT XII

## (DISTRIBUTION OF PRIVATE SEXUALLY EXPLICIT MATERIALS IN VIOLATION OF CALIFORNIA CIVIL CODE § 1708.85)[6]

### (AGAINST THE MINDGEEK DEFENDANTS)

418.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

419.   By maintaining, streaming, distributing, reuploading, and monetizing videos and images of sexually explicit conduct, including nonconsensual sexual acts and child pornography, of Plaintiff on its websites, including but not limited to Pornhub, MindGeek intentionally distributed videos and images of Plaintiff.

420.   The distributed material exposed an intimate body part of Plaintiff and/or shows Plaintiff engaged in sexually explicit conduct, including exposure of an intimate body part, or an act of intercourse or oral copulation.

421.   Plaintiff did not consent to MindGeek's online and widespread distribution of the videos and images depicting her.

422.   Plaintiff had a reasonable expectation that the material would remain private.

423.   MindGeek knew that the Plaintiff had a reasonable expectation that the material, which constituted CSAM, would remain private.

424.   Plaintiff has suffered substantial physical, psychological, financial, and reputational harm, as well as other damages, as a result of MindGeek's intentional distribution of the Plaintiff's videos and images.

### COUNT XIII

### (NEGLIGENCE)

---

[6]  Although Plaintiff contends California substantive law applies, in the event the Court determines Missouri law applies, Plaintiff asserts a claim under the analogous Mo. Rev. Stat. § 573.110.

**(AGAINST THE MINDGEEK DEFENDANTS)**

425.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

426.   MindGeek had a duty to use ordinary care and to prevent injury to Plaintiff.

427.   By maintaining, streaming, distributing, reuploading, and monetizing videos and images of nonconsensual sexual acts and child pornography of Plaintiff on its websites, failing to take down videos and images upon request but merely disabling the link, and by reuploading illegal content, among other wrongdoing detailed herein, MindGeek breached the duty of care to Plaintiff.

428.   MindGeek's breach of its duty of care caused harm to Plaintiff.

429.   Plaintiff has suffered substantial physical, psychological, financial, and reputational harm, as well as other damages, as the result of MindGeek's breach of the duty of ordinary care.

**COUNT XIV**

**(VIOLATION OF CAL. BUS. & PROF. CODE §§ 17200 AND 17500)**
**(AGAINST ALL DEFENDANTS)**

430.   Plaintiff incorporates by reference and realleges each and every allegation set forth above as if fully set forth herein.

431.   Defendants have engaged in unlawful, unfair, and fraudulent business acts and practices by participating in a venture engaged in trafficking that intentionally produced, recruited, funded, disseminated, and monetized the dissemination of CSAM materials, sex abuse, trafficking content, and other nonconsensual content on its site.

432.   Defendants fraudulently deceived its users that they were monetizing, distributing, and advertising legitimate, legal content, when in fact defendants' websites were riddled with videos of rape, child pornography, sex trafficking, and other nonconsensual content, including videos of Plaintiff.   Defendants knowingly

had inadequate age and consent verification systems in place that enabled users to upload child pornography to defendants' websites.   This conduct constitutes an unlawful, unfair, and fraudulent business act and practice.

433.   Defendants profited by selling advertising space to display advertisements alongside Plaintiff's videos, images, and likenesses without her consent.

434.   Defendants profited by featuring Plaintiff's videos, images, and likenesses without her consent to drive user traffic to their websites.

435.   This conduct constitutes an unlawful, unfair, and fraudulent business act and practice.

436.   Plaintiff has a financial interest in the use of her own videos, images, and likeness.

437.   As a result of defendants' use of Plaintiff's videos, images, and likeness without Plaintiff's consent, Plaintiff has lost money to which she is rightfully entitled.

438.   As a result of defendants' use of Plaintiff's videos, images, and likenesses without Plaintiff's consent, Plaintiff has suffered financial harm in the form of costs for therapy as well as substantial time away from her work and substantial expense hiring a company to assist her with her efforts investigate the continued dissemination of her videos on Pornhub and facilitate the take downs of her CSAM from MindGeek's tubesites.

439.   Plaintiff seeks restitution of all amounts to which defendants have been unjustly enriched as a result of their unlawful, unfair, and/or fraudulent acts, and disgorgement of all profits defendants have made through the unlawful, unfair, and/or fraudulent acts.

440.   Plaintiff is entitled to preliminary and permanent injunctive relief restraining the defendants from committing further unfair trade practices and mandating the full disclosure of defendants' personal and financial interests in

1  causing Plaintiff's harm.

## COUNT XV

## (VIOLATION OF CALIFORNIA'S

## TRAFFICKING VICTIMS PROTECTION ACT

## CAL. CIV. CODE § 52.5)[7]

## (AGAINST THE MINDGEEK DEFENDANTS)

441.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

442.   As set forth herein, MindGeek, through its Byzantine network of sham shell entities, owners, alter egos, agents, executives, and investors, knowingly solicited, maintained and profited from CSAM, trafficked, rape, and sex abuse material on its websites.

443.   The MindGeek Defendants' websites are available all over the country, including in California.

444.   The MindGeek Defendants intended to, and do, distribute CSAM and other trafficked, rape, and sex abuse materials through their websites and doing so was a fundamental part of MindGeek's business model.

445.   As a proximate result of the MindGeek Defendants' violation of Penal Code § 236.1, Plaintiff has suffered serious harm and damages.   Further, the MindGeek Defendants have received ill-gotten gains from the unlawful advertisement and exploitation of Plaintiff's video, name, images, likeness, and/or identity for its own business purposes and profit.

446.   The MindGeek Defendants' actions were willful, malicious, fraudulent, oppressive, outrageous, despicable, and taken in reckless disregard of Plaintiff's

---

[7]  Although Plaintiff contends California substantive law applies, in the event the Court determines Missouri law applies, Plaintiff asserts a claim under the analogous Mo. Rev. Stat. § 566.223.

rights.   Plaintiff is entitled to, among other forms of relief, punitive and treble damages.

## COUNT XVI

### (INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS)

### (AGAINST ALL DEFENDANTS)

447.   Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

448.   Defendants' conduct toward Plaintiff, as described herein, was outrageous and extreme.

449.   Defendants acted with reckless disregard of the likelihood that Plaintiff would suffer emotional distress, including humiliation and anxiety.   Defendants knew, or recklessly disregarded, that Plaintiff was harmed by the illegal CSAM featuring her on defendants' websites, but did nothing to help her, and instead directed and encouraged the proliferation of CSAM on its websites.

450.   As a direct and proximate result of defendants' conduct, Plaintiff suffered severe emotional distress and is accordingly entitled to appropriate damages.

451.   No reasonable person in Plaintiff's situation would be able to adequately endure the distress engendered by defendants' profit-driven indifference to, and encouragement of, her plight.

## COUNT XVII

### (CIVIL CONSPIRACY)

### (AGAINST ALL DEFENDANTS)

452.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

453.   As set forth herein, defendants conspired and acted in concert to commit unlawful acts, including, as set forth in count XIV, distribution of private sexually explicit materials in violation of Cal. Civ. Code § 1708.85; count XVI, violation of Cal. Bus. & Prof. Code §§ 17200 and 17500; and count XVII, violation of

California's Trafficking Victims Protection Act, Cal. Civ. Code § 52.5.   Each of the defendants shared the same conspiratorial objective, which was to maintain, stream, reupload, monetize, and profit from CSAM and other nonconsensual content and/or to benefit financially from such distribution so as to maximize profits and to do so while deceiving the public to believe that all content on MindGeek's tubesites was lawful and consensual.

454.   Defendants' conspiratorial scheme was carried out by the commission of the wrongful and overt acts set forth above, including, but not limited to:

(a)   recruiting, commissioning, paying for, soliciting content produced through human trafficking and slavery;

(b)   producing CSAM and nonconsensual sexual content through MindGeek owned production companies;

(c)   partnering with known traffickers;

(d)   advertising MindGeek tubesites prior to playing videos containing CSAM or otherwise illegal and trafficked content, including, upon information and belief, the CSAM videos of Plaintiff;

(e)   generating substantial advertisement revenue based on CSAM and otherwise illegal and trafficked content, including, upon information and belief, the CSAM videos of Plaintiff;

(f)   pushing all content posted on any of its tubesites, including the CSAM videos of Plaintiff, regardless of its initial sourcing to its other tubesites which it falsely portrayed as posted by a user other than MindGeek;

(g)   modifying effective content and duplicating to optimize search engine optimization ("SEO"), including to make content appear as if it was user made;

(h)   creating playlists that target viewers interested in child pornography and other illegal content;

(i)    featuring categories on their websites that target users interested in child pornography and other sexual abuse, trafficking and nonconsensual materials;

(j)    directing users to describe their videos using categories like "teen" to drive traffic;

(k)    maintaining the webpage and thumbnails for disabled videos so that the MindGeek Defendants can continue to generate traffic and revenue from that illegal content;

(l)    maintaining a search and tagging system—which include tags such as "passed out teen," and "sleeping pills"—to make it easier for users to find and view videos of child and adult sex abuse, sex trafficking, and other nonconsensual content;

(m)    providing guidance to its global network of sex traffickers on how to upload videos of sex trafficking and evade criminal liability while complying with MindGeek's purposefully loose restrictions, including by maintaining public list of "banned words"—i.e., words to avoid in the title of videos;

(n)    providing its global network of sex traffickers VPN services to allow them to cover up their unlawful conduct by obscuring the sex traffickers' locations and identities;

(o)    allowing anyone to anonymously upload and download videos on its tubesites, so that it would be extremely difficult for victims to have their videos permanently removed, thus increasing MindGeek's advertising revenue and profits;

(p)    allowing removed videos to reuploaded to its site;

(q)    allowing all videos to be downloaded which facilitated the reupload by different users with different titles; and

(r)     financing the illegal venture through syndicate financing at onerous and exorbitant rates and revenues generated from subscriptions and advertisements on CSAM and other illegal content, including Plaintiff's CSAM images and videos.

455.    At all relevant times, defendants' conduct was willful and done with legal malice and knowledge that it was wrongful.

456.    As a direct, proximate result of the operation and execution of the conspiracy, Plaintiff has been injured and suffered damages in an amount to be proven at trial.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment in her favor and against the defendants, jointly and severally:

A.      Awarding Plaintiff compensatory damages in an amount to be determined at trial;

B.      Awarding Plaintiff restitution for all monies defendants earned marketing, selling, and exploiting Plaintiff's videos, pictures, likeness, and images;

C.      Awarding Plaintiff punitive damages;

D.      Awarding Plaintiff her attorney fees and costs and expenses for litigating this case;

E.      Awarding Plaintiff treble damages;

F.      Awarding Plaintiff pre-judgment and post-judgment interest;

G.      Awarding Plaintiff injunctive relief in the form of, among other things, compelling the deletion of all videos and other content for which MindGeek has not verified the identity, age, and consent of all those appearing in the content, deploying all commercially feasible means of ensuring only content for which age and consent of those appearing in the content is displayed, and disgorgement of all profits the defendants earned.

H.      Granting such other and further relief as this Court deems just and

equitable.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial for all triable issues of fact.

DATED:   June 7, 2024

Respectfully submitted,
BROWN RUDNICK LLP


By:   */s/ Michael J. Bowe*
_____

Michael J. Bowe
*(pro hac vice* application forthcoming)

*Attorneys for Plaintiff*