# EXHIBIT A

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE DOE,<br><br>　　　　Plaintiff,<br><br>　　vs.<br><br>WEBGROUP CZECH REPUBLIC, A.S., et al.,<br><br>　　　　Defendants. | Case No. 2:21-cv-02428-SPG-SK<br><br>**ORDER GRANTING DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT**<br>**[ECF NO. 199]** |

　　　　Before the Court is Defendants WebGroup Czech Republic, a.s. ("WGCZ"), NKL Associates s.r.o. ("NKL"), WGCZ Limited, s.r.o., NKL Associates, s.r.o., Traffic F, s.r.o., GTFlix TV, s.r.o., FTCP, s.r.o., HC Media, s.r.o., and FBP Media's s.r.o. (collectively, "Defendants") Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(6). (ECF No. 199 ("Motion")). Plaintiff opposes. (ECF No. 200 ("Opp.")). Having considered the parties' submissions, the relevant law, the record in this case, and the arguments of counsel during the hearing on the Motion, the Court **GRANTS** Defendants' Motion.

## I. BACKGROUND AND PROCEDURAL HISTORY

The facts underlying this dispute are well-known to the parties and described in the Amended Order Granting Motions to Dismiss, the Order and Amended Opinion from the Ninth Circuit Court of Appeals, and the Order Granting In Part Remaining Defendants' Motion to Dismiss. *See* (ECF Nos. 162, 176, 192). Thus, the Court here recounts only the facts relevant to this motion and summarizes the key procedural history of the case.

Plaintiff Jane Doe filed a putative class action against sixteen defendants, including five U.S.-based defendants, nine Czech corporations, and two EU citizens. *See* (ECF No. 129 ("First Amended Complaint" or "FAC")). Plaintiff alleges she was trafficked as a minor and her traffickers filmed her while she was engaged in sex acts. Plaintiff further alleges that her traffickers then uploaded the videos ("Videos") to adult websites operated by two of the defendants, i.e., WebGroup Czech Republic, a.s. ("WGCZ") and NKL Associates, s.r.o. ("NKL").

On July 24, 2024, the Court granted in part Defendants' motion to dismiss Plaintiff's FAC. *See* (ECF No. 192 ("July 2024 Order")). The Court's July 2024 Order dismissed: (1) Plaintiff's claims brought under 18 U.S.C. §§ 2252 and 2260 for failure to adequately plead such claims; and (2) Plaintiff's claim under Section 1708.85 of the California Civil Code based on preemption grounds. *See* (*id.* at 20-21). The Court, however, granted Plaintiff leave to amend her complaint to allege plausible facts showing that: (1) Section 230 immunity does not bar her sex-trafficking claims under 18 U.S.C. §§ 1591 and 1595, *see* (*id.* at 16); (2) Assuming Section 230 immunity applies, the exception to immunity, as established by the Allow States to Fight Online Sex Trafficking Act ("FOSTA") applies, *see* (*id.* at 17); (3) Extra-territorial jurisdiction, as established in 18 U.S.C. § 1596, applies to Defendants as foreign entities, *see* (*id.* at 20); and (4) Vicarious or personal liability applies to the individual Defendants Stephane Michael Pacaud and Deborah Malorie Pacaud, *see* (*id.* at 22). The Court ordered Plaintiff to file an amended complaint that cures the deficiencies identified by the July 2024 Order within twenty-one days. *See* (*id.*).

Pursuant to the July 2024 Order, Plaintiff filed a Second Amended Complaint. *See* (ECF No. 194 ("SAC")). In the SAC, Plaintiff alleges the same causes of action under 18 U.S.C. §§ 2252 and 2260 and California Civil Code § 1708.85 that the Court dismissed without leave to amend. *See* (*id.* ¶¶ 222–239). The SAC also appears to abandon Plaintiff's claims against individual Defendants Stephane Michael Pacaud and Deborah Malorie Pacaud. For the claims under 18 U.S.C. §§ 1591 and 1595, the SAC alleges that WGCZ Defendants benefit from a sex trafficking venture because their "business model includes promoting and encouraging [child sexual abuse material ("CSAM")], hosting voluminous CSAM on their websites, fail[ing] to moderate and cull out illegal content, profiting from CSAM, and revenue-shar[ing] with uploaders of CSAM." (*Id.* ¶ 214). Defendants now move to dismiss Plaintiff's SAC with prejudice. Plaintiff opposes, and Defendants have filed a reply in support of their Motion. (ECF No. 201 ("Reply")).

## II. LEGAL STANDARD

Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is proper when the complaint either (1) lacks a cognizable legal theory or (2) fails to allege sufficient facts to support a cognizable legal theory." *Somers v. Apple, Inc.*, 729 F.3d 953, 959 (9th Cir. 2013). To survive a 12(b)(6) motion, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 556. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

When ruling on a Rule 12(b)(6) motion, the Court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the

nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). "[D]ismissal is affirmed only if it appears beyond doubt that [the] plaintiff can prove no set of facts in support of its claims which would entitle it to relief." *City of Almaty v. Khrapunov*, 956 F.3d 1129, 1131 (9th Cir. 2020) (internal citation and quotation marks omitted). However, the Court is "not required to accept as true allegations that contradict exhibits attached to the Complaint or matters properly subject to judicial notice, or allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Seven Arts Filmed Ent., Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013) (citing *Daniels–Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010)).

## III. DISCUSSION

Defendants advance multiple grounds for dismissal with prejudice under Rule 12(b)(6). Plaintiff's SAC, in Defendants' view, does not allege new facts to alter this Court's prior ruling that Section 230 immunity bars Plaintiff's claims under 18 U.S.C. §§ 1591 and 1595. Nor does the SAC, according to Defendants, allege sufficiently plausible facts to trigger the exception to Section 230 immunity, as established by FOSTA. Moreover, the SAC does not plead any new facts to change the Court's prior ruling that the extra-territorial reach in section 1591—the underlying criminal statute upon which Plaintiff relies for her section 1595 civil claim—does not extend to Defendants as foreign entities.[1] The Court addresses each argument in turn.

---

[1] In their motion and opposition, both parties dispute whether Section 230 immunity bars Plaintiff's claims brought under 18 U.S.C. §§ 2252 and 2260, as well as California Civil Code § 1708.85. They also contest whether Plaintiff's SAC alleges plausible facts to support these claims. *See* (Mot. at 27–29); *see also* (Opp. at 27-29). The Court, however, already dismissed these claims without leave to amend. *See* (July 2024 Order at 20–21). The Court's July 2024 Order granted leave to amend to cure the deficiencies identified in Plaintiff's FAC only with respect to Section 230 immunity, the FOSTA exception, and the territorial reach of § 1595 for the sex-trafficking claims. Moreover, comparing Plaintiff's FAC and SAC, the SAC does not make any substantive changes to the original pleaded claims under 18 U.S.C. §§ 2252 and 2260 and California Civil Code § 1708.85. *Compare*

A. **Whether Section 230 Bars Plaintiff's Sex-Trafficking Claims**

Defendants assert that Plaintiff's SAC does not allege any new facts to defeat their immunity provided by Section 230 of the Communications Decency Act ("the Act"). Section 230(c)(1) states: "No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). The statute further elaborates: "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* at § 230 (e)(3). In other words, Section 230 of the Act "immunizes providers of interactive computer services against liability arising from content created by third parties." *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1162 (9th Cir. 2008) (en banc) (footnote omitted).

In *Barnes*, the Ninth Circuit created a three-prong test to determine whether Section 230 immunity applies to a defendant. *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1099–1100 (9th Cir. 2009). The test establishes that "[i]mmunity from liability exists for '(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider.'" *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1097 (9th Cir. 2019) (quoting *Barnes*, 570 F.3d at 1100–01). "When a plaintiff cannot allege enough facts to overcome Section 230 immunity, a plaintiff's claims should be dismissed." *Id.* The Court previously held, and the parties do not dispute, that Defendants WGCZ and NKL provide an interactive computer service. *See* (July 2024 Order at 7); *see also* (Mot. at 13–14); (Opp. at 9).[2] The parties, however, dispute the latter two factors.

---

(FAC ¶¶ 221–237) *with* (SAC ¶¶ 222–239). The Court, therefore, will not re-adjudicate these dismissed claims.

[2] As Plaintiff notes, the Defendants' Motion discusses Section 230 immunity for Defendants WGCZ and NKL. *See* (Opp. at 9, n.2) (citing Mot. at 13–19). However, Plaintiff states, and Defendants do not dispute, that their arguments apply to all Defendants. *See* (*id.*).

1. **Whether Plaintiff's Sex-Trafficking Claims Seek to Hold Defendants Liable as Publishers**

Defendants contend that Plaintiff's sex-trafficking claims seek to hold Defendants WGCZ and NKL liable for publishing the alleged CSAM. (Mot. at 14–15). Plaintiff argues, on the other hand, that the SAC "seeks to hold WGCZ and NKL liable for their own bad acts, not as publishers or speakers." (Opp. at 9). The Court acknowledges that the scope of § 230(c)(1) immunity doctrine has "yielded mixed results." *Calise v. Meta Platforms, Inc.*, 103 F.4th 732, 736 (9th Cir. 2024). Hence, the Ninth Circuit in *Calise* "clarif[ied]" the contours of this immunity, which present "a difficult and complex issue that requires case-specific, and indeed claim-specific, analysis . . . ." *Id.* at 739. To that end, the court established a two-prong inquiry to guide the applicability of Section 230 immunity. First, a court must examine "what is the right from which the duty springs?" *Id.* at 742. The court elaborated that "[i]f it springs from something separate from the defendant's status as a publisher, such as from an agreement, or from obligations the defendant has in a different capacity, then § 230(c)(1) does not apply." *Id.* (internal citations omitted). Second, a court must then "ask what is this duty requiring the defendant to do? If it obliges the defendant to monitor third-party content—or else face liability—then that too is barred by § 230(c)(1)." *Id.* (internal quotation marks omitted).

As instructed by the Ninth Circuit, the Court must first apply the two-prong test utilizing a claim-specific approach. Section 1591(a)(2) imposes a duty, prohibiting one from knowingly "benefitting, financially or by receiving anything of value, from participation" in a sex trafficking venture that causes a person under the age of 18 "to engage in a commercial sex act." 18 U.S.C. § 1591(a)(2). The statute defines "participation in a venture" as "knowingly assisting, supporting, or facilitating" the unlawful conduct. *Id.* § 1591(e)(4).

With this legal duty established, the Court examines Plaintiff's various theories of liability for her sex-trafficking claims to determine if the liability springs from Defendants' role as publishers. The SAC, at its core, alleges that Defendants' "business model includes

-6-
Exhibit A

promoting and encouraging CSAM, hosting voluminous CSAM on their websites, fail[ing] to moderate and cull out illegal content, profiting from CSAM, and revenue-sharing with uploaders of CSAM." (SAC ¶ 214).[3] It is through these activities, according to Plaintiff, that Defendants knowingly benefit financially from participation in a venture engaged in sex trafficking. (*Id.* ¶ 213). As it relates to Defendants' platforms allegedly hosting voluminous CSAM and failing to moderate illegal conduct or verify individuals' ages, these activities are inevitably tethered to Defendants' statuses as publishers. Maintaining an online platform and reviewing or moderating online content are quintessential activities of Defendants' publishing role. *See Gonzalez v. Google LLC*, 2 F.4th 871, 891 (9th Cir. 2021), *vacated and remanded on other grounds*, 598 U.S. 617 (2023), *and rev'd sub nom. Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023) (emphasizing that "supplying a platform and communication services falls within the heartland of what it means to be the publisher of information under Section 230(c)(1)") (internal quotation marks omitted) (citing *Force v. Facebook, Inc.*, 934 F.3d 53, 65 (2d Cir. 2019)); *see also Force*, 934 F.3d at 70 ("[M]aking information more available is, again, an essential part of traditional publishing; it does not amount to developing that information within the meaning of Section 230.") (applying and citing to the "material contribution" test established by Ninth Circuit caselaw). The Court, applying *Barnes* and its progeny, concluded as such in its July 2024 Order. *See* (July 2024 Order at 7, 12–13); *see also Barnes*, 570 F.3d at 1099–1100. Accordingly, Section 230 immunizes Defendants from liability stemming from Plaintiff's allegations that their platforms display CSAM and fail to review or monitor such content.

Plaintiff's other allegations, however, such as Defendants' encouragement or promotion of CSAM on their platforms, may, perhaps, fall outside the scope of Section 230 immunity because the role of a publisher does not necessarily entail actively

---

[3] The Court notes that Plaintiff's Opposition insists the sex-trafficking claims "do not allege that Defendants have a duty to monitor their websites." (Opp. at 13). Instead, Plaintiff argues the claims allege that Defendants "have a duty to not design their websites for the purpose of hosting CSAM." (*Id.*). The SAC, however, continues to raise failure to moderate allegations under the sex-trafficking cause of action section. *See* (SAC ¶ 214).

encouraging creation of the content. Thus, whether the purported promotion and encouragement activities fall within the scope of Section 230 immunity requires analyzing Defendants' roles, if any, in developing or materially contributing to the content. *Cf. In re Apple Inc. App Store Simulated Casino-Style Games Litig.*, 625 F. Supp. 3d 971, 978 (N.D. Cal. 2022) ("Practically speaking, the second and third factors tend to overlap in significant ways."). This inquiry, therefore, brings us to the third factor.

### 2. Whether Another Information Content Provider Provided the Unlawful Content

Under the third element, Defendants maintain that the infringing content amounts to information provided by another information content provider—in this case, the online users. Under certain circumstances, a provider of an interactive computer service may lose its immunity and nonetheless remain liable when serving as an information content provider. Section 230 defines "information content provider" as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet . . . ." 47 U.S.C. § 230(f)(3); *see also Roommates.Com*, 521 F.3d at 1162 (noting that a service provider remains immune if "it passively displays content that is created entirely by third parties" but loses immunity when creating or developing the infringing content). The Ninth Circuit in *Roommates.Com* established that determining when an entity steps into the role of an information content provider, as opposed to an interactive computer service provider, turns on whether "it contributes *materially* to the alleged illegality of the conduct." 521 F.3d at 1168 (emphasis added). Therefore, providing "passive conduits," *id.* at 1167, or "neutral tools for navigating websites" remains "fully protected by CDA immunity, absent substantial affirmative conduct on the part of the website creator promoting the use of such tools for unlawful purposes," *id.* at 1174 n.37. This test has "consistently drawn the line at the crucial distinction between, on the one hand, taking actions (traditional to publishers) that are necessary to the display of unwelcome and actionable content and, on the other hand, responsibility for what makes

the displayed content illegal or actionable." *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1269, n.4 (9th Cir. 2016) (internal quotation marks omitted).

Here, Plaintiff's SAC suggests that Defendants materially contribute to the unlawful content on their platforms, thereby transforming their status to liable information content providers. To advance her material contribution argument, Plaintiff offers as examples several factual allegations in the SAC, including: Defendants' creation of advertisement based on data indicating CSAM; sharing of profits with sex trafficking users; use of VPNs to anonymize web traffic and evade law enforcement; and creation of thumbnails, titles, tags, keywords, search terms, and categories indicative of CSAM. *See* (Opp. at 17). As discussed in the Court's July 2024 Order, these factual allegations do not demonstrate that Defendants served as information content providers because Defendants' platform involved standard, content-neutral tools. As pleaded, these tools are only "necessary to the display" of *all* online content on Defendants' platforms and do not show a "substantial affirmative conduct on the part of the website creator" to promote the use of such tools for unlawful purposes. *Kimzey*, 836 F.3d at 1269, n.4; *Roommates.Com*, 521 F.3d at 1174, n.37. Finding in Plaintiff's favor would require departure from well-settled Ninth Circuit precedent for multiple reasons.

Defendants' online tools that Plaintiff challenges do not rise to the level of promotion and encouragement of CSAM. Precedent confirms this point. For example, Plaintiff's argument—that Defendants' use of advertisement materially contributes to the unlawful content—mirrors the argument raised in *Gonzalez*.[4] There, the Ninth Circuit rejected the claim that Google, as the defendant, materially contributed to the unlawful content "by pairing it with selected advertising and other videos." *Gonzalez*, 2 F.4th at 893. Nor does Plaintiff allege that Defendants particularly direct their advertising

---

[4] Specifically, Plaintiff alleges that Defendants show advertisements before or while videos play. As Plaintiff notes, such advertisements generate revenue for Defendants. (SAC ¶¶ 127, 219(a)).

operation with a keen focus toward CSAM; their advertising operation neutrally applies to *all* online content.[5]

Moreover, Plaintiff relies on *Gonzalez* to suggest that Defendants revenue-sharing with sex-traffickers materially contributes to the unlawful content. Essentially, Plaintiff contends that, like the defendant in *Gonzalez*, Defendants' share of revenue with sex-traffickers goes beyond a publishing role and demonstrates Defendants' encouragement of and contribution to the unlawful content. (Opp. at 13–14). A closer analysis of the revenue-sharing discussion in *Gonzalez*, however, reveals otherwise. The Ninth Circuit considered, as a matter of first impression, "whether § 230 immunizes an interactive computer service provider's revenue-sharing payments." *Gonzalez*, 2 F.4th at 898. The court emphasized: "[T]he best indication that the Gonzalez Plaintiffs' revenue-sharing allegations are not directed to any third-party content is that [defendant's] alleged violation of the [statute] could be remedied without changing any of the content posted by YouTube's users." *Id.*[6] In other words, if an online service provider's revenue-sharing conduct, alone, violates a statute irrespective of the user's online content, then a plaintiff's

---

[5] Indeed, Plaintiff implicitly concedes to the neutrality of these tools by stating Defendants "create thumbnails from *all* videos." (Opp. at 17) (emphasis added).

[6] As a brief factual summary in *Gonzalez*, plaintiffs sued Google and other social media platforms for knowingly providing material support to terrorist groups by "allowing ISIS to use their social media platforms," thereby violating the Anti-Terrorism Act. *Gonzalez*, 2 F.4th at 883. The Ninth Circuit held that such claims, like those alleged here, sought to hold the defendants liable for online publication activities and therefore did not overcome the Section 230 immunity hurdle. *Id.* at 892. The plaintiffs' revenue-sharing allegation, on the other hand, rested on the purported fact that the defendant, Google, provided a terrorist group "with material support by *giving ISIS money*." *Id.* at 898 (emphasis in original). The court emphasized that, unlike editorial or publishing activities, Google's "unlawful payments of money to ISIS," fell outside the scope of Section 230 immunity because, irrespective of ISIS posting content on YouTube, sending money to a terrorist group, alone, violated the Anti-Terrorism Act. *Id.* On appeal, the Supreme Court did not address whether Section 230 immunizes online platforms against revenue-sharing claims. *See Gonzalez v. Google LLC*, 598 U.S. 617, 622 (2023) (declining to "address the application of § 230" to the plaintiffs' claims).

revenue-sharing allegation is properly directed at that defendant's own conduct, as opposed to the conduct of third-party content providers. The same rationale does not and could not extend to this present case. But for some users posting CSAM on Defendants' platform, Plaintiff could not bring forth the revenue-sharing claim against Defendants. Put simply, Defendants' revenue-sharing activities that Plaintiff challenges cannot be divorced from the users' own conduct of filming and independently disseminating the infringing content. Based on this reasoning, Plaintiff's claims are indeed directed at third-party's conduct and do not independently challenge Defendants' revenue-sharing activities.

Similarly, Plaintiff's material contribution argument regarding Defendants' tags, keywords, and search functions fails. First, as an initial matter, Plaintiff contends that "ISPs engage in their own speech—and, therefore are not immune under § 230—when they provide third-party content to users through search and recommendation functions created by the ISPs themselves." (Opp. at 16) (citing *Anderson v. TikTok, Inc.*, 116 F.4th 180 (3d Cir. 2024) to support this proposition). Such wholesale argument, however, disregards the critical distinction between expressive versus content-neutral search algorithms. In *Anderson*, for example, the defendant used an algorithm for the purposes of curating and displaying "a tailored compilation of videos" on the user's feed "based on a variety of factors, including the user's age and other demographics, online interactions, and other metadata." 116 F.4th at 182. Against that factual background, the court concluded that Section 230 immunity did not apply because the defendant, TikTok, took on the role of an information content provider. Those distinct facts, however, demonstrate the defendant's independent role of creating a tailored compilation of various videos, thereby developing its own curated content. Those allegations are not analogous to the allegations of the SAC, where Plaintiff only alleges that Defendants' platforms, like many online service providers, use content-neutral algorithms that then list related searches or user-uploaded, related content.

The Third Circuit in *Anderson* arrived at its conclusion, in part, by applying the Supreme Court's recent decision in *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024).

Although *Moody* did not involve Section 230 immunity, the Supreme Court acknowledged that certain social media platforms employ algorithms to "unabashedly control the content that will appear to users, exercising authority to remove, label or demote messages [that the platforms] disfavor." *Id.* at 736. Under those narrow circumstances, a service provider has embraced the responsibility of creating or curating content pursuant to what it favors or disfavors. Those actions, therefore, constitute expressive algorithms that are not, in fact, content-neutral. Indeed, the Supreme Court cautioned that its decision "therefore do[es] not deal here with feeds whose algorithms respond solely to how users act online—giving them the content they appear to want, without any regard to independent content standards." *Id.* at n.5; *see also id.* at 746 (Barrett, J., concurring) (noting that expressive speech and "First Amendment implications . . . might be different" when "a platform's algorithm just presents automatically to each user whatever the algorithm thinks the user will like—e.g., content similar to posts with which the user previously engaged"). Applying this reasoning, *Moody* and subsequent circuit decisions like *Anderson* do not disturb the long-standing precedent that online service providers do not create content or lose Section 230 immunity simply by implementing content-neutral algorithms that generate related searches or user-uploaded content based on the users' own viewing activity.

Second, attributing liability to online service providers for implementing standard and neutral website features runs afoul Ninth Circuit precedent. These standard online tools, without more, do not materially contribute to the unlawful content's development.[7] This remains true even when a defendant's online "framework . . . could be utilized for proper or improper purposes." *Roommates*, 521 F.3d at 1172; *see also Dyroff*, 934 F.3d at 1099 ("[A] website does not become a developer of content when it provides neutral tools that a user exploits to create a profile or perform a search using criteria that constitutes a protected class."); *Carafano v. Metrosplash.com, Inc.*, 339 F.3d 1119, 1124–25 (9th Cir.

---

[7] *See* (July 2024 Order at 15) ("Additionally, Plaintiff at the hearing did not deny that most tags and keywords in use on Defendants' websites are user-generated.").

2003) (holding that a service provider's "decision to structure the information provided by users" and neutral use of additional online features do not constitute content development); *Force*, 934 F.3d at 70 ("Merely arranging and displaying others' content to users of Facebook through such algorithms—even if the content is not actively sought by those users—is not enough to hold Facebook responsible as the developer or creator of that content.") (cleaned up) (citing *Roommates.Com*, 521 F.3d at 1169–70). In fact, in the Plaintiff's cited case, the Third Circuit recognized that its "holding may depart from the . . . views of other circuits" and immediately cited, as an example, to the Ninth Circuit's decision in *Dryoff*. *See Anderson*, 116 F.4th at 184 n.13 (citing *Dryoff*, 934 F.3d at 1098).

Plaintiff's SAC is devoid of any allegations demonstrating that Defendants employ their traditional website features in a manner that distinctly targets or proliferates the presence of CSAM, as compared to other users-uploaded content on their website platforms. Nor does Plaintiff allege that Defendants' tools encourage or elicit users to post CSAM, compared to users who post other content. *See Gonzalez*, 2 F.4th at 893 ("Critically, *Carafano*'s neutral tools were neutral because the website did not encourage the posting of defamatory content by merely providing a means for users to publish the profiles they created.") (internal quotation marks omitted). Put simply, Plaintiff's factual allegations do not demonstrate that these website features lack content-neutrality. Therefore, considering Plaintiff's allegations in the SAC as true, the Court finds that Section 230 immunizes Defendants from liability for Plaintiff's sex-trafficking claims. *See id.* at 894 ("Though we accept as true the TAC's allegation that Google's algorithms recommend ISIS content to users, the algorithms do not treat ISIS-created content differently than any other third-party created content, and thus are entitled to § 230 immunity.").

**B. Whether Plaintiff Has Alleged Facts to Trigger FOSTA Exception for Her Sex-Trafficking Claim**

Defendants argue that Plaintiff's allegations also fail to invoke the exception to Section 230 immunity. In 2018, Congress enacted the Allow States and Victims to Fight

Online Sex Trafficking Act ("FOSTA"), which, in turn, amended Section 230 to carve out exceptions to the immunity defense. Accordingly, Section 230(e) states that "[n]othing in [Section 230] . . . shall be construed to impair nor limit any claim in a civil action brought under section 1595 of title 18, if the conduct underlying the claim constitutes a violation of section 1591 of that title." 47 U.S.C. § 230(e)(5)(A). Turning to Section 1595, this civil statute confers a private right of action for violations of certain federal trafficking laws, such as section 1591. Section 1591, the criminal analog to section 1595, imposes sex-trafficking liability in two ways. First, liability applies to anyone who "knowingly . . . recruits, entices, harbors, transports, provides, obtains, advertises, maintains, patronizes, or solicits by any means a person . . . knowing . . . the person has not attained the age of 18 years and will be caused to engage in a commercial sex act." 18 U.S.C. § 1591(a)(1). This section is often referred to as "direct liability." Second, a person or entity may also be liable if it "knowingly . . . benefits, financially or by receiving anything of value, from participation in a venture" that engages in such acts described in § 1591(a)(1). *Id.* § 1591(a)(2). This section is often referred to as "beneficiary liability." Furthermore, the statute defines "participation in a venture" as "knowingly assisting, supporting, or facilitating a violation of subsection (a)(1)." *Id.* § 1591(e)(4). Given that the Ninth Circuit's recent decision in *Does 1–6 v. Reddit* pre-dated Plaintiff's FAC, the Court granted leave for Plaintiff to amend her Section 1591 and 1595 claims accordingly. 51 F.4th 1137 (9th Cir. 2022), *cert. denied sub nom. Does v. Reddit, Inc.*, 143 S. Ct. 2560 (2023).

Defendants contend that Plaintiff's SAC fails to allege plausible facts showing that Defendants directly engaged in sex trafficking or knowingly participated in and benefited from a sex trafficking venture. (Mot. at 21). According to Defendants, Plaintiff's allegations—namely, that they did not pursue any measure to verify Plaintiff's identity or age and remove the Videos despite repeated requests to do so—do not rise to the level of establishing participation in a sex trafficking venture. Plaintiff responds that the *Reddit* decision, which defined the scope of beneficiary liability, is inapposite to this present case because Plaintiff's claims assert direct liability, not beneficiary liability. However, the

Exhibit A

pleaded allegations do not support a reasonable inference that the Defendants are directly liable under § 1591(a)(1). Nowhere in the SAC does Plaintiff claim that Defendants' own actions knowingly "caused" Plaintiff "to engage in a commercial sex act." 18 U.S.C. § 1591(a)(1). Further, the SAC lists and refers to Plaintiff's cause of action under 18 U.S.C. §§ 1591 and 1595 as "Benefiting from a Sex Trafficking Venture." (SAC at 52).

Plaintiff's theory of beneficiary liability under § 1591(a)(2) is also unavailing. Indeed, the factual allegations in *Reddit* closely mirror the present factual allegations here. Similar to the Plaintiff's claims here, the plaintiffs in *Reddit* alleged that the defendant "provides a platform where it is easy to share child pornography, highlights subreddits that feature child pornography to sell advertising on those pages, allows users who share child pornography to serve as subreddit moderators, and fails to remove child pornography even when users report it, as the plaintiffs did in this case." 51 F.4th at 1145. The Ninth Circuit nevertheless rejected the plaintiffs' assertion that those factors considered "together . . . amount[] to knowing participation in a sex trafficking venture." *Id.*; *see also id.* ("Mere association with sex traffickers is insufficient absent some knowing 'participation' in the form of assistance, support, or facilitation."). The Ninth Circuit concluded that such allegations "suggest only that Reddit turned a blind eye to the unlawful content posted on its platform." *Id.* (internal quotation marks omitted). The Circuit Court also reasoned that the allegations did not constitute a causal relationship or "connection between the child pornography posted on Reddit and the revenue Reddit generates, other than the fact that Reddit makes money from advertising on *all popular subreddits*." *Id.* at 1145–46 (emphasis added).

Plaintiff seeks to distinguish the *Reddit* case, arguing that "Defendants' business model encourage[s] and capitalize[s] on CSAM." (Opp. at 21). Taken as true, however, *Reddit* forecloses this argument. Plaintiff does not allege that Defendants' revenue amasses from a targeted focus or knowing participation in CSAM development. Instead, the allegations merely show that Defendants gain revenue generated by all content posted by

1  third-party users. The Court therefore finds that Plaintiff's factual allegations do not trigger
2  the FOSTA exception to Section 230 immunity.[8]
3  **IV.  CONCLUSION**
4      For the foregoing reasons, the Court GRANTS Defendants' dismissal of Plaintiff's Second Amended Complaint. Moreover, because Plaintiff has not and, given the discussion above, cannot cure the deficiencies in her pleading, the dismissal is with prejudice. Accordingly, the Court orders the parties to file a proposed judgment order within twenty-one (21) calendar days from the date of this order.

    **IT IS SO ORDERED.**

DATED:  February 21, 2025

HON. SHERILYN PEACE GARNETT
UNITED STATES DISTRICT JUDGE

---

[8] Because the Court finds Section 230 bars Plaintiff's claims brought under 18 U.S.C. §§ 1591 and 1595, the Court need not readdress whether the SAC alleges plausible facts warranting extra-territorial jurisdiction, as established in 18 U.S.C. § 1596.

-16-
Exhibit A